IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY (d/b/a/ TwinSpires), <br><br>        Plaintiff, <br><br>   v. <br><br> MICHIGAN GAMING CONTROL BOARD; HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; and DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, <br><br>        Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Churchill Downs Technology Initiatives Company ("TwinSpires") alleges as follows:

## INTRODUCTION

1.      This lawsuit challenges the state of Michigan's recent, unlawful efforts to shut down the popular horserace wagering platform that TwinSpires has long offered to Michigan residents.  For nearly a half-century, it has been "the policy of the Congress . . . to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(b).  To that end, Congress enacted the Interstate Horseracing Act of 1978 ("IHA"), which sets forth the *exclusive* conditions for "off-track" betting systems like TwinSpires to accept wagers on horseracing across state lines. Michigan, however, demands that TwinSpires obtain a Michigan-specific license and partner with a separately licensed brick-and-mortar racetrack within Michigan to accept wagers for races

occurring in other states, over and above what the IHA requires.  *See* Mich. Comp. Laws § 431.308(1)(d).  While TwinSpires voluntarily possessed such a Michigan license for many years—though it has always maintained it does not need one—the state recently (and summarily) suspended that license because of separate issues with the last remaining racetrack in Michigan. Should TwinSpires continue to operate pursuant to the IHA but without a Michigan license, the state has threatened significant penalties and said things will get worse for TwinSpires.

2.      But the IHA preempts Michigan's state-specific licensing requirement.  Congress established a uniform federal framework for interstate wagering on horseracing decades ago.  It determined in the IHA that "the federal government should prevent interference by one State with the gambling policies of another," and provided that an off-track betting platform may accept interstate wagers on horseraces if it obtains three, specific consents.  TwinSpires has obtained these requisite consents for the interstate horseraces on which Michigan residents can wager, enabling TwinSpires to lawfully accept such wagers pursuant to the IHA.  TwinSpires has consent, first, from "the entity that conducts the horserace[s]" (*i.e.*, the out-of-state track where the race will be run); second, from the state that "host[s]" the horserace (*i.e.*, the state, other than Michigan, in which the track is located); and third, from the agency "with jurisdiction to regulate off-track betting" in the state where the wager is *accepted* (*i.e.*, the state agency that licenses TwinSpires to accept interstate wagers, in this case the Oregon Racing Commission).  *See* 15 U.S.C. §§ 3002(9)-(11), 3004(a).  Michigan, as a state whose residents place interstate wagers, simply has no place within the IHA's exclusive statutory scheme when there is an out-of-state track and the wager is accepted out of state.  By seeking to impose additional state licensing requirements, Michigan is not just attempting to interfere with federally-authorized wagering on interstate horseraces, it has

effectively banned such wagering—unless TwinSpires meets its demands.   The Supremacy Clause of the United States Constitution forecloses this result.

3.       Michigan's licensing regime also runs afoul of the Interstate Commerce Clause. Michigan regulations require TwinSpires to partner with an in-state brick-and-mortar racetrack before allowing it to participate in interstate commerce by accepting off-track wagers on out-of-state horseraces.   But the Commerce Clause has long been understood to bar states from "'build[ing] up . . . domestic commerce' through 'burdens upon the industry and business of other States.'"   *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).   Requiring an in-state partnership to transact interstate commerce is exactly the kind of burden and discrimination the Clause prohibits:   the licensing power Michigan claims goes well beyond regulating in-state horseracing within its borders.

4.       Michigan residents have long enjoyed wagering on one of this nation's storied pastimes and have done so with TwinSpires for well over a decade.   But given Michigan's recent conduct in suspending TwinSpires's (voluntary) Michigan license and threatening fines and other consequences, that relationship is now at risk of being irreparably harmed.   TwinSpires seeks a declaration that Michigan's state-specific licensing requirements for interstate wagers are preempted and unconstitutional and an injunction foreclosing Defendants' attempts to enforce those requirements against TwinSpires.

## PARTIES

5.       Churchill Downs Technology Initiatives Company ("TwinSpires") is a Delaware corporation.   It is a subsidiary of Churchill Downs Incorporated, an industry leader in the horseracing, online wagering, and gaming-entertainment industries anchored by its flagship event, the Kentucky Derby.   TwinSpires is licensed by the Oregon Racing Commission to operate a wagering hub based in Oregon, including TwinSpires.com, mobile apps, and a phone service, that

allows individuals to engage in advance pari-mutuel wagering on horseraces occurring outside Michigan and throughout the Nation.  TwinSpires accepts wagers at its wagering hub in Oregon from Michigan residents.

6.    Defendant Michigan Gaming Control Board ("MGCB") is the state agency responsible for licensing and regulating the conduct of horseracing and pari-mutuel wagering on the results of horseraces in Michigan.  The MGCB maintains an office at 3602 W. Grand Blvd., Detroit, Michigan 48202.

7.    Defendant Henry L. Williams, Jr., is sued in his official capacity as the Executive Director of the Michigan Gaming Control Board.  The Executive Director is charged under state law with administering the Horse Racing Act of 1995 (the "Racing Act").  Mich. Comp. Laws § 431.302(d) (defining "racing commissioner" as "the executive director of the Michigan gaming control board").  Pursuant to that Act, the Executive Director is charged with issuing all relevant horseracing and pari-mutuel wagering licenses.  In addition, the Executive Director may enforce the licensing provisions of the Racing Act through "sanctions including, but not limited to, revocation or suspension of a license, exclusion from racetrack grounds, or a fine of not more than $25,000.00 for each violation."  Mich. Comp. Laws § 431.307(3).

8.    Defendant Dana Nessel is sued in her official capacity as Attorney General for the state of Michigan.  The Attorney General is the chief law enforcement officer of the state and the head of the state's executive branch Department of Attorney General.  The Attorney General "shall supervise the work of, consult and advise the prosecuting attorneys, in all matter pertaining to the duties of their offices."  Mich. Comp. Laws § 14.30.  In addition, the Attorney General "may, when in [her] own judgment the interests of the state require it, intervene in and appear for the people of [Michigan] . . . in any cause or matter, civil or criminal, in which the people of [Michigan] may be

a party." The Attorney General serves as the MGCB's "partne[r]" in the enforcement of gaming regulations and prosecution of alleged violations of Michigan's gaming laws. *Michigan Gaming Control Board, Department of Attorney General announce guilty pleas in illegal gambling operations case in Flint*, Michigan Gaming Control Board (Nov. 18, 2024), https://www.michigan.gov/mgcb/news/2024/11/18/guilty-pleas-announced-in-flint-illegal-gambling-operations-case.

## JURISDICTION AND VENUE

9.    This civil action arises under the United States Constitution, 15 U.S.C. § 3001 *et seq.*, and 28 U.S.C. § 2201.

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343. Because TwinSpires seeks an "injunction[] to protect rights safeguarded by the Constitution," it has presented a federal question that the federal courts have jurisdiction to resolve. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

11.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 57.

12.    Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

13.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants maintain offices and perform their official statewide duties in Lansing, which is within this District.

## FACTS

**A.    TwinSpires operates the premier online wagering platform for horseracing in the United States.**

14.    TwinSpires is one of the largest and most successful wagering platforms for horseracing in the United States.  It is named for the iconic twin spires on the grandstand at Churchill Downs racetrack, a National Historic Landmark where thoroughbred racing has run continuously for nearly 150 years—since the first Kentucky Derby on May 17, 1875.  TwinSpires is one of three distinct business segments (along with Live and Historical Racing and Gaming) operated by the industry-leading racing, online wagering, and gaming entertainment company Churchill Downs Incorporated.

15.    TwinSpires is licensed by the Oregon Racing Commission as a multi-jurisdictional simulcasting and interactive wagering hub in the state of Oregon.  The TwinSpires platform offers live streaming of horseraces, replays, and an assortment of horseracing-related information.  Through its Oregon-licensed hub, TwinSpires also offers advance deposit wagering ("ADW") in jurisdictions throughout the United States.  (ADW is a form of wagering where a customer funds their account first—*i.e.*, in advance—before they wager, rather than operating on credit.)

16.    TwinSpires accepts advance-deposit wagers in a history-rich and widespread form of wagering known as "pari-mutuel wagering."  In the United States, pari-mutuel wagering began at Churchill Downs shortly after the first Kentucky Derby in the 1870s and is now the predominant means of wagering on horseracing in the United States.  Pari-mutuel wagering differs from sports betting: in pari-mutuel wagering, every dollar wagered is pooled together, and—after a certain percentage is removed as "takeout" (for the host of wagering, the racetrack, taxes, fees, etc.)—the remainder of the pool is distributed equally among all winning wagerers.  Instead of trying to beat odds set by a bookmaker, then, a pari-mutuel wagerer is simply betting that his pick will do better

than other wagerers' picks.  A host of a pari-mutuel pool does not have a vested interest in any specific outcome of any particular bet.  The host simply earns more when there are more wagers from more wagerers, leading to a bigger pool and a bigger takeout.

**B.**    **Federal law provides the exclusive regulatory framework for interstate pari-mutuel wagering on horseraces.**

17.    The first time interstate pari-mutuel horse wagering took place in the United States was on May 1, 1971, when New York's Off-Track Betting Corp. offered pari-mutuel wagering pools in New York for the Kentucky Derby.  Churchill Downs had declined to sell the rights to the race for New York's "off-track" wagering on its race to occur.  (The Governor of Kentucky even sent a letter of protest.)  New York proceeded anyway, and, according to reports, New York's off-track betting on the 97th "Run for the Roses" earned so much that a winning wager "paid three times as much" in New York as that exact same wager paid "on track" at Churchill Downs racetrack in Louisville.  This test-case success, coupled with the obvious fact that the potential upside of pari-mutuel wagering increases for all constituents as the size of the wagering pool and number of wagerers increase, made plain the vast economic upside for what we would now think of as "remote," or "off-track," betting to individuals across state lines.  That economic potential kicked off a near decade-long dispute between racetracks, horsemen associations, and state regulators on whether and how to permit and regulate interstate pari-mutuel wagering.

18.    In 1978, Congress enacted and President Jimmy Carter signed the Interstate Horseracing Act of 1978 ("IHA") to settle in one fell swoop the issue of interstate pari-mutuel wagering on horseraces.  Congress explained that the federal government needed to step in "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(a)(2), (b).  Congress found a "need for Federal action to ensure States will continue to cooperate with

one another in the acceptance of legal interstate wagers" on horseraces.  *Id.* § 3001(a)(3).  And it determined that the "Federal government should prevent interference by one State with the gambling policies of another."  *Id.* § 3001(a)(2).  By providing a single federal regulatory framework, Congress enabled the proliferation of interstate pari-mutuel betting nationwide without state interference.

19.    Since then, the IHA provides the exclusive conditions for "accept[ing] an interstate off-track wager."  15 U.S.C. § 3003.  As amended, the Act defines an "interstate off-track wager" as "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State[,] and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools."  *Id.* § 3002(3).  "[E]xcept as provided in" the IHA, such wagers are prohibited.  *Id.* § 3003.

20.    The IHA authorizes "off-track betting systems"—those that accept wagers at places other than the track where the race is run—to accept such interstate pari-mutuel wagers, so long as the off-track betting system acquires consent from three entities. 15 U.S.C. §§ 3002(7), 3004(a). Those entities are: (1) the host racing association, the entity that "conducts the horserace subject to the interstate wager," *id.* § 3002(9); (2) the host racing commission, the entity "with jurisdiction to regulate the conduct of racing within the host state," *id.* § 3002(10); and (3) the off-track racing commission, the entity "with jurisdiction to regulate off-track betting in" the state where the off-track betting system is located, *id.* § 3002(11).  That is, consent is required from (1) the track where the race is run, (2) the state entity that regulates racing for that track, and (3) the state entity

regulating the off-track betting system which accepts the interstate wagers.  Once those consents are received, off-track betting systems may accept interstate wagers nationwide.  *Id.* § 3004(a).

21.    The IHA contains no provision requiring the consent of the state in which an individual placing the wager happens to reside. This makes sense given the historic understanding that wagering is regulated in the location it is *accepted*, not where the individual placing the bet resides.  *State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953) ("[A]n offer to bet is telegraphed by a person in this city to another in New York, and the latter accepts by telegraph, the betting is done, not in Richmond, but in New York, because the offer, being accepted there, takes effect ther[e]" (internal quotation marks omitted).); *cf. Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (applying traditional rule).

## C.    TwinSpires has accepted interstate pari-mutuel wagers, pursuant to federal law, since 2007.

22.    Consistent with the IHA, TwinSpires began operating as an "off-track betting system" licensed by the Oregon Racing Commission in 2007.  Since then, TwinSpires has provided interstate pari-mutuel wagering to customers residing in certain states across the country— including Michigan—who establish and fund an account from which they place interstate pari-mutuel wagers on horseraces via telephone; the Internet, at twinspires.com; or more recently (and popularly), on mobile apps.

23.    For example, TwinSpires has long accepted interstate wagers from out-of-state customers in Michigan for horseraces run in Virginia, because it has sought and obtained all relevant consents under the IHA for accepting such wagers.  TwinSpires has consent from the Virginia race tracks that "conduct[] the horseraces" for which it accepts wagers, like Colonial Downs; from the Virginia Racing Commission, which has "jurisdiction to regulate the conduct of racing within" Virginia; and, finally, from the Oregon Racing Commission, the entity "with

jurisdiction to regulate off-track betting" in Oregon, where TwinSpires's hub operates and accepts wagers.

**D.** **Pari-mutuel wagering on horseracing has a long history in Michigan.**

24. The history of wagering in Michigan is deeply intertwined with horseracing. For much of the state's early history, Michigan banned all forms of gambling. That changed in 1933 when the state authorized pari-mutuel wagering on horseracing, making it the first form of legal gambling in the state. *See* House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan—A Primer*, at 2 (June 2017). The very first race meet with pari-mutuel wagering occurred at the State Fairgrounds in Detroit on September 2, 1933. *Id.* For the next forty years pari-mutuel wagering would be the only form of legal gambling in the state. *Id.* at 3.

25. Over time, live horseracing within Michigan declined and attendance at race meets dropped. That led the state to authorize in-state tracks to simulcast out-of-state races and accept pari-mutuel wagers, consistent with the IHA. *See* P.A. 1986, No. 108. (15 U.S.C. § 3004(a)(1). (Because the racetracks in Michigan would be *accepting the wagers in Michigan*, the IHA required those Michigan racetracks to obtain "consent" from the Michigan state regulator for wagers on out-of-state races. *See* 15 U.S.C. § 3004(a)(1).). The state began small at first, allowing its racetracks to accept wagering on only one simulcast race per racing day. But soon enough, Michigan amended its laws to broadly expand its in-state simulcast wagering. It did so "with the intent to provide . . . financial assistance to the ailing horseracing industry in Michigan." *Fiscal Focus: Horse Racing in Michigan*, at 13.

26. In 1995, Michigan repealed its existing laws regulating horseracing and enacted the Horse Racing Law, which as amended, governed horseracing and pari-mutuel wagering at *in-state* racetracks. *See* P.A. 1995, No. 279. Michigan's statute provided, for example, that state officials would issue "race meeting licenses . . . to conduct live horse racing, simulcasting, and pari-mutuel

wagering on the results of live and simulcast horse races *in this state*."  Mich. Comp. Laws § 431.308(1)(b) (emphasis added).  In addition, "track licenses" would be issued "to maintain or operate a racetrack at which 1 or more race meeting licensees may conduct licensed race meetings."  Mich. Comp. Laws § 431.308(1)(c).  And the statute allowed "full card" simulcasting, allowing in-state racetracks to televise and accept pari-mutuel wagers for a full day's slate of out-of-state races.  Mich. Comp. Laws § 431.318(2).

27.    Within a year, total wagering in Michigan increased by 50%.  And simulcasting by in-state operators became increasingly popular—and an increasing part of the state's horseracing economy.  "[O]n a Saturday in December 2016," for example, "one of Michigan's racetracks advertised 26 simulcast races . . . None of the races originated in Michigan."  *Fiscal Focus: Horse Racing in Michigan,* at 3 n.5.  As of 2017, simulcast wagering represented over 95% of horserace wagering in Michigan.  *Id*. at 9.

28.    Any boost to Michigan's in-state horseracing proved short-lived, however.  At its peak in 1975, racetrack attendance reached 3.8 million people, yet by 2007 it had fallen to 1.1 million.  *Fiscal Focus: Horse Racing in Michigan,* at 4.  In 1989, total pari-mutuel wagering on live horseraces was $443.1 million.  *Id.*  By 2016, overall pari-mutuel wagering was $103.3 million with just $4.3 million coming from in-state live horseraces.  *Id.*  The number of tracks declined from eight in 1989, to two in 2016—and the state would be left with only a single racetrack by 2019.  *Id.* State tax revenues declined precipitously too.  In 1997, Michigan collected $14.7 million in taxes on horserace wagering.  *Id.* at 10.  But for each of the next 19 years, tax revenues declined.  In 2016, the state wagering tax generated a mere $3.5 million—the smallest figure since 1949.  *Id*.

29.    At the same time as Michigan's in-state horseracing declined, online (and out-of-state) ADW platforms experienced significant growth.  For instance, TwinSpires was collecting $1.5 billion in wagers annually by 2019.

30.    In 2019, amidst the explosive growth of online ADW platforms, Michigan amended its Horse Racing Law.  *See* P.A. 2019, No. 153.

31.    For the first time, the state imposed a new licensing requirement for what it called "third-party facilitators" offering ADW to Michiganders, like TwinSpires.  The amendments define "third-party facilitators" to be "persons that have contracts with race meeting licensees to facilitate wagering on live and simulcast racing."  Mich. Comp. Laws § 431.308(1)(d).  And they purport to ban the acceptance of any pari-mutuel wagers without a third-party facilitator license from Michigan.  Mich. Comp. Laws § 431.317(10).  The amendments also state that to "solicit[] or accept[] wagers on the results of live or simulcast horse races from individuals in this state" without first securing the new Michigan license is a felony, punishable by up to five years imprisonment or a fine of up to $10,000, and "[e]ach act of solicitation or wager that is accepted" without a license "is a separate offense."  Mich. Comp. Laws § 431.317(9).  (Collectively, this Complaint refers to these provisions (Mich. Comp. Laws § 431.308(1)(d) and 431.317(9)–(10)) as the "Licensing Requirements.").  The Executive Director of MGCB may also pursue a $25,000 fine for a violation of the Licensing Requirements.  Mich. Comp. Laws § 431.307(3).

32.    To comply with the Licensing Requirements, Michigan requires a third-party facilitator to meet several conditions.  *See* Mich. Comp. Laws § 431.308(1)(d)(i)–(vi). Importantly, a third-party facilitator "must have a joint contract with all race meeting licensees and certified horsemen's organizations *in this state*."  *Id.* § 431.308(1)(d)(i) (emphasis added).  That

is, in order to "solicit[] or accept[] wagers . . . from individuals" in Michigan, the state requires "third-party facilitator" entities to partner with *in-state* brick-and-mortar horserace meet licensees.

**E.    Although unnecessary, TwinSpires follows Michigan's new Licensing Requirements and contracts with mandated in-state partners.**

33.    When Michigan amended its laws in 2019, TwinSpires had been accepting pari-mutuel wagers from Michiganders for out-of-state races pursuant to the IHA and its Oregon Racing Commission license for approximately a decade.  Indeed, TwinSpires had previously explained to MGCB that it was doing so, and MGCB ultimately did not intervene.  Nonetheless, to ensure ADW would be offered to Michigan residents without disruption, and out of a desire to work with state lawmakers and regulators to achieve positive results for the Michigan horseracing industry, TwinSpires promptly sought a third-party facilitator license pursuant to the new Licensing Requirements.

34.    TwinSpires partnered with the only existing in-state racetrack remaining in Michigan, Northville Downs, and the relevant certified horsemen's associations on June 11, 2020. In exchange for serving as TwinSpires's in-state partner for pari-mutuel wagering, TwinSpires contractually agreed to give a percentage of the total amount of money wagered by Michigan residents on TwinSpires (known in industry terms as "the handle") to Northville Downs.  Based on that agreement, TwinSpires filed its initial third-party facilitator application in the summer of 2020.

35.    On September 3, 2020, MGCB granted a "Conditional Temporary Third-Party Facilitator License" to TwinSpires.  MGCB would subsequently extend that temporary license until December 2021, when MGCB granted TwinSpires its first annual license for 2022.

36.    TwinSpires successfully renewed its license again for 2023 and 2024.

37.    Since then, TwinSpires has continued as the leading operator of online horseracing wagering in Michigan.  In 2021, it accepted 62.1% of the $35.8 million wagered in online horseracing bets from residents of the state.  And since that time, Michigan residents have trusted their wagers with TwinSpires, leading the company to consistently outperform other horseracing betting platforms.

**F.    TwinSpires applies for its 2025 third-party facilitator license.**

38.    On August 27, 2024, MGCB staff informed TwinSpires that MGCB would send out a renewal notice for TwinSpires's 2025 third-party facilitator license only after it received the race meeting licensee application from TwinSpires's in-state partner track.  As in years past, TwinSpires planned to partner with Northville Downs as the sole racetrack operating in Michigan, which submitted its application to be a race meeting licensee shortly thereafter.

39.    On September 24, 2024, MGCB staff advised TwinSpires that "renewal notices will be going out this week, with a due date of November 30th for the third-party facilitator applications."  MGCB staff further advised TwinSpires that so long as MGCB received TwinSpires's application by November 30, 2024, its "license w[ould] remain active until a decision is made on the 2024 renewal application," even though TwinSpires's current license would otherwise expire on December 31, 2024.  TwinSpires submitted its renewal application on November 26, 2024, to ensure it stayed in "good standing."

40.    On October 30, 2024, MGCB determined that Northville Downs met Michigan's standards and requirements to grant a race meeting license.  But it conditioned that license, contrary to Michigan law, on approval of yet another license:  Northville Downs's separate "track license."

41.    Michigan Compiled Laws § 431.308 requires a "track license" for "persons to maintain or operate a racetrack."  In early 2024, Northville Downs had shut down operations at

the track's longtime home in Northville—where it had continually operated since 1944—because the track was set to be razed for a new development.  (Northville Downs secured a new location, but MGCB has not yet issued a track license to Northville Downs.)

**G.     Michigan demands that TwinSpires stop accepting interstate wagers.**

42.     On December 23, 2024, MGCB Executive Director Henry L. Williams, Jr. notified TwinSpires that Northville's "track license w[ould] not be approved by January 1, 2025."  Based on MGCB's October 30, 2024 order, the Director said Northville Downs's lack of an approved track license also precluded the issuance of a race meeting license to Northville Downs. Accordingly, the Executive Director concluded, TwinSpires could no longer operate as a "third-party facilitator" in Michigan, because it lacked the requisite in-state partner with a valid race meeting license under the Licensing Requirements.  The Director summarily informed TwinSpires that "on January 1, 2025 at 12:00am, all account wagering with Michigan account holders must cease."

43.     TwinSpires responded on December 31, 2024.  It noted that TwinSpires had submitted the required renewal application on November 26, 2024, and therefore, per MGCB's September 24 representations, TwinSpires was "in good standing with" MGCB until a decision issued as to its pending application.  TwinSpires further explained that its only purported obligation as a "third-party facilitator" under the Licensing Requirements was to partner with the state's only race meeting licensee, Northville Downs, which it had done.  And TwinSpires reiterated its long-held position that TwinSpires's continued ADW operations in Michigan remained lawful because it indisputably complies with the IHA in offering interstate, "off-track" wagering to Michiganders. Indeed, that "off-track" wagering is all TwinSpires can even offer within the state, regardless of Northville Downs's licensing status:  there is not a race even scheduled in Michigan until April 2025, and such racing will only occur if Northville Downs is ultimately issued its track license.

44.    TwinSpires also explained that, even on the merits of Michigan's Licensing Requirements, the Executive Director lacked authority under state law to condition a race meeting license on granting a track license as it had purported to do with Northville Downs.  Mich. Comp. Laws § 431.314(1) allows the Executive Director to "grant or deny" an application for a race meeting license—not to hinge a grant on numerous future actions.  MGCB's order had stated that it was "granting a 2025 Race Meeting License" to Northville Downs, which was binding on the MGCB.  While TwinSpires noted that the Executive Director could revoke or suspend a license that it had granted, it could not do so without following the requisite procedures under the Racing Act.  *See* Mich. Comp. Laws § 431.314(4), (5).  MGCB had not followed those procedures for Northville Downs's race meeting license, so, TwinSpires explained, Northville Downs's race meeting license should remain operative.

45.    On January 3, 2025, MGCB staff responded.  It stated that because Northville Downs had not obtained a track license, it could not obtain the race meeting license (even though the Board had already issued the race meeting license).  According to MGCB, without a partner with a race meeting license, TwinSpires was precluded from operating in Michigan.  MGCB stated that TwinSpires does not have "unfettered access to Michigan residents," but instead its "operations are contingent" upon its in-state partner fulfilling its race meeting licensing requirements.  MGCB neither acknowledged nor disputed that TwinSpires met the requirements of the IHA.  Instead, the MGCB said that if TwinSpires continued to accept wagers from Michigan residents—as it had at that point done for well over a decade pursuant to the IHA—TwinSpires would be "subjecting [it]self to administrative, civil, and criminal penalties" and "jeopardizing [its] suitability for licensure."

46.    On January 6, 2025, MGCB again demanded that TwinSpires shut off its pari-mutuel wagering platform in Michigan or "things would get worse" for TwinSpires.  On January 7, 2025, MGCB notified TwinSpires that it had "summarily suspended" TwinSpires's third-party facilitator license because TwinSpires had "failed to cease all account wagering with Michigan account holders effective January 1, 2025."  MGCB again made no mention of TwinSpires's continuous and ongoing compliance with the IHA.

47.    TwinSpires informed MGCB that it plans to keep operating and accepting pari-mutuel wagers from Michigan residents, as expressly permitted by the IHA.

**H.    TwinSpires will suffer irreparable injury.**

48.    MGCB's actions have subjected TwinSpires to irreparable injury and placed it in a perilous position.  If TwinSpires is forced to cease its interstate ADW offering in Michigan, which federal law clearly permits, then it stands to wrongfully lose millions of dollars in revenue for which TwinSpires would never be able to recover damages, because the state is immune from money damages.  *See Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997).  And since interstate pari-mutuel wagering is at the core of TwinSpires's operations in Michigan, compliance with MGCB's order would mean the shutdown of effectively its entire in-state "enterprise." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).  That shutdown would result in the loss of substantial customer goodwill and significant damage to TwinSpires's competitive position.  Those injuries are irreparable.  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *see also Performance Unlimited*, 52 F.3d at 1382; *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014) (finding irreparable harm where plaintiff would never be able to recover damages against the federal government).

49.     On the other hand, Michigan has made clear it can and likely will pursue "administrative, civil, and criminal penalties" pursuant to the state's Licensing Requirements if TwinSpires continues to offer ADW to Michigan consumers under the IHA.  That includes potential criminal prosecution or a fine of up to $10,000, *see* Mich. Comp. Laws §§ 431.307(3), 431.317(9), for engaging in interstate commerce expressly authorized under federal law.  This, too, poses irreparable injury to TwinSpires—not only from the threat of impending criminal sanctions, but the corresponding "loss of customer goodwill and competitive position" such sanctions cause.  *Hall*, 878 F.3d at 530.

50.     These extraordinary threats to TwinSpires's business, coming for the first time since it began offering its platform to Michigan residents over a decade ago, gives TwinSpires no choice but to ask this Court to protect its legal rights now.

## COUNT I

### (Supremacy Clause)

51.     TwinSpires repeats and realleges paragraphs 1 through 50.

52.     The Supremacy Clause of the United States Constitution establishes that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl.2.  "Under the Supremacy Clause, from which our preemption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."  *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 96, 108 (1992) (citation omitted).

53.     The IHA occupies the field of interstate wagering on horseraces.  Congress emphasized that "the Federal government should prevent interference by one State with the gambling policies of another."  15 U.S.C. § 3001(a)(2).  And the IHA was "Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers."

*Id.* § 3001(a)(3).  Congress thus expressly provided that "[n]o person may accept an interstate off-track wager *except as provided in this chapter*" of federal law.  *Id.* § 3003 (emphasis added).  The IHA is the exclusive source for regulation of interstate horseracing wagers.

54.    In addition, Congress provided detailed and comprehensive provisions relating to the consent required before an off-track betting system can accept an interstate off-track wager.  Consent needs to be given by the "entity that conducts the horserace," in other words the track where the race will be run.  15 U.S.C. § 3002(9).  Consent must too come from the state which is the "host" of the race subject to the interstate wager.  *Id.* § 3002(10).  And finally, consent must come from the entity "with jurisdiction to regulate off-track betting" in the state where the wager is *accepted*—not where the individual who is wagering lives or places the wager.  *Id.* § 3002(11).  These consent provisions "leave no room for supplementation by the State."  *Horseman's Benevolent & Protective Ass'n, Inc., v. Zonak*, 2008 WL 11453695, at *5 (S.D. Ohio Sept. 23, 2008).

55.    "The logical interpretation of the [IHA's] plain text is that Congress intend[ed] to preempt the limited field of interstate off-track wagering," while "leav[ing] regulation of intrastate wagering to the states."  *Zonak*, 2008 WL 11453695, at *7.  Because Michigan's Licensing Requirements purport to regulate interstate off-track wagering when "Congress intended to occupy the entire field of interstate horserace wagering," they are preempted.  *Id.* at *5.

56.    The Licensing Requirements also conflict with the IHA.  A state law is preempted under conflict preemption when a federal law "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478–79 (2018).  In fact, given Congress's explicit statement that it sought to prevent "interference" by states, the IHA "provisions not only impose . . . obligations"

on systems like TwinSpires, "but also confer a federal right to be free from any other . . . requirements." *Id.* at 479.  After all, unless an off-track betting system complies with the IHA, such wagering is generally illegal.  It is only permitted "as provided" by the IHA.  15 U.S.C. § 3003.  To acquire the federal right to accept interstate wagers, the IHA sets out specific federal conditions.  But that right would be rendered meaningless if Michigan could impose its own local conditions (carrying with them the threat of significant civil and criminal penalties), like the Licensing Requirements, to bar what federal law plainly permits.

57.    The Supremacy Clause does not permit Michigan to enforce Licensing Requirements that federal law preempts.

## COUNT II

### (Interstate Commerce Clause)

58.    TwinSpires repeats and realleges paragraphs 1 through 50.

59.    The Commerce Clause gives Congress the power to "regulate Commerce . . . among the several States."  U.S. Const. art. 1, § 8, cl. 3.  It addresses "a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation."  *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citation omitted).

60.    The Supreme Court has held that the Commerce Clause "of its own force prohibits the States from restricting interstate trade even when Congress has not passed a law imposing such a limit on them."  *Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023).  This is known as the "dormant" or "negative" aspect of the Commerce Clause.  *Id.*  "State laws offend" the dormant "Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon

the industry and business of other States.'"  *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443).

61.     To determine whether a state law violates the dormant Commerce Clause, courts must conduct two inquiries.  *Truesdell*, 80 F.4th at 768.  First, a court must evaluate whether a state law "'discriminates' against out-of-state economic interests to benefit local economic interests."  *Id.* (quoting *C&A Carbone v. Town of Clarkstown*, 511 U.S. 383, 390 (1994)).  A plaintiff can demonstrate that the law is discriminatory "on its face," has a "discriminatory effect," or has a "discriminatory purpose."  *Id.* at 769.  Where a law does so, the state law cannot survive unless the state "meet[s] a demanding test to save it."  *Id.*  Second, even if a law does not discriminate, a court will determine whether the law still causes "substantial harm" to interstate commerce.  *Nat'l Pork Producers*, 598 U.S. at 385.  A law causes "substantial harm" to interstate commerce when its "interstate burdens clearly exceed its local benefits" under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Truesdell*, 80 F.4th at 768 (cleaned up).

62.     State regulatory regimes that seek to "'hoard' commerce 'for the benefit of' in-state merchants" are discriminatory.  *Nat'l Pork Producers*, 598 U.S. at 372–73.  Thus, the Supreme Court has long "held . . . invalid" so-called "local processing requirements" that "bar the import" of a "service" within a state absent engaging with an in-state service—whether it be in-state solid waste processing, shrimp packaging, or milk pasteurizing.  *Carbone*, 511 U.S. at 391–92 (collecting cases).  The "essential vice" of these state requirements is that they "deprive[]" out-of-state enterprises access to "local demand for their services."  *Id.* at 392.  That is, unless those enterprises comply with the state-imposed requirement "for the benefit of local businesses," they are totally barred from offering their services within the state.  *Id.*  States cannot regulate interstate commerce in this way.  After all, the requirement to economically support a given state's in-state

businesses is little different from a de facto tariff on interstate commerce.  *Cf. W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994) ("[C]ases are filled with state laws that aspire to reap some of the benefits of tariffs by other means.").

63.    Michigan's Licensing Requirements for third-party facilitators cannot survive dormant Commerce Clause scrutiny because they are discriminatory.  Like other invalid local processing requirements, Michigan requires all off-track betting systems, like TwinSpires, to partner with an in-state race meeting licensee to offer interstate wagering, even if the bets are for races happening outside Michigan.  *See* Mich. Comp. Laws § 431.308(1)(d).  This is nothing more than a forced and discriminatory subsidy for local industry.  In addition, the law automatically privileges in-state pari-mutuel wagering entities (which can conduct interstate pari-mutuel wagering without an additional in-state partner), while out-of-state entities like TwinSpires must always maintain an in-state partnership.  It is no different than if Michigan required any online retailer to partner with an in-state brick-and-mortar store before it could accept orders from individuals in Michigan.  States cannot condition access to "local demand" for interstate commerce on economic support for local businesses.

**PRAYER FOR RELIEF**

TwinSpires respectfully requests that the Court enter an order and judgement against Defendants:

a.  Declaring that the Licensing Requirements are preempted by the Interstate Horseracing Act of 1978, insofar as Michigan state law purports to regulate the acceptance of interstate pari-mutuel wagers on horseraces outside of Michigan.

b.  Declaring that the Licensing Requirements violate the Interstate Commerce Clause, insofar as Michigan state law purports to regulate the acceptance of interstate pari-mutuel wagers on horseraces outside of Michigan.

c.  Preliminarily and permanently enjoining Defendants, their agents, employees, and successors from enforcing the Licensing Requirements to prevent the acceptance of interstate pari-mutuel wagers on horseraces outside of Michigan.

d.  Granting all other relief that the interests of justice require.

Dated:  January 12, 2025                        Respectfully submitted,


    /s/ Patrick G. Seyferth
BUSH SEYFERTH PLLC

Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
linkous@bsplaw.com

GIBSON, DUNN & CRUTCHER LLP

Thomas H. Dupree, Jr.*
John W. Tienken*
1700 M St N.W.
Washington, DC 20036
202-955-8500
TDupree@gibsondunn.com
JTienken@gibsondunn.com

Christine Demana*
2001 Ross Ave., Ste. 2100
Dallas, TX  75201
214-698-3246
CDemana@gibsondunn.com

  *Applications for admission forthcoming

*Attorneys for Plaintiff*