# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY (d/b/a/ TwinSpires), | Case No. 1:25-cv-00047 |
| Plaintiff, | Hon. Hala Y. Jarbou |
| v. | Magistrate Judge Maarten Vermaat |
| MICHIGAN GAMING CONTROL BOARD; HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; and DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## EXPEDITED CONSIDERATION REQUESTED

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Churchill Downs Technology Initiatives Company (d/b/a TwinSpires) ("TwinSpires"), moves the Court for an order for preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

This Motion is based on the accompanying Brief, the exhibits thereto, and such other written and oral argument as may be presented to the Court.

As required by Local Rule 7.1(d)(i), undersigned counsel hereby certifies that on January 17, 2025, there was a conference between undersigned counsel and counsel for Defendants in which undersigned counsel explained the nature of the motion and requested, but did not obtain, concurrence in the relief sought.

WHEREFORE, TwinSpires respectfully requests that this Court enter an order granting this Motion for Preliminary Injunction, and awarding such other relief that the Court deems appropriate.

January 17, 2025                                      Respectfully submitted,

                                                     /s/Derek J. Linkous
                                                     Patrick G. Seyferth (P47575)
                                                     Derek J. Linkous (P82268)
                                                     **BUSH SEYFERTH PLLC**
                                                     100 West Big Beaver, Suite 400
                                                     Troy, MI 48084
                                                     (248) 822-7800
                                                     seyferth@bsplaw.com
                                                     linkous@bsplaw.com

                                                     Thomas H. Dupree, Jr.*
                                                     John W. Tienken*
                                                     **GIBSON, DUNN & CRUTCHER LLP**
                                                     1700 M St N.W.
                                                     Washington, DC 20036
                                                     202-955-8500
                                                     TDupree@gibsondunn.com
                                                     JTienken@gibsondunn.com

                                                     Christine Demana*
                                                     **GIBSON, DUNN & CRUTCHER LLP**
                                                     2001 Ross Ave., Ste. 2100
                                                     Dallas, TX  75201
                                                     214-698-3246
                                                     CDemana@gibsondunn.com

                                                     *Attorneys for Plaintiff*

                                                     *Application for admission filed or
                                                     forthcoming*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHURCHILL DOWNS TECHNOLOGY
INITIATIVES COMPANY (d/b/a/
TwinSpires),

               Plaintiff,

     v.

MICHIGAN GAMING CONTROL BOARD;
HENRY L. WILLIAMS, JR., in his official
capacity as Executive Director of the Michigan
Gaming Control Board; DANA NESSEL, in
her official capacity as Attorney General of the
State of Michigan,

               Defendants.

Case No. 1:25-cv-00047

Hon. Hala Y. Jarbou

**ORAL ARGUMENT REQUESTED**

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

  A.  TwinSpires Operates The Premier Online Wagering Platform For Horseracing In The United States. ..................................................................................................... 3

  B.  Federal Law Provides The Exclusive Regulatory Framework For Interstate Pari-Mutuel Wagering On Horseraces. ..................................................................................... 4

  C.  TwinSpires Has Accepted Interstate Pari-Mutuel Wagers, As Authorized By Federal Law, Since 2007 ......................................................................................................... 6

  D.  Pari-Mutuel Wagering On Horseracing Has A Long History In Michigan. ...................... 7

  E.  Although Unnecessary, TwinSpires Follows Michigan's New Licensing Requirements And Contracts With Mandated In-State Partners. .................................................... 10

  F.  TwinSpires Applies For Its 2025 Third-Party Facilitator License. ................................11

  G.  Michigan Demands That TwinSpires Stop Accepting Interstate Wagers. ...................... 12

LEGAL STANDARD ............................................................................................... 14

ARGUMENT ............................................................................................................ 15

  I.  TwinSpires Is Likely To Succeed On The Merits That Michigan's Licensing Requirements Are Unconstitutional. .......................................................................... 15

    A.  The Supremacy Clause Bars Enforcement Of The Licensing Requirements. .............. 15

      1.  The IHA exclusively occupies the field of interstate pari-mutuel wagering. .......... 16

      2.  Michigan's Licensing Requirements conflict with the IHA's commands. ............... 20

    B.  The Dormant Commerce Clause Bars Michigan's Discriminatory Licensing Requirements. ..................................................................................................... 23

      1.  Michigan's Licensing Requirements discriminate against out-of-state companies. . 24

      2.  Michigan's Licensing Requirements are no different than discriminatory taxes. ..... 26

  II.  TwinSpires Will Suffer Irreparable Injury From Irrecoverable Loss To Its Business And Goodwill. ............................................................................................................. 28

  III.  The Public Interest And The Balance Of Equities Weigh In Favor Of Granting A Preliminary Injunction. ....................................................................................... 31

CONCLUSION ........................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) .................................................................................................22

*Arizona v. United States*,
  567 U.S. 387 (2012) ...............................................................................15, 16, 17, 20, 21

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) .................................................................................................19

*Att'y Gen. v. PowerPick Club*,
  783 N.W.2d 515 (Mich. Ct. App. 2010) ...........................................................6, 19

*Breeze Smoke LLC v. Yatin Enters. Inc.*,
  No. 1:22-CV-1182, 2023 WL 3070893 (W.D. Mich. Apr. 25, 2023) ....................14

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) .................................................................................................23

*C & A Carbone, Inc. v. Town of Clarkstown*,
  511 U.S. 383 (1994) .............................................................................................25, 26

*Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp., Mich.*,
  82 F.4th 442 (6th Cir. 2023) ..................................................................................14

*Chamber of Com. of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) .................................................................................29

*Comptroller of Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015) .............................................................................................23, 26

*CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*,
  727 F. Supp. 3d 641 (E.D. Ky. 2024) ........................................................16, 20, 22

*Dahl v. Bd. of Trustees v. W. Mich. Univ.*,
  15 F.4th 728 (6th Cir. 2021) .....................................................................................31

*Dep't of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008) .................................................................................................24

*Energy Michigan, Inc. v. Michigan Public Service Comm'n*,
  Nos. 23-1280/1322/1324, 23-1323, 23-1324, 2025 WL 211975 (6th Cir. Jan.
  16, 2025) ...............................................................................................2, 25, 26, 28

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ................................................................................16

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs.*
   *Litig.*,
   65 F.4th 851 (6th Cir. 2023) ................................................................22

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
   505 U.S. 88 (1992) ................................................................................21

*Granholm v. Heald*,
   544 U.S. 460 (2005)........................................................23, 25, 26, 28

*Guy v. Baltimore*,
   100 U.S. 434 (1880).........................................................................2, 24

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
   878 F.3d 524 (6th Cir. 2017) ..........................................................29, 30

*Highland Coop v. City of Lansing*,
   492 F. Supp. 1372 (W.D. Mich. 1980) ...............................................31

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985)..............................................................................15

*Horseman's Benevolent & Protective Ass'n, Inc., v. Zonak*,
   2008 WL 11453695 (S.D. Ohio Sept. 23, 2008) .......................17, 18, 21

*Isbrandtsen Co. v. Johnson*,
   343 U.S. 779 (1952)..............................................................................19

*Kansas v. Garcia*,
   589 U.S. 191 (2020)....................................................................16, 17, 22

*Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park*
   *Racing Ass'n, Inc.*,
   20 F.3d 1406 (6th Cir. 1994) ..........................................................20, 21

*Kentucky v. Biden*,
   57 F.4th 545 (6th Cir. 2023) ................................................................31

*Kentucky v. United States ex rel. Hagel*,
   759 F.3d 588 (6th Cir. 2014) ...............................................................29

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012)..........................................................................15, 20

*LensCrafters, Inc. v. Robinson,*
    403 F.3d 798 (6th Cir. 2005) ........................................................................28

*Lescallett v. Commonwealth,*
    17 S.E. 546 (Va. 1893)..................................................................................19

*Maryland v. Louisiana,*
    451 U.S. 725 (1981)......................................................................................15

*Matthews v. Centrus Energy Corp.,*
    15 F.4th 714 (6th Cir. 2021) ........................................................................16

*McQuestern v. Steinmetz,*
    58 A. 876 (N.H. 1904) .................................................................................19

*Merck Sharp & Dohme Corp. v. Albrecht,*
    587 U.S. 299 (2019)......................................................................................22

*Mik v. Fed. Home Mortg. Corp.,*
    743 F.3d 149 (6th Cir. 2014) ........................................................................22

*Moltan Co. v. Eagle-Picher Indus., Inc.,*
    55 F.3d 1171 (6th Cir. 1995) ........................................................................31

*Moskovic v. City of New Buffalo,*
    No. 1:21-CV-144, 2021 WL 1422680 (W.D. Mich. Apr. 15, 2021) ................29, 30

*Mumford v. Basinski,*
    105 F.3d 264 (6th Cir. 1997) ........................................................................29

*Murphy v. NCAA,*
    584 U.S. 453 (2018)...........................................................................16, 17, 18, 19

*Mut. Pharm. Co. v. Bartlett,*
    570 U.S. 472 (2013)......................................................................................15

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023).............................................................................2, 23, 24, 25

*Northville Downs v. Granholm,*
    622 F.3d 579 (6th Cir. 2010) ........................................................................26

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023) ................................................................28, 29, 31

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ................................................................29, 30

*Palmer v. Michigan*,
  No. 1:22-cv-90, 2022 WL 908966 (W.D. Mich. Mar. 29, 2022) ...........................................31

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
  52 F.3d 1373 (6th Cir. 1995) ...................................................................................................29

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
  822 F.2d 1390 (6th Cir. 1987) .................................................................................................31

*State ex rel. Reading v. W.U. Tel. Co.*,
  57 N.W.2d 537 (Mich. 1953)...............................................................................................6, 19

*Rich v. State*,
  42 S.W. 291 (Tex. Crim. Ct. App. 1897)................................................................................19

*Samantar v. Yousuf*,
  560 U.S. 305 (2010).................................................................................................................19

*Saratoga Harness Racing, Inc. v. City of Saratoga Springs*,
  390 N.Y.S.2d 240 (N.Y. App. Div. 1976) ..............................................................................19

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*,
  989 F.2d 1266 (1st Cir. 1993) .................................................................................................17

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019)...........................................................................................................23, 24

*Toomer v. Witsell*,
  334 U.S. 385 (1948).................................................................................................................25

*Torres v. Precision Indus., Inc.*,
  995 F.3d 485 (6th Cir. 2021) ...................................................................................................16

*Truesdell v. Friedlander*,
  80 F.4th 762 (6th Cir. 2023) .......................................................................................24, 25, 26

*United States v. Truesdale*,
  152 F.3d 443 (5th Cir. 1998) ...................................................................................................19

*Verizon North Inc. v. Strand*,
  309 F.3d 935 (6th Cir. 2002) ...................................................................................................21

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019).................................................................................................................16

*W. Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994).................................................................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).................................................................................14

**Constitutional Provisions**

U.S. Const. art. I..................................................................................23

U.S. Const. art. VI................................................................................15

**Statutes**

15 U.S.C. § 3001..................................................................1, 5, 17, 18, 20

15 U.S.C. § 3002...................................................................2, 5, 6, 7, 17, 18

15 U.S.C. § 3003..........................................................................5, 16, 17

15 U.S.C. § 3004...............................................................6, 7, 17, 18, 21

15 U.S.C. § 3005...................................................................................21

15 U.S.C. § 3006...................................................................................21

Mich. Comp. Laws § 431.307...........................................................9, 30

Mich. Comp. Laws § 431.308.................................1, 8, 9, 12, 24, 28

Mich. Comp. Laws § 431.314...............................................................13

Mich. Comp. Laws § 431.317...........................................................9, 30

Mich. Comp. Laws § 431.318...................................................8, 10, 25

P.A. 1986, No. 108.................................................................................7

P.A. 1995, No. 279.................................................................................8

P.A. 2019, No. 153.................................................................................9

Pub. L. 95-515 (1978)..........................................................................17

**Regulations**

OAR 462-200-0310 ..............................................................................18

OAR 462-220-0060 ..............................................................................19

**Other Authorities**

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) ...........................22

Ed DeRosa, *What Does Pari-Mutuel Betting Mean In Horse Racing* .............................................4

House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan—A Primer* (June 2017) ...................................................................................................................7, 8, 9

*Internet Gambling Prohibition Act of 1999: Hearing on H.R. 3125 Before the Subcommittee on Crime of the House Committee on the Judiciary*, 106th Cong. 59 (2000) ...................................................................................................17

Jenny Tang, *TwinSpires License Suspended in Michigan Over Illegal Horse Race Betting*, Gambling Industry News (Jan. 13, 2025)....................................................30

Steve Cady, *Betting on Derby Opens Here Today*, N.Y. Times, Apr. 28, 1971 ............................4

Steve Cady, *OTB Payoff is $59*, N.Y. Times, May 2, 1971 ............................................4

Ziv Chen, *Michigan Gaming Control Board Suspends TwinSpires for Violating State Gaming Laws*, Sportsbook Review (Jan. 13, 2025).......................................30

## INTRODUCTION

TwinSpires seeks a preliminary injunction to enjoin Michigan's recent, unlawful efforts to shut down the popular horserace wagering platform that TwinSpires has long offered to Michigan residents.  For nearly a half-century, it has been "the policy of the Congress . . . to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(b).  To that end, Congress enacted the Interstate Horseracing Act of 1978 ("IHA"), which sets forth the exclusive conditions for off-track wagering systems like TwinSpires to accept wagers on horseracing across state lines.  Michigan, however, demands that TwinSpires obtain a Michigan-specific license and partner with a separately licensed brick-and-mortar racetrack within Michigan to accept wagers for races occurring in other states, over and above what the IHA requires.  *See* Mich. Comp. Laws § 431.308(1)(d).  While TwinSpires voluntarily possessed such a Michigan license for many years—though it has always maintained it does not need one—the state recently (and summarily) suspended that license because of separate issues with the sole remaining racetrack in Michigan.  Should TwinSpires continue to operate pursuant to the IHA but without a Michigan license, the state has threatened significant penalties and said "things would get worse" for TwinSpires.

The IHA preempts Michigan's licensing requirement.  Congress established a uniform federal framework for interstate wagering on horseracing decades ago.  It determined in the IHA that "the federal government should prevent interference by one State with the gambling policies of another," and provided that an off-track wagering platform may accept interstate wagers on horseraces if it obtains three specific consents.  TwinSpires has obtained these requisite consents, enabling TwinSpires to lawfully accept such wagers under the IHA.  TwinSpires has consent, first, from "the entity that conducts the horserace[s]" (*i.e.*, the out-of-state track where the race will be

run); second, from the state that "host[s]" the horserace (*i.e.*, the state, other than Michigan, in which the track is located); and third, from the agency "with jurisdiction to regulate off-track betting" in the state where the wager is *accepted* (*i.e.*, the state agency that licenses TwinSpires to accept interstate wagers, in this case the Oregon Racing Commission). *See* 15 U.S.C. §§ 3002(9)-(11), 3004(a).  Michigan, as a state whose residents place interstate wagers, simply has no place within the IHA's exclusive statutory scheme when there is an out-of-state track and the wager is accepted out of state.  By seeking to impose additional state licensing requirements, Michigan is not just attempting to interfere with federally authorized wagering on interstate horseraces, it has effectively banned such wagering—unless TwinSpires accedes to its demands.   The Supremacy Clause of the United States Constitution forecloses this result.

Michigan's licensing regime also runs afoul of the Interstate Commerce Clause.  Michigan regulations require TwinSpires to partner with an in-state brick-and-mortar racetrack before allowing it to participate in interstate commerce by accepting off-track wagers on out-of-state horseraces.  But the Commerce Clause has long been understood to bar states from "'build[ing] up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).   The licensing power Michigan claims goes well beyond what the Constitution permits.   Requiring an in-state partnership to transact interstate commerce is exactly the kind of burden and discrimination the Clause prohibits.  Michigan's requirements are akin to a mandate that any online retailer partner with an in-state brick-and-mortar store before it could accept orders from individuals in Michigan. Such "state laws that ban or restrict interstate transactions in favor of local ones" are presumptively invalid. *Energy Michigan, Inc. v. Michigan*

*Public Service Comm'n*, Nos. 23-1280/1322/1324, 23-1323, 23-1324,  2025 WL 211975, *9 (6th Cir. Jan. 16, 2025) (cleaned up).

Michigan residents have long enjoyed wagering on one of this nation's storied pastimes and have done so with TwinSpires for well over a decade.  But given Michigan's recent conduct in suspending TwinSpires's Michigan license and threatening fines and other consequences, that relationship is now at risk of being irreparably harmed.  TwinSpires seeks an injunction to stop the state from enforcing its licensing requirements for interstate wagers because those requirements are preempted and unconstitutional.

## BACKGROUND

### A.    TwinSpires Operates The Premier Online Wagering Platform For Horseracing In The United States.

TwinSpires is one of the largest and most successful wagering platforms for horseracing in the United States.  It is named for the iconic twin spires on the grandstand at Churchill Downs racetrack, and is one of Churchill Downs Incorporated's three distinct business segments (along with Live & Historical Racing and Gaming).  Declaration of Benjamin Murr (Jan. 17, 2025) ("Decl.") (attached hereto with accompanying Exhibits A–H) ¶ 8; Ex. A, at 4–9.

TwinSpires is licensed by the Oregon Racing Commission as a multi-jurisdictional simulcasting and interactive wagering hub in the state of Oregon.  Ex. B.  The TwinSpires platform offers live streaming of horseraces, replays, and an assortment of horseracing-related information. Ex. A, at 6.  Through its Oregon-licensed hub, TwinSpires also offers advance deposit wagering ("ADW") in jurisdictions throughout the United States.  *See* Ex. A, at 6.  (ADW is a form of wagering where a customer funds their account first—*i.e.*, in advance—before they wager, rather than operating on credit.  *See* Ex. A, at 6.)

3

TwinSpires accepts advance-deposit wagers in a history-rich and widespread form of wagering known as "pari-mutuel wagering."  *See* Ex. A, at 6; Decl. ¶¶ 10–11.  Pari-mutuel wagering differs from sports betting: in pari-mutuel wagering, every dollar wagered is pooled together into a "handle," and—after a certain percentage is removed as "takeout" (for the host of wagering, the racetrack, taxes, fees, etc.)—the remainder of the pool is distributed equally among all winning wagerers.  *See* Ed DeRosa, *What Does Pari-Mutuel Betting Mean In Horse Racing*, TwinSpires,    https://www.twinspires.com/betting-guides/what-is-pari-mutuel-betting/    (last accessed January 14, 2025).

**B.**    **Federal Law Provides The Exclusive Regulatory Framework For Interstate Pari-Mutuel Wagering On Horseraces.**

The first time interstate pari-mutuel horse wagering took place in the United States was on May 1, 1971, when New York's Off-Track Betting Corp. offered pari-mutuel wagering pools in New York for the Kentucky Derby.  *See* Steve Cady, *Betting on Derby Opens Here Today*, N.Y. Times, Apr. 28, 1971, at 53; Steve Cady, *OTB Payoff is $59*, N.Y. Times, May 2, 1971, at S1. Churchill Downs had declined to sell the rights to the race for New York's "off-track" wagering on its race to occur.  *See* Cady, *Betting on Derby Opens Here Today*, at 53.  New York proceeded anyway, and, according to reports, New York's off-track betting on the 97th "Run for the Roses" earned so much that a winning wager "paid three times as much" in New York as that exact same wager paid "on track" at Churchill Downs in Louisville.  *Id.*  This test-case success, coupled with the obvious fact that the potential upside of pari-mutuel wagering increases for all constituents as the size of the wagering pool and number of wagerers increase, made plain the vast economic upside for "off-track" wagering across state lines.  That economic potential kicked off a near decade-long dispute between racetracks, horsemen's associations, and state regulators on whether and how to permit and regulate interstate pari-mutuel wagering.

4

In 1978, Congress enacted and President Jimmy Carter signed the Interstate Horseracing Act of 1978 ("IHA") to settle in one fell swoop the issue of interstate pari-mutuel wagering on horseraces.  Congress explained that the federal government needed to step in "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(a)(2), (b).  Congress found a "need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers" on horseraces.  *Id.* § 3001(a)(3).  And it determined that the "Federal government should prevent interference by one State with the gambling policies of another."  *Id.* § 3001(a)(2).  By providing a single federal regulatory framework, Congress enabled the proliferation of interstate pari-mutuel betting nationwide without individual state interference.

Since then, the IHA provides the exclusive conditions for "accept[ing] an interstate off-track wager."  15 U.S.C. § 3003.  As amended, the Act defines an "interstate off-track wager" as "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State[,] and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools."  *Id.* § 3002(3).  "[E]xcept as provided in" the IHA, such wagers are prohibited.  *Id.* § 3003.

The IHA authorizes "off-track betting systems"—those that accept wagers at places other than the track where the race is run—to accept such interstate pari-mutuel wagers, so long as the off-track betting system acquires consent from three entities.  15 U.S.C. §§ 3002(7), 3004(a).  Those entities are: (1) the host racing association, the entity that "conducts the horserace subject to the interstate wager," *id.* § 3002(9); (2) the host racing commission, the entity "with jurisdiction

to regulate the conduct of racing within the host State," *id.* § 3002(10); and (3) the off-track racing commission in the "off-track State," the entity "with jurisdiction to regulate off-track betting in" the state in which "the interstate off-track wager is accepted," *id.* § 3002(6), (11).  That is, consent is required from (1) the track where the race is run, (2) the state entity that regulates racing for that track, and (3) the state entity regulating the off-track betting system that accepts the interstate wagers.  Once those consents are received, off-track betting systems may accept interstate wagers nationwide.  *Id.* § 3004(a).

The IHA contains no provision requiring the consent of the state in which an individual placing the wager happens to reside.  This makes sense given the historic understanding that wagering is regulated in the location it is *accepted*, not where the individual placing the bet resides.  *State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953) ("[A]n offer to bet is telegraphed by a person in this city to another in New York, and the latter accepts by telegraph, the betting is done, not in Richmond, but in New York, because the offer, being accepted there, takes effect ther[e]." (quotation marks omitted)); *cf. Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (applying traditional rule).

## C.    TwinSpires Has Accepted Interstate Pari-Mutuel Wagers, As Authorized By Federal Law, Since 2007.

Consistent with the IHA, TwinSpires began operating as an "off-track betting system" licensed by the Oregon Racing Commission in 2007.  Decl. ¶ 14.  Since then, TwinSpires has provided interstate pari-mutuel wagering to customers residing in certain states across the country—including Michigan (since approximately 2010)—who establish and fund an account from which they place interstate pari-mutuel wagers on horseraces via telephone; the Internet, at twinspires.com; or more recently (and popularly), on mobile apps.  Decl. ¶¶ 22–23.

For example, TwinSpires accepted interstate wagers from out-of-state customers in Michigan for certain horseraces run in Pennsylvania in 2024, because it has sought and obtained all relevant consents under the IHA for accepting such wagers. Decl. ¶¶ 16–21; Ex. C. TwinSpires has consent from the Pennsylvania racetrack that "conducts th[ose] horseraces"; from the Pennsylvania Racing Commission, which has "jurisdiction to regulate the conduct of racing within" Pennsylvania; and, finally, from the Oregon Racing Commission, the entity "with jurisdiction to regulate off-track betting" in Oregon, where TwinSpires's hub operates and accepts wagers. Decl. ¶¶ 19–21; 15 U.S.C. §§ 3002(10)-(11), 3004(a).

**D.      Pari-Mutuel Wagering On Horseracing Has A Long History In Michigan.**

The history of wagering in Michigan is deeply intertwined with horseracing. For much of the state's early history, Michigan banned all forms of gambling. That changed in 1933 when the state authorized pari-mutuel wagering on horseracing, making it the first form of legal gambling in the state. *See* House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan—A Primer*, at 2, (June 2017), https://www.house.mi.gov/hfa/PDF/Agriculture/FiscalFocus_Horse_Racing_in_Michigan.pdf. The very first race meet with pari-mutuel wagering occurred at the State Fairgrounds in Detroit on September 2, 1933. *Id.* For the next 40 years pari-mutuel wagering would be the only form of legal gambling in the state. *Id.* at 3.

Over time, live horseracing within Michigan declined and attendance at race meets dropped. That led the state to authorize in-state tracks to simulcast out-of-state races and accept pari-mutuel wagers, consistent with the IHA. *See* P.A. 1986, No. 108. (Because the racetracks in Michigan would be *accepting the wagers in Michigan*, the IHA required those Michigan racetracks to obtain "consent" from the Michigan state regulator for wagers on out-of-state races. *See* 15 U.S.C. § 3004(a)(1).). The state began small, allowing its racetracks to accept wagering on only one

simulcast race per racing day.  But soon enough, Michigan amended its laws to broadly expand its in-state simulcast wagering.  It did so "with the intent to provide . . . financial assistance to the ailing horseracing industry in Michigan."  *Fiscal Focus: Horse Racing in Michigan*, at 13.

In 1995, Michigan repealed its existing laws regulating horseracing and enacted the Horse Racing Law, which as amended, governed horseracing and pari-mutuel wagering at *in-state* racetracks.  *See* P.A. 1995, No. 279.  Michigan's statute provided, for example, that state officials would issue "[r]ace meeting licenses . . . to conduct live horse racing, simulcasting, and pari-mutuel wagering on the results of live and simulcast horse races . . . *in this state*."  Mich. Comp. Laws § 431.308(1)(b) (emphasis added).  In addition, "[t]rack licenses" would be issued "to maintain or operate a racetrack at which 1 or more race meeting licensees may conduct licensed race meetings."  Mich. Comp. Laws § 431.308(1)(c).  And the statute allowed "full card" simulcasting, allowing in-state racetracks to televise and accept pari-mutuel wagers for a full day's slate of out-of-state races.  Mich. Comp. Laws § 431.318(2).

Within a year, total wagering in Michigan increased by 50%.  And simulcasting by in-state operators became increasingly popular—and an increasing part of the state's horseracing economy.  "[O]n a Saturday in December 2016," for example, "one of Michigan's racetracks advertised 26 simulcast races . . . None of the races originated in Michigan."  *Fiscal Focus: Horse Racing in Michigan*, at 3 n.5.  As of 2017, simulcast wagering represented over 95% of horserace wagering in Michigan.  *Id.* at 9.

Any boost to Michigan's *in-state* horseracing proved short-lived, however.  At its peak in 1975, racetrack attendance reached 3.8 million people, yet by 2007 it had fallen to 1.1 million.  *Fiscal Focus: Horse Racing in Michigan*, at 4.  In 1989, total pari-mutuel wagering on live horseraces was $443.1 million.  *Id.*  By 2016, overall pari-mutuel wagering was $103.3 million

with just $4.3 million coming from in-state live horseraces.  *Id.*  The number of tracks declined from eight in 1989, to two in 2016—and the state would be left with only a single racetrack by 2019. *Id.*  State tax revenues declined precipitously too.  In 1997, Michigan collected $14.7 million in taxes on horserace wagering.  *Id.* at 10.  But for each of the next 19 years, tax revenues declined. In 2016, the state wagering tax generated a mere $3.5 million—the smallest figure since 1949.  *Id.* At the same time as Michigan's in-state horseracing declined, online (and out-of-state) ADW platforms experienced significant growth.

Amidst the explosive growth of online ADW platforms, Michigan amended its Horse Racing Law in 2019.  *See* P.A. 2019, No. 153.  For the first time, the state imposed a new licensing requirement for what it called "third-party facilitators" offering ADW to Michiganders, like TwinSpires.  The amendments define "third-party facilitators" to be "persons that have contracts with race meeting licensees to facilitate wagering on live and simulcast racing."  Mich. Comp. Laws § 431.308(1)(d).  And they purport to ban the acceptance of any pari-mutuel wagers without a third-party facilitator license from Michigan.  Mich. Comp. Laws § 431.317(10).  The amendments also state that to "solicit[] or accept[] wagers on the results of live or simulcast horse races from individuals in this state" without first securing the new Michigan license is a felony, punishable by up to five years imprisonment or a fine of up to $10,000, and "[e]ach act of solicitation or wager that is accepted" without a license "is a separate offense."  Mich. Comp. Laws § 431.317(9).   (Collectively, this Motion refers to these provisions (Mich. Comp. Laws §§ 431.308(1)(d) and 431.317(9)–(10)) as the "Licensing Requirements.").   The Executive Director of Michigan Gaming Control Board ("MGCB") may also pursue a $25,000 fine for a violation of the Licensing Requirements.  Mich. Comp. Laws § 431.307(3).

To comply with the Licensing Requirements, Michigan requires a third-party facilitator to meet several conditions. *See* Mich. Comp. Laws § 431.308(1)(d)(i)–(vi). Importantly, a third-party facilitator "must have a joint contract with all race meeting licensees and certified horsemen's organizations *in this state*." *Id.* § 431.308(1)(d)(i) (emphasis added). That is, to "solicit[] or accept[] wagers . . . from individuals" in Michigan, the state requires "third-party facilitator" entities to partner with *in-state* brick-and-mortar horserace meet licensees. Those in-state race meet licensees, however, may simulcast the exact same races and accept the same pari-mutuel wagers by Michiganders without any such partnership. *Id.* § 431.318.

**E.    Although Unnecessary, TwinSpires Follows Michigan's New Licensing Requirements And Contracts With Mandated In-State Partners.**

When Michigan amended its laws in 2019, TwinSpires had been accepting pari-mutuel wagers from Michiganders for out-of-state races pursuant to the IHA and its Oregon Racing Commission license for approximately a decade. Decl. ¶ 24. TwinSpires had consistently maintained in communications to Michigan regulators that it did not need a state license to accept interstate wagers from Michiganders. Decl. ¶¶ 26, 39, 41. Nonetheless, to ensure ADW would be offered to Michigan residents without disruption, and out of a desire to work with state lawmakers and regulators to achieve positive results for the Michigan horseracing industry, TwinSpires promptly sought a third-party facilitator license pursuant to the new Licensing Requirements. Decl. ¶ 29.

TwinSpires partnered with the only existing in-state racetrack remaining in Michigan, Northville Downs, and the relevant certified horsemen's associations on June 11, 2020. Decl. ¶ 30. In exchange for serving as TwinSpires's in-state partner for pari-mutuel wagering, TwinSpires contractually agreed to give a percentage of the total amount of money wagered by Michigan residents on TwinSpires (known in industry terms as "the handle") to Northville Downs. Based

on that agreement, TwinSpires filed its initial third-party facilitator application in the summer of 2020.

On September 3, 2020, MGCB granted a "Conditional Temporary Third-Party Facilitator License" to TwinSpires. Ex. D. MGCB would subsequently extend that temporary license until December 2021, when MGCB granted TwinSpires its first annual license for 2022. Decl. ¶ 32. TwinSpires successfully renewed its license for 2023 and 2024. *Id.*

TwinSpires has continued to be the leading operator of online horseracing wagering in Michigan. In 2024, TwinSpires had nearly 18,000 Michigan residents as active users, and TwinSpires's 2024 Michigan resident handle on all racing was over $48.5 million. Decl. ¶ 24. In the years since it began operating, Michigan residents have trusted their wagers with TwinSpires, leading the company to consistently outperform other horseracing betting platforms and earning significant goodwill. Decl. ¶ 24.

**F.    TwinSpires Applies For Its 2025 Third-Party Facilitator License.**

On August 27, 2024, MGCB staff informed TwinSpires that MGCB would send out a renewal notice for TwinSpires's 2025 third-party facilitator license only after it received the race meeting licensee application from TwinSpires's in-state partner track. Ex. E; Decl. ¶ 34. As in years past, TwinSpires planned to partner with Northville Downs—the sole racetrack operating in Michigan, which submitted its application to be a race meeting licensee shortly thereafter. Decl. ¶ 34.

On September 24, 2024, MGCB staff advised TwinSpires that "renewal notices will be going out this week, with a due date of November 30th for the [third-party facilitator] applications." Ex. E. MGCB staff further advised TwinSpires that so long as MGCB received TwinSpires's application by November 30, 2024, its "license w[ould] remain active until a decision is made on

the 2024 renewal application," even though TwinSpires's current license would otherwise expire on December 31, 2024.  TwinSpires submitted its renewal application on November 26, 2024, to ensure it stayed in "good standing."  Ex. E.

On October 30, 2024, MGCB determined that Northville Downs met Michigan's standards and requirements to grant a race meeting license.  Decl. ¶ 35.  But it conditioned that license, contrary to Michigan law, on approval of yet another license:  Northville Downs's separate "track license."  Decl. ¶ 35.  Michigan Compiled Laws § 431.308 requires a "track license" for "persons to maintain or operate a racetrack."  In early 2024, Northville Downs had shut down operations at the track's longtime home in Northville—where it had continually operated since 1944—because the track was set to be razed for a new development.  (Northville Downs secured a new location in Hastings, but MGCB has not yet issued a track license to Northville Downs.)  Decl. ¶¶ 34, 38.

## G.    Michigan Demands That TwinSpires Stop Accepting Interstate Wagers.

On December 23, 2024, MGCB Executive Director Henry L. Williams, Jr. notified TwinSpires that Northville's "track license w[ould] not be approved by January 1, 2025."  Ex. F. Based on MGCB's October 30, 2024 order, the Executive Director said Northville Downs's lack of an approved track license also precluded the issuance of a race meeting license to Northville Downs.  Ex. F.  Accordingly, the Executive Director concluded, TwinSpires could no longer operate as a "third-party facilitator" in Michigan, because it lacked the requisite in-state partner with a valid race meeting license under the Licensing Requirements.  Ex. F.  The Executive Director summarily informed TwinSpires that "on January 1, 2025 at 12:00am, all account wagering with Michigan account holders must cease."  Ex. F.

TwinSpires responded on December 31, 2024.  Ex. G.  It noted that TwinSpires had submitted the required renewal application on November 26, 2024, and therefore, per MGCB's

September 24 representations, TwinSpires was "in good standing with" MGCB until a decision issued as to its pending application.  Ex. G.  TwinSpires further explained that its only purported obligation as a "third-party facilitator" under the Licensing Requirements was to partner with the state's only race meeting licensee, Northville Downs, which it had done.  Ex. G.  And TwinSpires reiterated its long-held position that TwinSpires's continued ADW operations in Michigan remained lawful because it indisputably complies with the IHA in offering interstate, "off-track" wagering to Michiganders.  Ex. G.  Indeed, that "off-track" wagering is all TwinSpires can even offer within the state, regardless of Northville Downs's licensing status:  there is not a race even scheduled in Michigan until April 2025, and such racing will only occur if Northville Downs is ultimately issued its track license.  Ex. G.

TwinSpires also explained that, even on the merits of Michigan's Licensing Requirements, the Executive Director lacked authority under state law to condition a race meeting license on granting a track license as it had purported to do with Northville Downs.  Section 431.314(1) allows the Executive Director to "grant or deny" an application for a race meeting license—not to hinge a grant on numerous future actions.  MGCB's order had stated that it was "granting a 2025 Race Meeting License" to Northville Downs, which was binding on the MGCB.  While TwinSpires noted that the Executive Director could revoke or suspend a license that it had granted, it could not do so without following the requisite procedures under the Racing Act.  *See* Mich. Comp. Laws § 431.314(4), (5).  MGCB had not followed those procedures for Northville Downs's race meeting license, so, TwinSpires explained, Northville Downs's race meeting license should remain operative.  Ex. G.

On January 3, 2025, MGCB staff responded.  Ex. H.  It stated that because Northville Downs had not obtained a track license, it could not obtain the race meeting license (even though

the Board had already issued the race meeting license).  Ex. H.  According to MGCB, without a partner with a race meeting license, TwinSpires was precluded from operating in Michigan. MGCB stated that TwinSpires does not have "unfettered access to Michigan residents," but instead its "operations are contingent" upon its in-state partner fulfilling its race meeting licensing requirements.  Ex. H.  MGCB neither acknowledged nor disputed that TwinSpires met the requirements of the IHA.  Ex. H.  Instead, the MGCB said that if TwinSpires continued to accept wagers from Michigan residents—as it had at that point done for well over a decade pursuant to the IHA—TwinSpires would be "subjecting [it]self to administrative, civil, and criminal penalties" and "jeopardizing [its] suitability for licensure."  Ex. H.

On January 6, 2025, MGCB again demanded that TwinSpires shut off its pari-mutuel wagering platform in Michigan or "things would get worse" for TwinSpires.  Decl. ¶ 41.  On January 7, 2025, MGCB notified TwinSpires that it had "summarily suspended" TwinSpires's third-party facilitator license.  Decl. ¶ 42.  MGCB again made no mention of TwinSpires's continuous and ongoing compliance with the IHA.

## LEGAL STANDARD

Courts consider four factors in deciding whether to grant a preliminary injunction: whether the movant is likely to succeed on the merits of its claim; whether the movant is likely to suffer irreparable harm absent an injunction; the balance of equities; and the public interest.  *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp., Mich.*, 82 F.4th 442, 447 (6th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *accord Breeze Smoke LLC v. Yatin Enters. Inc.*, No. 1:22-CV-1182, 2023 WL 3070893, at *2 (W.D. Mich. Apr. 25, 2023).  All four factors favor preliminary injunctive relief here.

## ARGUMENT

### I.    TwinSpires Is Likely To Succeed On The Merits That Michigan's Licensing Requirements Are Unconstitutional.

TwinSpires is likely to prove that Michigan's Licensing Requirements are preempted under the IHA and are unconstitutional under the dormant Commerce Clause.

### A.    The Supremacy Clause Bars Enforcement Of The Licensing Requirements.

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl.2.  "Accordingly, it has long been settled that state laws that conflict with" or otherwise interfere with federal law, *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (citation omitted), are "without effect," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  The Supremacy Clause means states cannot impose requirements that are "contrary to" federal law.  *See Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985).

Absent an express preemption provision, federal law preempts state law in two circumstances. First, if "Congress, acting within its proper authority, has determined" that an area "must be regulated by its exclusive governance," federal law preempts any state law in that area. *Arizona v. United States*, 567 U.S. 387, 399 (2012).  In such cases, "the scope of [the] federal statute indicates that Congress intended federal law to occupy a field exclusively."  *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012).  In other words, the "framework of regulation is so pervasive that Congress left no room for the States to supplement it," or Congress otherwise established that it considered the federal interest "so dominant" as to "preclude enforcement of state laws on the subject."  *Arizona*, 567 U.S. at 399 (cleaned up).  Courts refer to this as field preemption.

15

Second, federal law preempts any state law that "confers rights or imposes restrictions that conflict with the federal law." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).  So when state law "impose[s] a duty that [i]s inconsistent" with federal law, it is preempted.  *Id.* (citing *Mut. Pharm. Co.*, 570 U.S. at 493); *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 492 (6th Cir. 2021) (federal law preempts state law that poses "an obstacle to the accomplishment and execution of" the federal scheme (citation omitted)).  Or, as some have articulated, "federal law pre-empts state-law" when the "two are in logical contradiction."  *Kansas v. Garcia*, 589 U.S. 191, 214 (2020) (Thomas, J., concurring); *see also CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*, 727 F. Supp. 3d 641, 654 (E.D. Ky. 2024).  This is known as conflict preemption.

"While recognized as separate categories," field and conflict preemption are not "rigidly distinct."  *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)) ("[F]ield pre-emption may be understood as a species of conflict pre-emption.").  Both apply here.

### 1.  The IHA exclusively occupies the field of interstate pari-mutuel wagering.

The beginning of any preemption analysis is the text and structure of federal law.  *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).  The IHA provides a "comprehensive" "statutory framework" for interstate off-track wagering.  *Arizona*, 567 U.S. at 401.  The IHA expressly prohibits any person "from accept[ing] interstate off-track wager[s] *except as provided in this chapter*."  15 U.S.C. § 3003 (emphasis added).  And the IHA defines an "interstate off-track wager" as one "placed or accepted in one State with respect to the outcome of a horserace taking place in another State."  Congress amended the statute in 2000 to expand the definition to explicitly "include[] pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting

system in the same or another State" as well as "pari-mutuel wagering pools." *Id.* § 3002(3).[1]  The IHA then provides that interstate off-track wagers "may be accepted by an off-track betting system *only if* consent is obtained" from three entities: (1) the racetrack running the race, (2) the state racing authority governing that race, and (3) the off-track betting authority regulating betting in the state where the wager is accepted. *Id.* § 3004(a) (emphasis added).

"The plain language of [the IHA] makes clear that the IHA exclusively regulates interstate wagering." *Horseman's Benevolent & Protective Ass'n, Inc., v. Zonak*, 2008 WL 11453695, at *5 (S.D. Ohio Sept. 23, 2008).  It alone establishes "the absolute condition precedent to off-track wagering across state lines." *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270 (1st Cir. 1993).  By setting out the "only" means for accepting interstate wagers (as Congress otherwise banned them, 15 U.S.C. § 3003), Congress "foreclose[d] any state regulation in this area, even if it is parallel to federal standards." *Murphy*, 584 U.S. at 479 (quoting *Arizona*, 567 U.S. at 401).

What the text of the IHA's operative provisions establish, statutory context confirms. There are times in field preemption cases where it is unclear what particular field Congress "ousted the States from regulating." *Kansas*, 589 U.S. at 208.  Not so here.  Congress stated it plainly: "[I]n the limited area of interstate off-track wagering on horseraces, there is a need for Federal action."  15 U.S.C. § 3001(a)(3).  Congress, too, provided the reason for that action: "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers."

---

[1] The IHA as enacted in 1978 provided that an "interstate off-track wager" was "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State."  Pub. L. 95-515 (1978).  A lot happened between 1978 and 2000, including the boom of technology and the Department of Justice opining that interstate pari-mutuel wagering violated the Interstate Wire Act.  *See Internet Gambling Prohibition Act of 1999: Hearing on H.R. 3125 Before the Subcommittee on Crime of the House Committee on the Judiciary*, 106th Cong. 59 (2000) (statement of Kevin V. DiGregory, Deputy Assistant Attorney General, Criminal Division).  By passing a new version of the definition for "interstate off-track wager[s]," Congress explicitly reaffirmed that pari-mutuel wagering is permissible under federal law, so long as the relevant consents under § 3004(a) are obtained.

*Id.*  Even though States "should have the primary responsibility for determining what forms of gambling may legally take place within their borders," Congress clarified that it was the "Federal Government [that] should prevent interference by one State with the gambling policies of another." *Id.* § 3001(a)(1)–(2).  So, Congress established it was its "policy . . . to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  *Id.* § 3001(b).  And it announced, with this "explicit language" that the IHA would regulate interstate wagers and "effectuate broad and complete control of the field."  *Zonak*, 2008 WL 11453695, at *6.

Given this pervasive federal framework, off-track betting systems like TwinSpires have "a federal right to be free from any other [state] requirements," as they comply with the relevant (and exclusive) federal requirements.  *See Murphy*, 584 U.S. at 479.  TwinSpires offers interstate off-track wagering only where it can comply with the IHA by getting the consent of "each State involved."  15 U.S.C. § 3002(3).  For instance, TwinSpires has accepted wagers in Oregon on Pennsylvania races at tracks like Parx Racing.  *See* Decl. ¶ 18.  In doing so, TwinSpires has obtained consent from (1) Parx Racing, the track where the race is run; (2) the Pennsylvania State Horse Racing Commission, the entity regulating the track; and (3) the Oregon Racing Commission, the entity that regulates TwinSpires.  *See* 15 U.S.C. § 3004(a); OAR 462-200-0310 (Oregon's requirements for "conducting of off-track wagering"); Ex. B; Decl. ¶¶ 18–21.  With these consents, TwinSpires did not need Michigan's permission to accept an interstate wager in Oregon from a Michigander on a race at Parx Racing (for example) because the IHA does not require TwinSpires to seek the consent of the state where an individual resides while placing a bet.  In fact, a requirement that TwinSpires must seek consent from Michigan to accept bets in Oregon would "interfere[e] . . . with the gambling policies" of Oregon—precisely what the IHA sought to

prevent.  § 3001(a)(2).  To put it another way, the IHA grants off-track betting systems a "federal right" *not* to have to seek such consent to accept wagers on interstate races.  *Murphy*, 584 U.S. at 479.

That the IHA would leave no room for Michigan to veto the accepting of wagers in Oregon (or other states) accords with the background common law understanding.  The common law historically prescribed that a wager is made, not where an individual resides, but rather where the wager is *accepted*.[2]  *State ex rel. Reading v. W.U. Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953); *Saratoga Harness Racing, Inc. v. City of Saratoga Springs*, 390 N.Y.S.2d 240, 242 (N.Y. App. Div. 1976) (same); *McQuestern v. Steinmetz*, 58 A. 876, 877 (N.H. 1904) (same); *Rich v. State*, 42 S.W. 291, 292 (Tex. Crim. Ct. App. 1897) (same); *Lescallett v. Commonwealth*, 17 S.E. 546, 548 (Va. 1893) (same); *cf. Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (focusing on where bet was "accept[ed]" to determine location used "for the purpose of . . . gambling"); *United States v. Truesdale*, 152 F.3d 443, 447 (5th Cir. 1998) (acknowledging common-law rule).  As the Michigan Supreme Court explained the historic common law rule, "an offer to bet" in Michigan that is "accepted" in another state, such as New York, "takes effect" in New York, not Michigan.  *Reading*, 57 N.W.2d at 539.  Accordingly, where a wager was accepted, determined where it was regulated.  *Id.*  Congress "is understood to legislate against a background of common-law . . . principles."  *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)).  So "when a statute covers an issue previously governed by the common law," there is a longstanding "presumption that Congress intended to retain the substance of the common law."  *Id.* (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)).

---

[2] In fact, Oregon's regulations provide the same rule today.  *See* OAR 462-220-0060 ("Any wager that is made from an account maintained by the hub operator is considered to have been made in the State of Oregon.").

Here, Congress occupied the field of interstate pari-mutuel wagering on horseracing.  And it did so to the exclusion of Michigan's Licensing Requirements.  15 U.S.C. § 3001; *see Kurns*, 565 U.S. at 630.

### 2.  Michigan's Licensing Requirements conflict with the IHA's commands.

Even supposing the IHA does not preempt the field of interstate pari-mutuel horserace wagering, Michigan's Licensing Requirements "conflict" with the IHA all the same and must give way.  *Arizona*, 567 U.S. at 399.  The Licensing Requirements both "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" *id.*, and plainly contradict it, *CTIA - The Wireless Ass'n*, 727 F. Supp. 3d at 654.

When Congress enacts a comprehensive statute like the IHA, it must make a series of choices to reflect competing priorities.  As discussed above, interstate off-track wagering on horseraces caused disputes over whether and how to regulate an activity that crosses state lines and thus may be subject to regulation by multiple sovereigns.  For instance, the Governor of Kentucky protested New York's off-track wagering on the Kentucky Derby in 1971.  *See* Decl. ¶ 13.  Should Kentucky or New York get to decide if such wagering were to be allowed?  And what about the racetracks and the jockeys running the races—should they get a say, too?  *See Kentucky Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994).

The IHA "struck a careful balance."  *Arizona*, 567 U.S. at 400.  Congress expressly acknowledged the "interference by one State with the gambling policies" of another that the absence a single, federal scheme had enabled.  Congress further added that there was a "need" for "cooperat[ion]" between the states in the "acceptance of legal interstate wagers."  Congress also concluded that the federal government should promote, rather than restrict, interstate wagering on

horseracing.   Accordingly, Congress enacted the IHA to facilitate "cooperation," limit "interference," and promote interstate wagering on horseraces.   "[T]he compromise found at 15 U.S.C. § 3004(a) . . . allows interstate off-track wagering if, and only if, the interested parties consent," namely the track running the race, the state regulating that track, and the off-track wagering regulator in another state.   *Kentucky Div., Horsemen's Benev. & Protective Ass'n,* 20 F.3d at 1414.   In other words, the IHA gave three possible veto points for interstate off-track wagering.   But not a fourth.

The Licensing Requirements "directly impede[] fulfillment of the federal regulatory scheme."   *Zonak,* 2008 WL 11453695, at *9.   A state law is preempted "if it interferes with the methods by which the federal statute was designed to reach [its] goal."   *Verizon North Inc. v. Strand,* 309 F.3d 935, 940 (6th Cir. 2002) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)).   That is particularly true when the state and federal law "conflict in the method of enforcement" as "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."   *Arizona*, 567 U.S. at 406.   Here, Congress made the deliberate decision to provide that only certain entities in certain involved states could either consent or object to interstate off-track wagering.   Simply put, an additional veto for the state in which an individual resides when placing a wager "is not the system Congress created."   *Arizona*, 567 U.S. at 408.

If there were any doubt, the IHA's cause of action provision puts it to rest.   In crafting a cause of action to enforce the IHA's limits on interstate pari-mutuel wagering, Congress confirmed that the state in which a wagerer resides does not have a veto right because it did not provide that state with a cause of action to challenge violations of the statute.   Instead, Congress said that the "host State," the state where the race is run, could "commence a civil action against any person"

who "accept[s] any interstate off-track wager in violation of" the IHA.  15 U.S.C. §§ 3005, 3006.

Congress also provided that the two entities associated with the racetrack hosting the race—the

host racing association and the associated horsemen's group—could also sue.  But noticeably

absent from the list is the allowance of any claim by the wagerer's residential state.  *Cf. Mik v.*

*Fed. Home Mortg. Corp.*, 743 F.3d 149, 160 (6th Cir. 2014) ("The express provision of one method

of enforcing a substantive rule suggests that Congress intended to preclude others." (quoting

*Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

At bottom, Michigan's Licensing Requirements stand "in logical contradiction" with the

IHA.  *Kansas*, 589 U.S. at 214 (Thomas, J., concurring); *CTIA - The Wireless Ass'n*, 727 F. Supp.

3d at 654.  As Justice Thomas has explained, when "federal law gives an individual the right to

engage in certain behavior that state law prohibits, the laws would give contradictory commands

notwithstanding the fact that an individual could comply with both by electing to refrain from the

covered behavior."  *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 319 (2019); *see also*

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 n.107 (2000) (explaining that "additional

[state] conditions" must give way when "federally recognized conditions" are exclusive).  And

that is exactly the case here.  The IHA has established a ceiling for regulation of interstate pari-

mutuel wagers on horse races.  Michigan cannot go above it without contradicting federal law's

commands.

\*     \*     \*

In enacting the IHA, Congress established a comprehensive scheme to regulate interstate

pari-mutuel wagering on horseraces.  That scheme occupies the field, displacing state laws seeking

to regulate the same interstate conduct.  But even if the IHA were held to be not so broad, the IHA

does not permit the Licensing Requirements and their "extraneous pull on the scheme established

by Congress." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 860–61 (6th Cir. 2023) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001)).

**B.    The Dormant Commerce Clause Bars Michigan's Discriminatory Licensing Requirements.**

The Commerce Clause provides Congress with a "positive grant" of authority "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3; *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).  Yet the Supreme Court's precedents also teach that the Clause has a "further, negative command." *Nat'l Pork Producers*, 598 U.S. at 368.  The Commerce Clause "prevents the States from adopting protectionist measures" against interstate commerce, "even when Congress has failed to legislate on the subject." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *Nat'l Pork Producers*, 598 U.S. at 385.

This "dormant" Commerce Clause has been central to the economic development of the United States.  After all, "removing state trade barriers was a principal reason for the adoption of the Constitution." *Tenn. Wine & Spirits Retailers*, 588 U.S. at 515.  And the Framers maintained "the conviction" that if the "new Union" were to succeed, it "would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citation omitted).  Thus, the Constitution "by its own force" has long been understood to "preserve[] a national market for goods and services." *Tenn. Wine & Spirits Retailers*, 588 U.S., at 514, 515.  Were it otherwise and states allowed to put up barriers at their domestic borders, the Supreme Court has said, "we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising." *Id.* at 515.

At the "very core" of the dormant Commerce Clause jurisprudence is the principle that states may not discriminate "on the basis of some interstate element." *Wynne*, 575 U.S. at 549. States may not enforce "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).  That means, states may not "'build up . . . domestic commerce' through 'burdens upon the industry and business of other States.'" *Nat'l Pork Producers*, 598 U.S. at 369 (quoting *Guy*, 100 U.S. at 443).  Such discriminatory measures are "almost always" invalid, *Truesdell v. Friedlander*, 80 F.4th 762, 768 (6th Cir. 2023), and will only be sustained based on a "showing that [they are] narrowly tailored to advance a legitimate local purpose," *Tenn. Wine & Spirits Retailers*, 588 U.S. at 518.

Michigan's Licensing Requirements are "prototypical discriminatory [state] law[s]." *Truesdell*, 80 F.4th at 769.  They are presumptively invalid as "local processing requirements" preventing access to Michiganders, and they function as de facto discriminatory taxes on out-of-state competitors.

### 1.  Michigan's Licensing Requirements discriminate against out-of-state companies.

The Licensing Requirements improperly steer interstate commerce into a local competitor, *i.e.*, an in-state Michigan racetrack.  Under the Licensing Requirements, an out-of-state ADW like TwinSpires may accept pari-mutuel wagers from Michigan residents, if and only if, TwinSpires enters into "a joint contract with all race meeting licensees and certified horsemen's organizations in this state."  Mich. Comp. Laws § 431.308(1)(d)(*i*) (emphasis added).  This compelled contracting requirement applies even if an ADW like TwinSpires were to accept interstate wagers only for races and on racetracks far beyond Michigan's borders (and currently there is no licensed in-state horseracing in Michigan).  Thus, for the simple privilege of gaining access to engage in

commerce with Michiganders, the Licensing Requirements demand that ADWs pay to play. Moreover, in-state race meeting licensees are authorized, under Michigan law, to simulcast the exact same races and accept the same pari-mutuel wagers by Michiganders. *Id.* § 431.318. That means out-of-state ADWs, under the Licensing Requirements, are forced to pay in-state entities that are otherwise (and remain) their competitors in offering pari-mutuel interstate wagers. *See* Decl. ¶ 29 (describing competition from in-state racetracks).

By seeking to "'hoard' commerce 'for the benefit of' in-state merchants," the Licensing Requirements are unconstitutionally discriminatory. *Nat'l Pork Producers*, 598 U.S. at 372–73; *see Energy Michigan*, 2025 WL 211975, at *8. Michigan's Licensing Requirements are no different than the long line of other "local processing requirements" that the Supreme Court has found invalid time and again. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391–92 (1994) (collecting cases); *Truesdell*, 80 F.4th at 769–770. Each time, the Court found such requirements that "bar the import" of an out-of-state "service" absent economic engagement with an in-state service to be invalid—whether it be in-state solid waste processing, oyster shucking, or milk pasteurizing. *C & A Carbone*, 511 U.S. at 391–92; *see also Granholm*, 544 U.S. at 475 ("We have viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere."). For example, the Court held invalid a South Carolina requirement that shrimp boats "unload, pack, and stamp their catch" in South Carolina before "shipping or transporting" the shrimp to another state. *Toomer v. Witsell*, 334 U.S. 385, 403 (1948). This, despite the fact the shrimpers' "home bases" were in Georgia and would otherwise do all the work there. The Court explained that the state could not "divert to South Carolina employment and business which might otherwise go to Georgia." *Id.* Nor could the state "impose" this "artificial rigidity on the economic pattern of the industry." *Id.* at 404.

Neither can Michigan.  The "essential vice" of the Licensing Requirements is that they "deprive[]" out-of-state ADWs of access to "local demand for their services."  *C & A Carbone*, 511 U.S. at 392.  That is, unless those enterprises comply with the state-imposed partnering requirement "for the benefit of local businesses," they are totally barred from offering their wagering platform within the state.  *Id.*  Such a requirement effectively "grant[s] a monopoly to a 'local enterprise,'" which, as discussed, is otherwise TwinSpires's competitor.  *Truesdell*, 80 F.4th at 770.  After all, Northville Downs is the only operating racetrack with a race meeting license in the state of Michigan.  This effort to "protect the in-state simulcast wagering market against out-of-state simulcast wagering" violates the dormant Commerce Clause's antidiscrimination principle. *Northville Downs v. Granholm*, 622 F.3d 579, 590 (6th Cir. 2010).  And, by "prevent[ing] out-of-state" ADWs from "offering their product in Michigan," the state has deprived them of "their right to have access to the market" of the state on "equal terms."  *Id.* at 589 (quoting *Granholm*, 544 U.S. at 473).  At bottom, the situation TwinSpires finds itself in is no different than if Michigan required any online retailer to partner with an in-state brick-and-mortar store before it could accept orders from individuals in Michigan.  States cannot condition access to "local demand" for interstate commerce on economic support for local businesses.  *C & A Carbone*, 511 U.S. at 392.

## 2.  Michigan's Licensing Requirements are no different than discriminatory taxes.

Consider, too, that the Licensing Requirements operate as a discriminatory tax on interstate pari-mutuel wagering.  *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994) ("[C]ases are filled with state laws that aspire to reap some of the benefits of tariffs by other means."); *Wynne*, 575 U.S. at 545 (finding discriminatory taxes were no different from the "the quintessential evil targeted by the dormant Commerce Clause"); *Energy Michigan*, 2025 WL 211975, at *8 (explaining the ratified Constitution "aimed" to bar the imposition of "heavy" duties on "out-of-

state" trade (quotation marks omitted)).  Pari-mutuel wagering involves pooling the wagers from many individuals and then paying out an equal distribution of the pool to the winners, minus the "takeout."  The "takeout" is a fixed percentage (depending on wager type) of the pool, which goes to the host racetrack, horsemen's associations, taxes, and the entity accepting the wager and facilitating its inclusion in the host racetrack's wagering pool.  TwinSpires's or any other ADW's pari-mutuel horseracing revenue comes exclusively from the takeout.  As a fixed percentage, the amount of the takeout does not depend on which horse wins or how many winners there are.  For the takeout, all that matters is the total amount wagered on each given wager type.  The higher the amount wagered, the higher the takeout and, thus, the higher the revenue for ADWs.  As the horseracing industry struggled in Michigan in recent times, the size of in-state race meeting licensees' takeout has necessarily declined too.  Now, Michigan has required out-of-state companies like TwinSpires to cede a far-from-trivial share of their takeout to an in-state business, in order to accept wagers from Michigan residents.

To see how the Licensing Requirements are nothing more than a discriminatory tax by another name, take an example.  If a Michigan race meeting licensee "in this state" seeks to simulcast races outside of Michigan, then it may do so—without giving up a cut of its takeout.  Say the total amount wagered for a race is $1,000 and the takeout is 20%, then that in-state racetrack would collect up to $200 for those wagers on that out-of-state race, minus any taxes or fees.  Now, when an out-of-state company like TwinSpires seeks to accept wagers from Michiganders for that same exact race and the exact same amount wagered, it cannot collect an equal amount.  In fact, Michigan forbids it from doing so.  Why?  It has to give up a share of its takeout to an in-state racetrack.  If that in-state takeout share were 4% of the total wagered, then TwinSpires could earn no more than $160 because $40 (4% of the "handle") must go to the in-

state business.  Or, to put it another way, assuming a total takeout of 20% and a 4% share to the local track, then the 4% that out-of-state ADWs provide to in-state tracks is one-fifth of their revenue stream.  One out of every five dollars of possible revenue is diverted in-state.  Not for any service it offers, not for any race that in-state track runs, not for any promotions, not for any marketing—none of that.  The only reason for the lower takeout is TwinSpires must have a contract "with all race meeting licensees . . . in this state."  That is the cost of doing business with Michiganders.  But it is a price the Constitution does not permit the state to charge.  *Granholm*, 544 U.S. at 475; *Energy Michigan*, 2025 WL 211975, at *8.

*          *          *

Michigan's Licensing Requirements for third-party facilitators cannot survive dormant Commerce Clause scrutiny because they are discriminatory.  Like other invalid local processing requirements, Michigan requires all off-track betting systems like TwinSpires to partner with an in-state race meeting licensee to offer interstate wagering, even if the bets are for races happening outside Michigan.  *See* Mich. Comp. Laws § 431.308(1)(d).  This is nothing more than a forced and discriminatory subsidy for local industry (and would-be competitors).  Moreover, it functions as a discriminatory tax by increasing the cost of doing business merely because TwinSpires is an out-of-state ADW offering wagers on out-of-state races pursuant to the IHA.  Such a discriminatory regime is virtually "per se invalid" and cannot survive the "strictest scrutiny" the Supreme Court's dormant Commerce Clause precedents require.  *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 803 (6th Cir. 2005).

## II.    TwinSpires Will Suffer Irreparable Injury From Irrecoverable Loss To Its Business And Goodwill.

"A showing of irreparable harm is an indispensable" prerequisite "for the issuance of a preliminary injunction."  *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023).  And TwinSpires has

demonstrated the perilous position MGCB's actions have put it in and the irreparable harm TwinSpires will face absent a preliminary injunction.  Decl. ¶¶ 43–46.

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by money damages."  *Moskovic v. City of New Buffalo*, No. 1:21-CV-144, 2021 WL 1422680, at \*5 (W.D. Mich. Apr. 15, 2021) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)).  If TwinSpires is forced to cease its interstate ADW offering in Michigan, which federal law clearly permits, then it stands to wrongfully lose millions of dollars in revenue.  TwinSpires would never be able to recover damages for that lost revenue because the state of Michigan is immune from money damages.  *See Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *cf. Ohio*, 87 F.4th at 783 ("[E]conomic injuries caused by federal agency action are generally unrecoverable because the APA does not waive sovereign immunity for damages claims."); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014).  And since interstate pari-mutuel wagering is at the core of TwinSpires's operations in Michigan, compliance with MGCB's order would mean the shutdown of effectively its entire in-state "enterprise."  *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).  That shutdown would result in the loss of substantial customer goodwill and significant damage to TwinSpires's competitive position that TwinSpires has built for over a decade.  Decl. ¶¶ 44–45.  Those injuries are irreparable.  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *see Performance Unlimited*, 52 F.3d at 1382.

29

Meanwhile, Michigan has made clear it can and likely will pursue "administrative, civil, and criminal penalties" pursuant to the state's Licensing Requirements if TwinSpires continues to offer ADW to Michigan consumers under the IHA. That includes potential criminal prosecution or a fine of up to $10,000, *see* Mich. Comp. Laws §§ 431.307(3), 431.317(9), for engaging in interstate commerce expressly authorized by federal law and protected by the Constitution. This, too, poses irreparable injury to TwinSpires—not only from the threat of impending criminal sanctions, but the corresponding "loss of customer goodwill and competitive position" such sanctions cause. *Hall*, 878 F.3d at 530; *see also Overstreet*, 305 F.3d at 578; Decl. ¶¶ 44–45.

In fact, news articles have already accused TwinSpires of "illegal" activity, further damaging TwinSpires's reputation. *See, e.g.*, Jenny Tang, *TwinSpires License Suspended in Michigan Over Illegal Horse Race Betting*, Gambling Industry News (Jan. 13., 2025), https://gamblingindustrynews.com/news/regulation/twinspires-license-suspended-michigan/; Ziv Chen, *Michigan Gaming Control Board Suspends TwinSpires for Violating State Gaming Laws*, Sportsbook Review (Jan. 13, 2025), https://www.sportsbookreview.com/news/michigan-gaming-control-board-suspends-twin-spires-jan-13-2025/. What's more, these accusations have the potential to spillover and jeopardize TwinSpires's standing with regulators in other jurisdictions. TwinSpires will have to expend countless resources in marketing in an attempt to reacquire customers this negative publicity will drive away and in compliance costs due to increased regulatory scrutiny—dollars it can never recover from the state. *See* Decl. ¶¶ 44–46.

These extraordinary threats to TwinSpires's business, coming for the first time since it began offering its platform to Michigan residents over a decade ago, gave TwinSpires no choice but to ask this Court to protect its legal rights now with a preliminary injunction, rather than "wait until the conclusion of these proceedings to obtain relief." *Moskovic*, 2021 WL 1422680, at *5.

III.    **The Public Interest And The Balance Of Equities Weigh In Favor Of Granting A Preliminary Injunction.**

"The two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). These factors decisively weigh in favor of issuing a preliminary injunction. The State has no "'valid' interest in enforcing" its unconstitutional Licensing Requirements. *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (government has no "valid" interest in enforcing unconstitutional laws). Along the same lines, an injunction would serve the public interest because it would halt Michigan's disregard of the Supremacy Clause and Interstate Commerce Clause of the U.S. Constitution. *See Ohio*, 87 F.4th at 783 ("[T]he public interest lies in correctly applying the law."); *Dahl v. Bd. of Trustees v. W. Mich. Univ.*, 15 F.4th 728, 735–36 (6th Cir. 2021) ("[p]roper application of the Constitution . . . serves the public interest"). The last two factors favor granting a preliminary injunction.[3]

**CONCLUSION**

For the foregoing reasons, the Court should grant TwinSpires's motion for a preliminary injunction and enjoin the Defendants from enforcing the Licensing Requirements.

---

[3] "[T]he Sixth Circuit has long held that 'the district court possesses discretion over whether to require the posting of security'" before granting injunctive relief under Rule 65(c). *Palmer v. Michigan*, No. 1:22-cv-90, 2022 WL 908966, at *6 (W.D. Mich. Mar. 29, 2022) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). Where an "injunction would impose no meaningful burden on the" state, *id.*, or the case otherwise implicates a strong public interest, both true here, a bond is unnecessary, *Highland Coop v. City of Lansing*, 492 F. Supp. 1372, 1383 (W.D. Mich. 1980). TwinSpires respectfully requests the Court grant a preliminary injunction without requiring a bond.

January 17, 2025

Respectfully submitted,

/s/Derek J. Linkous
Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
**BUSH SEYFERTH PLLC**
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
linkous@bsplaw.com

Thomas H. Dupree, Jr.*
John W. Tienken*
**GIBSON, DUNN & CRUTCHER LLP**
1700 M St N.W.
Washington, DC 20036
202-955-8500
TDupree@gibsondunn.com
JTienken@gibsondunn.com

Christine Demana*
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Ave., Ste. 2100
Dallas, TX 75201
214-698-3246
CDemana@gibsondunn.com

*Attorneys for Plaintiff*

*\*Application for admission filed or forthcoming*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Civil Rule 7.2(b), because it contains 9,837 words, excluding the portions of the brief exempted from the word count under Local Civil Rule 7.2(B)(i).  The word count was generated using Word for Office 365.

/s/Derek J. Linkous
Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
**BUSH SEYFERTH PLLC**
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com
