UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHURCHILL DOWNS TECHNOLOGY
INITIATIVES COMPANY,

       Plaintiff,                         Case No. 1:25-cv-47

v.                                     Hon. Hala Y. Jarbou

MICHIGAN GAMING CONTROL
BOARD, et al.,

       Defendants.
_____/

## OPINION

Plaintiff Churchill Downs Technology Initiatives Company ("TwinSpires") filed a complaint against Defendants Michigan Gaming Control Board ("MGCB"), MGCB Executive Director Henry L. Williams, Jr. ("Executive Director"), and Attorney General for the State of Michigan Dana Nessel ("Attorney General"). (ECF No. 1.) TwinSpires alleges that Defendants violate the United States Constitution through their enforcement of licensing provisions in the Michigan Horse Racing Law. Specifically, TwinSpires claims that the Interstate Horseracing Act (15 U.S.C. §§ 3001-3007) preempts the state law's requirement to partner with in-state institutions (Mich. Comp. Laws §§ 431.308(1)(d), 431.317(10)), and that this requirement conflicts with Congress's exclusive powers over interstate commerce. Before the Court is TwinSpires's motion for preliminary injunction to prevent Defendants from enforcing the state's licensing requirement. (ECF No. 11.) For the reasons stated herein, the Court will grant TwinSpires's motion.

## I. BACKGROUND

TwinSpires is a multi-jurisdictional wagering hub licensed in the State of Oregon. (Murr Decl. 4, ECF No. 11-1; Or. License, ECF No. 11-3.) Users from across the country can place

interstate wagers on horse races through TwinSpires via its online platforms.  (Murr Decl. 4-5.)

TwinSpires accepts wagers—including pari-mutuel wagers—at its processing hub in Oregon.  (*Id.*

at 5.)  Unlike fixed-odds betting, where the odds (and expected payout) are established at the time

a bettor places a wager, in pari-mutuel betting, the host collects all the wagers and pools them

together.  After an initial "takeout" amount covers payments to the host and the racetrack, as well

as taxes and fees, the host distributes the pooled wagers among the winners.  In part because the

host has no vested interest in a specific outcome, pari-mutuel wagering has become the

predominant form of gambling on horse racing.  (*Id.* at 4-5.)

As interstate pari-mutuel wagering became popular through the 1970s, Congress passed

the Interstate Horseracing Act of 1978 ("IHA") to regulate the industry and "ensure States will

continue to cooperate with one another in the acceptance of legal interstate wagers."  15 U.S.C.

§ 3001.  The statute outlines the exclusive procedures by which a "person"[1] can accept interstate

off-track wagers, striking a delicate balance between state authority over intrastate activity and

Congress's powers over interstate commerce. *Id.* § 3003.  For interstate off-track wagers, an "off-

track betting system"[2] needs consent only from certain racetracks and certain state regulatory

entities. *Id.* § 3004.  The IHA does not govern how entities give their consent to off-track betting

systems for interstate off-track wagers; it only establishes which entities the off-track betting

system needs consent from in order to accept such wagers.  *Id.*

Pari-mutual wagering on horse races has been lawful in Michigan since 1933.  In 1995, the

Michigan legislature overhauled its horse racing regulatory scheme by enacting the Michigan

---

[1] In the IHA, a "person" is defined as "any individual, association, partnership, joint venture, corporation, State or political subdivision thereof, department, agency, or instrumentality of a State or political subdivision thereof, or any other organization or entity."  15 U.S.C. § 3002(1).

[2] Defined as "any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run, which business is conducted by the State or licensed or otherwise permitted by State law." 15 U.S.C. § 3002(7).

Horse Racing Law ("MHRL"), which reestablished pari-mutuel wagering as a legal form of betting on horse racing.  1995 Mich. Legis. Serv. P.A. 279 (H.B. 4526) (current version at Mich. Comp. Laws § 431.317(1)).  According to the House Fiscal Agency, a nonpartisan agency within the Michigan legislature that provides analyses for bills and statutes, the MHRL "affirmatively authorize[d] the pari-mutuel system of wagering on the results of horse races" and "also prescribe[d] how pari-mutuel wagering is to be carried out."  House Fiscal Agency Legis. Analysis, Pub. Acts 271 & 272 of 2016 (2016) [hereinafter House Fiscal Agency 2016 Analysis].  In 2019, after recognizing that pari-mutuel wagering through online and mobile applications was not regulated in the statute, the Michigan legislature passed amendments that created a new licensing requirement for third-party facilitators (entities that accept wagers electronically).  House Fiscal Agency Legis. Analysis, Pub. Act 153 of 2019 (2020).  As the law is currently written, to obtain a third-party facilitator license, a "person"[3] "must have a joint contract with all race meeting licensees and certified horsemen's organizations in [Michigan]."  Mich. Comp. Laws § 431.308. Only persons with either a race meeting license (given to entities that "conduct live horse racing, simulcasting, and pari-mutuel wagering . . . at a licensed race meeting in [Michigan]") or a third-party facilitator license can accept pari-mutuel wagers in Michigan.  Mich. Comp. Laws §§ 431.308(b), 431.317(10).

TwinSpires has been accepting wagers from Michiganders since the early 2010s.  (Munn Decl. 9.)  After Michigan enacted the 2019 Horse Racing Law amendments, TwinSpires entered into a contract with the sole racetrack operating in Michigan at the time—Northville Downs—to comply with the third-party facilitator licensing requirement.  (*Id.* at 10-11.)  However, Northville

---

[3] In the MHRL, a "person" is defined as "an individual, firm, partnership, corporation, association, or other legal entity."  Mich. Comp. Laws 431.302(p).

Downs temporarily lost its license to operate in Michigan while it moved the location of its racetrack.  On January 1, 2025, no horsetracks in Michigan were licensed.  Because no horsetracks were licensed, there were no horsetracks for third-party facilitators to partner with, so entities like TwinSpires could not comply with the MHRL licensing requirement.  The MGCB instructed these third-party facilitators not to accept wagers from Michigan residents until they could contract with a licensed racetrack.  While TwinSpires's competitors stopped accepting wagers from Michigan at that time, TwinSpires resisted the MGCB's request and continued accepting wagers.   In response, the MGCB issued a summary suspension order against TwinSpires on January 7, 2025, suspending its third-party facilitator license and threatening additional sanctions.  (ECF No. 15-4.)

On January 31, Northville Downs received its requisite licensing, allowing third-party facilitators to accept wagers in accordance with the MHRL license requirement.  Mich. Gaming Control Bd., Ord. Ending Northville Downs Summary Suspension (Jan. 31, 2025), https://perma.cc/VLZ7-YC4W.  However, the MGCB has maintained its suspension against TwinSpires.  *See id.* (explaining that TwinSpires's third-party facilitator license remained suspended with litigation pending).

TwinSpires asserts that compliance with the third-party facilitator license requirement was unnecessary because of the preemptive effect of the IHA and that any related sanctions would be unconstitutional.  TwinSpires claims it voluntarily acquiesced to the MHRL license requirement to promote a good relationship with the MGCB and stimulate growth in Michigan's horse race industry.

Defendants disagree.  According to Defendants, the IHA does not restrict a state's ability to require additional consent for interstate off-track wagers.  Because TwinSpires has accepted wagers that were placed in Michigan, Defendants argue that TwinSpires has violated the MHRL

licensing requirement and is subject to penalties, including fines and licensing suspensions.  Mich. Comp. Laws § 431.307.  Defendants argue that TwinSpires accepts wagers in Michigan and therefore needs consent (via a license) from Michigan regulatory entities.

TwinSpires filed its complaint in this Court on January 12, 2025.  On January 16, the Executive Director filed a complaint and an emergency motion for a temporary restraining order against TwinSpires in the Third Judicial Circuit Court for Wayne County, seeking an order preventing TwinSpires from operating in Michigan without a license.  TwinSpires filed a motion for a preliminary injunction against Defendants in this Court on January 17, 2025, and removed the Executive Director's state court lawsuit to the United States District Court for the Eastern District of Michigan on January 21, 2025, where it remains pending.

## II. JURISDICTION

As a threshold issue, Defendants argue that this Court does not have jurisdiction over TwinSpires's claims.  The Court addresses each of Defendants' jurisdictional arguments below.

### A. Cause of Action

Defendants argue that TwinSpires lacks jurisdiction because the Supremacy Clause does not bestow upon plaintiffs a cause of action under which they can bring a claim.  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015) ("[T]he Supremacy Clause is not the source of any federal rights . . . and certainly does not create a cause of action." (internal punctuation and citation omitted)).  However, as the Supreme Court explained, "[t]o say that the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law."  *Id.*  In fact, in *Armstrong*, the Supreme Court reiterated the existence of a "long recognized" implied right of action "if an individual claims federal law immunizes him from state regulation."  *Id.*  In such cases, "the court may issue an injunction upon finding the state regulatory actions preempted."  *Id.* (citing *Ex parte Young*, 209 U.S. 123, 155-56

(1908)); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. . . . A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").  Additionally, the state actor need not have already acted in the allegedly unconstitutional manner.  *Ex parte Young*, 209 U.S. at 167 (explaining that whether the state actor has already commenced—or "is about to commence"—the allegedly unconstitutional action, "[t]he state cannot, in either case, impart to the official immunity from responsibility to the supreme authority of the United States.").

*Armstrong* merely clarified that the Supremacy Clause does not confer a cause of action, an important point for the ultimate holding: because the implied cause of action to enjoin state actors is based on common law principles of traditional equity jurisprudence rather than the Constitution (via the Supremacy Clause), a federal statute may preclude this type of private enforcement.  *Armstrong*, 575 U.S. at 327-28 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996)));  *see also* Richard H. Fallon, Jr. et al., Hart and Wechsler's the Federal Courts and the Federal System 844-45 (7th ed. 2015) (explaining that *Armstrong* reaffirmed the implied cause of action to enjoin state law on federal preemption grounds, subject to limitations from Congress via the relevant federal statute).

To determine whether a federal statute precludes this implied cause of action, courts look to whether Congress expressed an "'intent to foreclose' equitable relief."  *Armstrong*, 575 U.S. at 328 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)).  Congress

exhibits an intent to foreclose equitable relief when the language of the federal statute suggests that the courts are not the proper forum to adjudicate equitable claims of this nature.  *Id.*

*Armstrong* presents a helpful example of such an intent to foreclose.  In *Armstrong*, private parties sued Idaho health care officials that reimbursed providers at rates lower than what the Medicaid Act prescribed.  *Id.* at 323-24.  The private parties claimed that the state health care officials' actions were unconstitutional, preempted by federal statute.  *Id.*  However, the language of the Medicaid Act clarified that Congress expressly created an alternative remedy for when state actors violated the Medicaid Act's reimbursement provisions.  *Id.* at 328 ("[T]he sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services.").  Congress did not want private parties to sue state health care officials over conflicts with Medicaid's requirements; Congress wanted the Secretary of Health and Human Services to resolve such disputes.  *Id.* The Supreme Court recognized that when a statute's language creates an alternative, exclusive remedy for a Supremacy Clause violation, it illustrates an intent to foreclose equitable relief against state actors.  *Id.*  And, while an alternative remedy "might not, *by itself*, preclude the availability of equitable relief," if the federal statute also creates "judgment-laden standard[s]" that are "judicially unadministrable [by] nature," it suggests courts are not the proper forum to resolve a conflict with defiant state actors.  *Id.* at 328-29.

Unlike the Medicaid Act's exclusive remedy for a state's noncompliance with federal regulation, the IHA is silent on the process by which persons can sue a state if the state does not comply with the preemptive elements of the statute.[4]  Such silence does not preclude an implied

---

[4] As discussed in detail below, the IHA only limits a person's ability to sue a state when the person proceeds under the cause of action outlined in section 3006(a).  15 U.S.C. § 3006(d).  The cause of action is related to noncompliance with the IHA's acceptance procedure, not the implied cause of action for equitable relief based on preemption.  *Id.*

right of action for equitable relief against a state actor that is allegedly violating preemptive elements of a federal statute; in fact, it signals Congress had no intent to foreclose such claims in equity.  Even if a federal statute "does not *confer* jurisdiction," so long as it "does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the [state actor's] order for compliance with federal law," then federal jurisdiction exists.  *Verizon Md., Inc.*, 535 U.S. at 642; *see also Armstrong*, 575 U.S. at 331 (evaluating the implied cause of action under equitable principles as an independent basis for jurisdiction; the Court later analyzed whether the Medicaid Act's language expressly created a private right of action).

Because the IHA did not create an alternative, exclusive remedy for when state actors conflict with federal requirements, and the language of the IHA is far from judicially unadministrable, Congress did not express an intent to foreclose TwinSpires's equitable claims.

Defendants cite *Lindsey v. Whitmer*, 124 F.4th 408, 415 (6th Cir. 2024) to reiterate that "the Supremacy Clause doesn't establish standing.  It is 'not the source of any federal rights.'" *Id.* (quoting *Armstrong*, 575 U.S. at 324).  As discussed above, the Court agrees that the Supremacy Clause does not confer a right of action.  TwinSpires proceeds via the distinct implied right of action for equitable claims against state actors that violate preemptive principles of federal statutes. In *Lindsey*, the Court of Appeals made it clear that it sought not "to change Supreme Court precedents or redraw the lines created by them." *Id.*  Instead, the Court of Appeals reaffirmed the notion that common law equitable relief is subject to constraints from either the Constitution or federal statute. *Id.* at 415-16.  In *Lindsey*, the constraints came from the Constitution.  The Court of Appeals noted that the Constitution deprives individual legislators of standing to sue for equitable relief against the Executive Branch. *Id.*  "The equitable powers of federal courts are limited by historical practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021).  One

such practice is refraining from interference between "'the bitter political battle[s]' between the branches." *Lindsey*, 124 F.4th at 416 (quoting *Raines v. Byrd*, 521 U.S. 811, 827 (1997)). TwinSpires's equitable claim does not implicate the issue of legislative standing nor other limitations on the implied right of action established through historical practice; it faces no constraints from the Constitution or federal statute.

The Court will follow in the footsteps of the well-established precedent that acknowledges an implied cause of action for TwinSpires's equitable claim. *E.g.*, *Whole Woman's Health v. Jackson*, 595 U.S. at 44 ("Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions."); *Armstrong*, 575 U.S. at 327-28; *Verizon Md., Inc.*, 535 U.S. at 642; *Shaw*, 463 U.S. at 96 n.14; *Ex parte Young*, 209 U.S. at 155-56.

### B. Jurisdiction Under the IHA

Defendants argue that TwinSpires lacks standing to sue under the IHA's express cause of action. The IHA creates a cause of action for "[t]he host State, the host racing association, or the horsemen's group" to "commence a civil action against any person alleged to be in violation of this chapter." 15 U.S.C. § 3006. The cause of action specifically refers to suits related to "person[s] accepting any interstate off-track wager in violation of [the IHA]." *Id.* §§ 3005, 3006(a); *see also Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270 (1st Cir. 1993) (discussing the limited cause of action outlined in the IHA for when a person accepts an interstate off-track wager contrary to the process established in the statute).

Defendants contend that because TwinSpires is neither a host state, host racing association, or a horsemen's group, they cannot proceed under the cause of action. Defendants are correct, but it matters not. TwinSpires is not proceeding under this cause of action. As discussed above,

9

TwinSpires is proceeding under the implied cause of action available to enjoin state actors from violating federal law.  That implied cause of action exists independently from any express cause of action outlined in a statute (so long as the statute does not specifically create an alternative remedy for cases in equity—against state actors—based on preemption).  *Armstrong*, 575 U.S. at 327-28, 331.  Even though the federal statute in question does not affirmatively grant a cause of action for TwinSpires, because the federal statute does not indicate Congress's intent to foreclose private enforcement of preemption principles, TwinSpires can proceed under the implied cause of action for equity claims against state actors that allegedly violate the Constitution.  *Id.* at 331; *Verizon Md., Inc.*, 535 U.S. at 642.

### C. Injunctive Relief Under the IHA Against Michigan

Defendants next assert that the IHA prevents TwinSpires from proceeding against state actors.  It does not.  As indicated above, the IHA outlines a limited cause of action for when a person accepts an interstate wager in violation of the IHA.  It does not preclude parties from proceeding under the implied right of action to enjoin state actors from unconstitutional conduct.

The IHA limits a person's right to sue a state, but only for the cause of action outlined in the IHA.  15 U.S.C. § 3006(d) ("Nothing in this chapter shall be construed to permit a State to be sued *under this section* other than in accordance with its applicable laws.") (emphasis added).  The IHA prevents private parties from suing a state when a person does not properly accept an interstate off-track wager.  Simply put: a state is not to be held liable when an in-state horse race association or off-track betting system accepts a wager in violation of the IHA.  *Id.*  But this restriction does not apply to the case before the Court; TwinSpires proceeds under a separate cause of action—one that the IHA does not restrict.

**D. Eleventh Amendment Immunity**

TwinSpires has named the MGCB and the Attorney General as defendants in this case. Defendants argue that TwinSpires cannot sue the MGCB and the Attorney General.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health*, 595 U.S. at 39. This immunity applies equally to state agencies. *LIUNA v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022) (citing *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). There exists a "narrow exception grounded in traditional equity practice—one that allows certain private parties to seek judicial orders in federal court preventing state executive *officials* from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 595 U.S. at 39 (emphasis added) (citing *Ex parte Young*, 209 U.S. at 159-60). MGCB is not an official. It maintains immunity under the Eleventh Amendment as a state agency—an arm of the state. *Ashford v. Univ. of Mich.*, 89 F.4th 960, 969 (6th Cir. 2024). The MGCB has not waived this immunity, and Congress has not "unequivocally expresse[d] its intent to abrogate sovereign immunity" for this claim. *Id.* The Eleventh Amendment bars TwinSpires's claims against the MGCB.

As indicated above, the exception to Eleventh Amendment immunity is narrow, applying only to those officials that "enforce state laws." *Id.* TwinSpires bears the burden of directing the Court "to any enforcement authority the attorney general possesses in connection with" the MHRL. *Id.* at 44 (dismissing claims against the Attorney General of Texas). TwinSpires has met this burden. Unlike in *Whole Woman's Health*, where the Attorney General of Texas could not enforce the statute in question, here, the Attorney General enforces the penalties that the Executive Director seeks to impose under the MHRL. Because TwinSpires has properly alleged that the Executive Director and the Attorney General are responsible for enforcing the purportedly

unconstitutional actions, Eleventh Amendment immunity does not shield TwinSpires's claims against the Executive Director and the Attorney General.

### III. STATUTORY LANGUAGE

Before addressing the parties' legal theories for TwinSpires's motion for preliminary injunction, the Court must establish the starting gate for the remainder of its analysis.  While the Court has already addressed its interpretation of the jurisdictional language in the IHA, because the parties offer conflicting interpretations of the relevant IHA and MHRL sections, the Court will settle the differences.  TwinSpires argues that because the IHA preempts the MHRL licensing requirement, the MGCB cannot sanction TwinSpires for accepting wagers—that are placed in Michigan—for out-of-state races.  Defendants argue that the IHA does not prevent the MGCB from enforcing the MHRL licensing requirement on out-of-state races.  As is required, the Court starts "with the language of the statute" and "examines the plain meaning of its words."  *United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019).

### A. 15 U.S.C. § 3001

The IHA starts with Congress's findings and policy, announcing that the purpose of the statute is "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States."  15 U.S.C. § 3001(b).  It recognizes that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders."  *Id.* § 3001(a)(1).  While states retain authority over intrastate gambling, "the Federal Government should prevent interference by one State with the gambling policies of another, and should act to protect identifiable national interests."  *Id.* § 3001(a)(2).  Finally, Congress established that "in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure

States will continue to cooperate with one another in the acceptance of legal interstate wagers." *Id.* § 3001(a)(3).

First, note that this section describes the specific activity subject to federal regulation: "the limited area of interstate off-track wagering." *Id.* § 3001(a)(3).  Second, note how this section addresses state authority.  States retain exclusive authority over what *types* of gambling may be allowed within their borders.  As discussed below, the IHA does not commandeer states to legalize any type of gambling.  However, for the "forms"[5] of gambling that may legally take place within a state's borders, the state does not have exclusive governing authority.  *See id.* § 3001(a)(1). States retain only a "*primary* responsibility," as opposed to the *sole* or *exclusive* responsibility, over "the forms of gambling [that] may legally take place within their borders."  *Id.* (emphasis added).  States wield this primary authority with respect to the procedures for intrastate gambling, including how a state's regulatory body gives the required consent to an off-track betting system under section 3004(a) of the IHA (discussed below).  However, for the limited area of the interstate off-track wagering, the IHA establishes an exclusive process for off-track betting systems to follow "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers." *Id.* § 3001(a).

Through this first section of the IHA, Congress distinguishes between a state's authority over intrastate activity and interstate activity.  States can establish their own intrastate procedures for horse race gambling—should they choose to allow such gambling at all.  States also regulate how they give consent to an off-track betting system when such consent is required by the IHA. However, once a state allows gambling on horse races, Congress regulates the procedure for

---

[5] *See, e.g.*, *Form*, Black's Law Dictionary (12th ed. 2024) ("The outer shape, structure, or configuration of something, as distinguished from its substance or matter.").

accepting an interstate off-track wager by identifying the only entities an off-track betting system needs consent from.  By creating a uniform interstate procedure, Congress advances its purpose of preventing state interference with the policies of another state while maintaining respect for states' intrastate regulatory powers.

### B. 15 U.S.C. § 3002

The IHA next defines certain terms.  Most of the definitions are self-explanatory.  One, in particular, requires close examination.  An interstate off-track wager

> means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.

15 U.S.C. § 3002(3).  Starting with the first clause, a "legal wager" refers to a wager that complies with the process as outlined in the IHA.  When a wager is not "legal," it is subject to the cause of action outlined in section 3006.  This language must refer to the IHA's procedures because the alternative (a reference to state laws) would render the subsequent phrase "where lawful in each State involved" superfluous.[6]  *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 257 (6th Cir. 2020) (discussing how courts should avoid statutory interpretations that cause words "to duplicate another provision or to have no consequence" (quoting *Nielsen v. Preap*, 586 U.S. 392, 414 (2019))).

Next, the Court will address the meaning of the phrase "where lawful in each State involved," which, as discussed, modifies the term "pari-mutuel wagers."

---

[6] Due to the offsetting commas, the phrase "where lawful in each State involved" modifies the term "pari-mutuel wagers" as an explanatory phrase; the commas operate as parentheses.  *See* The Chicago Manual of Style §§ 6.51, 6.55 (18th ed. 2024).  Because a "legal wager . . . includes pari-mutual wagers [that are] lawful in each State involved," the phrase "legal wager" must refer to a wager that is legal under the IHA, not the laws of the states, to avoid surplusage.

For an interstate off-track wager, so long as pari-mutuel wagers are "lawful in each State involved" in the transaction, the IHA governs the process by which that wager can be accepted. 15 U.S.C. §§ 3002(3), 3003.  Thus, if pari-mutuel wagers are lawful in a state, then interstate off-track wagers are also lawful in that state.

Because there are active, licensed third-party facilitators in Michigan, pari-mutuel wagers are clearly lawful.  The IHA governs interstate off-track wagers placed in Michigan.  However, when TwinSpires filed its motion for preliminary injunction, there were no licensed racetracks in Michigan, and TwinSpires accepted pari-mutuel wagers that were placed in Michigan without a recognized third-party facilitator license.  Given the attempted enforcement actions against TwinSpires for these transactions, the Court will explain why—even when no entities could *accept* wagers in Michigan—interstate off-track pari-mutuel wagers remained lawful and subject to the IHA's exclusive regulations.

The IHA only requires that pari-mutuel wagers are lawful in each state involved in the interstate transaction; it does not require pari-mutuel wagering to be active.  15 U.S.C. § 3002(3) (using the noun "pari-mutuel wagers" as opposed to the verb "pari-mutuel wagering").  According to the MHRL, "[t]he pari-mutuel system of wagering on the results of horse races as permitted by this act is not unlawful."  Mich. Comp. Laws § 431.317(1).  Looking at this language, the Michigan legislature permits the pari-mutuel system of wagering on horse races.[7]  With this interpretation, the phrase "pari-mutuel system of wagering" serves as the subject that is permitted and lawful according to the statute, not merely the procedure for accepting such wagers.[8]  Authorizing the

---

[7] Other sections of MHRL reiterating that the procedure for pari-mutuel wagering outlined in the statute is the only way to accept such a wager in Michigan do not alter this analysis.  *E.g.*, Mich. Comp. Laws § 431.326.

[8] In both the IHA and the MHRA, the pari-mutuel *system* refers to the type of gambling (as opposed to fixed-odds gambling) while the *form* refers to the process for accepting pari-mutuel wagers.  *E.g.*, 15 U.S.C. §§ 3001(a)(1), 3002(13); Mich. Comp. Laws §§ 431.302(o), 431.317(1) (referencing the "pari-mutuel system of wagering" in the first sentence, then the "forms of pari-mutuel wagering" in the second sentence); *see also Form*, Black's Law

pari-mutuel system of wagering on horse races is one separate and distinct element of Michigan's statute.  Another element of the statute establishes the process by which entities can accept such wagers.  *Id.* § 431.317(8)-(10).  The House Fiscal Agency's analysis is consistent with this reading, construing this language as "affirmatively authoriz[ing] the pari-mutuel system of wagering on the results of horse races" and "*also* prescrib[ing] how pari-mutuel wagering is to be carried out." House Fiscal Agency 2016 Analysis (emphasis added); *see also Rohan v. Detroit Racing Ass'n*, 22 N.W.2d 433, 348-49 (Mich. 1946) (interpreting similar language as "authorizing . . . pari-mutuel betting").

Beyond the plain language, this interpretation makes sense conceptually when considering the separation of powers established in Michigan's Constitution.  *See* Mich. Const. art. III, § 2 ("No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.").  The legislature has the authority to make certain conduct lawful.  *Id.* art. IV, § 1.  The Executive Director has the power to issue licenses allowing entities to participate in this lawful conduct, but the Executive Director does not have the power to deem pari-mutuel wagering unlawful.  Mich. Comp. Laws § 431.307 (granting the Executive Director the power to "promulgate rules . . . for conducting . . . pari-mutuel wagering on horse racing results").  If the Executive Director could make this activity unlawful by revoking all licenses, it would be an improper exercise of legislative power.  *Id.* § 431.307(1)(a) (limiting the Executive Director to actions that "govern[], restrict[], approve[], or regulat[e] . . . pari-mutuel wagering"; each power describes regulating the actors involved, not the activity itself).  The 2019

---

Dictionary (12th ed. 2024) ("The outer shape, structure, or configuration of something, as distinguished from its substance or matter.").

amendments did not alter the general status of pari-mutuel wagers as a lawful activity in Michigan. Even when no entities have the license to accept these wagers, the system itself is lawful.[9]

The Court adopts the interpretation explained above as the natural reading of the language, bolstered by the structure of the IHA and its navigation of federalism principles[10] and Michigan's separation of powers between the legislative and executive branches.  However, Defendants advance an alternative interpretation.  Even if the Court were to adopt this interpretation (which it does not), interstate off-track wagers placed in Michigan remained lawful even when no entities could accept such wagers in Michigan.

Per Defendants' interpretation, this section of the MHRL declares that the procedure for accepting pari-mutuel wagers, as outlined in the statute, is "not unlawful."  Mich. Comp. Laws § 431.317(1).  In other words, the MHRL only makes the process of accepting these wagers lawful when that acceptance conforms to the requirements outlined in the statute.  Defendants, relying on this interpretation, claim that because entities cannot legally accept pari-mutuel wagers in Michigan, as a general principle, pari-mutuel wagers are unlawful in the state.  Not so.

In support of its argument, Defendants rely on Chapter XLIV of the Michigan Penal Code, which regulates gambling.  Mich. Comp. Laws §§ 750.301-750.315a.  But Michigan laws do not outlaw all conduct related to gambling.

Michigan employs a broad supplier-side gambling regulatory scheme.  Michigan prohibits "tak[ing], receiv[ing], or accept[ing]" bets.  *Id.* § 301.  Michigan prohibits hosting or maintaining

---

[9] Think of a master switch for an electrical current.  A master switch allows for electricity to flow through a room, a prerequisite for turning on an individual light.  The MHRL acts as the master switch, which enables the Executive Director to offer a license (akin to turning on an individual light).  The Michigan legislature flipped on the master switch, making pari-mutuel wagers lawful.  The Executive Director has the power to turn on individual lights, but the Executive Director does not control the master switch.  The IHA is concerned with whether there is an active electric current in the room, not whether there is light.

[10] Which, as explained above, grants states authority over intrastate activity, but so long as the state generally allows pari-mutuel wagers, the interstate system is protected by the IHA.  15 U.S.C. §§ 3001, 3003.

a gambling event.  *Id.* §§ 750.302, 750.303, 750.304.[11]  Michigan even prohibits advertising and disseminating information related to these illegal gambling events.  *Id.* §§ 750.305, 750.305a.  But for consumer-side regulations, Michigan laws have a glaring omission: there is no prohibition on the act of *placing* a wager.[12]

Michigan law only prohibits consumer-side conduct once a wager has been accepted.  Michigan prohibits the possession of unauthorized lottery tickets.  *Id.* §§ 750.306.  Michigan prohibits people from entering or being physically present at a place where unauthorized gaming occurs.  *Id.* § 750.309.  Michigan even prohibits winning money on gambling and losing money on gambling when the subject of the wager is a game or race located in Michigan.[13]  *Id.* §§ 750.314, 750.315.  But Michigan's gambling prohibitions do not cover the act of placing a wager.  *See State ex rel. Reading v. W. Union Tel. Co.*, 57 N.W.2d 537, 539-40 (Mich. 1953) (holding that because Western Union did not accept a bet, and only facilitated the act of *placing* a wager out of state, it did not partake in gambling activity covered under Michigan's prohibitions).[14]

---

[11] Arcades, antique slot machines, crane games, and certain card games at senior citizen housing are exempted.  Mich. Comp. Laws §§ 750.303, 750.303a.

[12] The MHRL does not regulate the act of placing a wager either.  The only language pertaining to placing a bet—that "wagers must be placed by persons within this state and may be placed only [through licensed entities]"—is framed as a restriction on the entities that accept such bets.  Mich. Comp. Laws § 431.317(8) (using the passive voice to put the onus on entities that accept bets).  Similarly, the onus is on race meeting licensees to not accept wagers from patrons under the age of 18.  *Id.* § 431.317(6).

[13] Michigan statutes are presumed to not cover extraterritorial activity unless there is "clear legislative intent" to the contrary.  *Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843, 854-55 (Mich. 1982).  Nothing in the language of Michigan's prohibition on winning or losing money from gambling implies extraterritorial intent.  Mich. Comp. Laws §§ 750.314, 750.315.  Additionally, Michigan law treats money as won or lost in Michigan when the wager relates to a game/race that takes place in-state.  *See* Mich. Comp. Laws § 206.110(2)(d) (explaining that winnings on gambling or pari-mutuel races are only considered Michigan-based income when the casino or race "is located in [Michigan]").

[14] Even the separate opinion acknowledged that the prohibited activity would be the act of *receiving* gambling money in Michigan rather than the act of placing it.  *State ex rel. Reading*, 57 N.W.2d at 542-44 (Reid, J., concurring).

The act of placing a wager is distinct from the act of accepting a wager.  *Id.* at 539 ("If, therefore, an offer to bet[15] is telegraphed by a person in this city to another in New York, and the latter accepts by telegraph, the betting is done, not in Richmond, but in New York, because the offer, being accepted there, takes effect ther[e]."); *see also* 15 U.S.C. § 3002(3) (recognizing that placing a wager and accepting a wager are separate acts that can take place in separate states); *Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533-34 (Mich. Ct. App. 2010) (discussing the distinct act of accepting a bet (citing *State ex rel. Reading*, 57 N.W.2d at 539 (Mich. 1953))).[16]  In Michigan, "a bet is made at the time and place where the offer of it is accepted."  *State ex rel. Reading*, 57 N.W.2d at 539.  As discussed above, Michigan's laws cover conduct associated with a completed wager.  Mich. Comp. Laws §§ 750.301-750.315a.  Until a wager is accepted, it is not prohibited gambling conduct, and when that wager is accepted out of state, the gambling conduct did not take place within the jurisdictional reach of Michigan's gambling prohibitions.  *State ex rel. Reading*, 57 N.W.2d at 539.  Thus, so long as the individual does not have a physical presence in a Michigan gambling house, and does not win or lose on a gambling event that takes place in-state, the individual has not violated Michigan law.  *Id.* at 539-40.

As is relevant for the case before the Court, while no entity could accept pari-mutuel wagers within Michigan's borders when Northville Downs's licenses were suspended, Michigan does not prevent residents from placing such wagers out of state.  Thus, even if the Court were to adopt Defendants' interpretation of MHRL section 431.317(a), pari-mutuel wagers remained lawful

---

[15] "Offer to bet" is a wager, as another entity must accept this offer; once accepted it becomes gambling activity.  *State ex re. Reading*, 57 N.W.2d at 539.

[16] In *Attorney General*, the Michigan Court of Appeals discussed what type of conduct can be considered gambling; it did not address when the act of gambling is completed.

throughout January (particularly those wagers accepted out of state for races that took place out of state).

As discussed above, the IHA is concerned with the lawful status of pari-mutuel wagers, not whether any entity is accepting wagers in a state. Under either interpretation of the MHRL language, pari-mutuel wagers were lawful in Michigan even when Northville Downs did not have its licenses.

### C. 15 U.S.C. § 3003

In this section, Congress makes clear that "[n]o person may accept an interstate off-track wager except as provided in this chapter." 15 U.S.C. § 3003. This language is explicit: there is one, exclusive procedure by which entities can accept interstate off-track wagers, and it is the procedure outlined in the IHA. "The plain language of § 3003 makes clear that the IHA exclusively regulates interstate wagering." *Horseman's Benevolent & Protective Ass'n, Inc. v. Zonak*, No. 2:07-cv-00057, 2008 WL 11453695, at *5 (S.D. Ohio Sept. 23, 2008); *see also Campbell v. Hussey*, 368 U.S. 297, 300-01 (1961) (explaining that when Congress establishes a uniform, interstate standard, it reflects the exclusive means of regulation rather than a floor from which states may implement supplemental regulation); *cf.* 29 U.S.C. § 1871 (expressly establishing that "[t]his chapter is intended to *supplement* State law" (emphasis added)); 33 U.S.C. § 1370 (expressly permitting supplemental state regulation that is more stringent than the federal regulatory floor).

If the language was not explicit enough, the structure of the statute implies exclusivity. Given the states' primary responsibilities for activity within their borders, and the "need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers," 15 U.S.C. § 3001(a), the IHA prevents states from taking a "good for me but not for thee" approach to gambling regulation. Once a state permits pari-mutuel wagers within

its borders, it must participate in the interstate off-track wagering scheme Congress established. *Id.* § 3002(3). If states could add additional consent requirements, it would defeat Congress's pronounced purpose to "prevent interference by one State with the gambling policies of another." *Id.* § 3001(a). For example, if the MGCB could require an additional licensing requirement to interstate off-track wagers, it could prevent entities in Oregon and Pennsylvania from accepting certain wagers even though such entities were complying with local laws and the IHA. The MGCB would be interfering with other states' gambling policies that permitted this activity. The IHA seeks to facilitate interstate off-track wagers by establishing a uniform national system, preventing this type of state-based interference.

Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers. The IHA prohibits states from adding supplemental requirements.

### D. 15 U.S.C. § 3004

Next, the IHA outlines the exclusive, across-the-board procedure for interstate off-track wagers. Under this procedure, an off-track betting system needs consent from three entities to accept a wager. "An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from" three entities: (1) the host racing association; (2) the host racing commission; and (3) the off-track racing commission. 15 U.S.C. § 3004(a). Sometimes, the off-track betting system will need consent from additional, nearby racetracks, but no other regulatory entities. 15 U.S.C. § 3004(b). When read in conjunction with the previous section that declares this to be the exclusive procedure for accepting an interstate off-track wager, it is clear the off-track betting system needs consent from these entities only.

The parties do not dispute the definitions of the first two consenting entities;[17] they only differ on the meaning of "off-track racing commission."  That term refers to a "person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in *that State*."  *Id.* § 3003(11) (emphasis added).  The parties disagree on the meaning of "that State."  TwinSpires argues the additional "State" it needs consent from is Oregon because its wagering hub—the location from which it accepts interstate off-track wagers—is located in Oregon.  Defendants argue the additional "State" from which TwinSpires must obtain consent to an interstate off-track wager is Michigan because TwinSpires "holds a license to conduct interstate off-track wagers in Michigan,[18] and does in fact accept interstate off-track wagers that are placed in Michigan."  (Defs.' Br. 21, ECF No. 16.)

The term "that State" in section 3004 is ambiguous.  When statutory language is ambiguous, the Court looks to the legislative history.  *Bedford*, 914 F.3d at 427.  The legislative history for the IHA illustrates that the "off-track racing commission" refers to the regulating entity of the "off-track state."  S. Rep. No. 95-1117, at 7-8 (1978) (discussing the expectation that the off-track betting system would negotiate an initial consent agreement with the host racing association then present the completed agreement to "the racing commissions of the host state and the *off-track state* for final approval" (emphasis added)).  Because the "off-track state" is the "State in which an interstate off-track wager is accepted," 15 U.S.C. § 3002(6), the third entity from which an off-track betting system needs consent is the regulatory entity for the state in which a bet

---

[17] A "host racing association" is "any person who, pursuant to a license of other permission granted by the [state in which the horserace subject to the interstate wager takes place], conducts the horserace subject to the interstate wager." 15 U.S.C. § 3002(5), (9).  A "host racing commission" is the "person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the [state in which the horserace subject to the interstate wager takes place]." *Id.* § 3002(5), (10).

[18] The Court will assume this assertion refers to the mere act of holding a license—even a suspended one—as the entire dispute stems from Defendants' assertion that TwinSpires is improperly accepting pari-mutuel off-track wagers without a valid license.

is *accepted*.  The off-track betting system does not need consent from the regulating entity for the state in which a bet is *placed*.  Unless the wager is *accepted* in Michigan, MGCB is not the off-track commission that must consent to the wager.

Defendants conflate accepting a bet that was placed in Michigan with the act of accepting a bet while being present in Michigan.  As indicated above, the act of placing a wager is distinct from the act of accepting a wager.  *E.g.*, 15 U.S.C. § 3002(3) (distinguishing between the act of placing a wager and the act of accepting a wager).  A wager placed through electronic means is accepted where the accepting entity is located.  *PowerPick Club*, 783 N.W.2d at 533-34 (citing *State ex rel. Reading*, 57 N.W.2d at 539).  TwinSpires accepts interstate off-track wagers at its Oregon-based processing hub.  The off-track commission from which TwinSpires needs consent under the IHA is Oregon's regulating agency, not the MGCB.

Note that the State of Michigan still plays a role in off-track wagering.  When a race that takes place in Michigan is the subject of an interstate off-track wager, or when an entity *accepts* an interstate off-track wager in Michigan, the MGCB's consent is required.  15 U.S.C. § 3004.  Additionally, the IHA requires that a state generally consent to allowing its residents to place pari-mutuel wagers by making such activity lawful.  If pari-mutuel wagers are not lawful in a state, then neither are interstate off-track wagers.  States retain "the option of regulating [pari-mutuel wagering]."  *Ky. Div. Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1417 (6th Cir. 1994).  If states exercise this option and choose to make all pari-mutuel wagering unlawful, then the IHA does not interfere—no interstate off-track wagers may come from that state.  *Id.* at 1414-15.  But, as discussed, Michigan did not exercise this option; pari-mutuel wagers remained lawful in Michigan.  Mich. Comp. Laws § 431.317(a).

Although Michigan has a role to play in interstate off-track wagers placed in Michigan, the IHA does not require MGCB consent when that wager is *accepted* outside of Michigan and the subject of that wager is a race that takes place outside of Michigan.

## IV. LEGAL STANDARD

Whether to issue a preliminary injunction is in the discretion of the district court.  *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015).  A court considers and balances four factors: (1) whether the movant has established a substantial likelihood or probability of success on the merits; (2) whether the movant would suffer irreparable injury without the preliminary injunction; (3) whether the issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction.  *Kentucky v. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014).  Each factor should "be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks and citation omitted).  An injunction at this stage should "only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citation omitted).

"[A] hearing is only required when there are disputed factual issues, and not when the issues are primarily questions of law."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 552 (6th Cir. 2007).  "[W]here material facts are not in dispute . . . district courts generally need not hold an evidentiary hearing."  *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312-13 (11th Cir. 1998)).  Here, there are no material facts in dispute,

24

and the primary issues are questions of law.  Of note, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## V. PRELIMINARY INJUNCTION ANALYSIS

### A. Likelihood of Success on the Merits

To show a strong likelihood of success on the merits, TwinSpires must show "more than a mere possibility of success."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  However, a party "is not required to prove his case in full" to obtain a preliminary injunction.  *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 543.  "It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id.* (citing *Six Clinics*, 119 F.3d at 402) (internal quotation marks and alterations omitted).

TwinSpires asserts that Defendants' enforcement of the MHRL licensing provisions is unconstitutional due to (1) the IHA preempting this state law licensing requirement; and (2) the dormant commerce clause.

### 1. Preemption

"Preemption is based on the Supremacy Clause . . . ."  *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 477 (2018).  "[F]ederal law is supreme in case of a conflict with state law."  *Id.*  For the IHA "to preempt state law, it must satisfy two requirements.  First, it must represent the exercise of a power conferred on Congress by the Constitution."  *Id.*  In this case, that power is the regulation of interstate commerce.  "Second, since the Constitution 'confers upon Congress the power to regulate individuals, not States,'" the statute must regulate private actors.  *Id.* (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).  The principles of preemption,

which restrict state actions that conflict with federal law, is not an inherent regulation of the states. *Id.* at 478.  Even though the "language might appear to operate directly on the States," the IHA "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints."  *Id.* at 478-79.  The IHA regulates individuals by "impos[ing] restrictions on private actors," *id.* at 480, prohibiting persons from accepting interstate off-track wagers through any process that deviates from section 3004.  15 U.S.C. § 3003.

TwinsSpires argues that Defendants' enforcement of the MHRL on interstate off-track wagers accepted outside of Michigan—on races taking place outside of Michigan—implicates multiple types of preemption: field preemption and conflict preemption.

### (a) Field Preemption

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'"  *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. at 479.  "[F]ield preemption does not involve congressional commands to the States.  Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law."  *Id.*

"[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  When "federal statutory directives provide a full set of standards governing" certain activity, "including the punishment for noncompliance[,] . . . Congress occupies an entire field."  *Id.* at 401.  Congress, via the IHA, established a full, exclusive set of standards governing the process by which an entity can accept interstate off-track wagers. 15 U.S.C. §§ 3003, 3004.  Congress also included the punishment for noncompliance in the IHA. 15 U.S.C. § 3005.  By establishing this complete, exclusive regulatory structure, Congress occupied the field of regulating interstate off-track wagering.  *Horseman's Benevolent &*

26

*Protective Ass'n, Inc.*, 2008 WL 11453695, at *5 ("The plain language of § 3003 makes clear that the IHA exclusively regulates interstate wagering.").

Field preemption need not stymie state powers in tangential areas outside the field that Congress occupies. Congress can carefully tailor the federal regulatory scheme to wholly occupy a specific field in the interstate commerce space while still preserving state authority in an intrastate space. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 385-86 (2015) (recognizing that even though the federal Natural Gas Act occupied the field of interstate transactions, states could regulate intrastate transactions so long as they did not "invalidly invade[] the federal [government's] exclusive domain" (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 513-14 (1989))). Congress did so here, carefully tailoring the IHA to regulate the limited area of accepting interstate off-track wagers. The IHA allows states to outlaw pari-mutuel wagering altogether via intrastate regulation. 15 U.S.C. 3002(3). States can limit the "takeout" amount that an off-track betting system receives. 15 U.S.C. § 3004(c). But if a state decides to allow pari-mutuel wagering, it cannot invade the IHA's exclusive regulatory scheme for accepting interstate off-track wagers. *Id.* § 3003. Once a state decides that pari-mutuel wagering is permissible within its borders, the federal field covers interstate off-track pari-mutuel wagers in that state. And for the "limited area of interstate off-track wagering on horseraces," *id.* § 3001(a)(3), "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. Here, Michigan's licensing requirement is impermissible.

The IHA occupies the field of interstate off-track wagers and, as discussed above, regulates interstate off-track pari-mutuel wagers in Michigan. Under the IHA, when a person in Michigan places a wager on an out-of-state race through TwinSpires, because TwinSpires accepts wagers at its processing hub in Oregon, TwinSpires does not need Defendants' consent. The IHA establishes

27

that, for a wager of that kind, TwinSpires only needs consent from the entity conducting the horserace outside of Michigan (the host racing association), the regulatory entity in that state (the host racing commission), and the regulatory entity in Oregon (the off-track racing commission). 15 U.S.C. § 3004(a).[19]  The Executive Director's attempt to force TwinSpires to hold a Michigan license in order to accept wagers of the aforementioned kind is akin to adding an additional consent requirement, one that runs contrary to the IHA's exclusive requirements. *Id.* § 3003.  Thus, the Executive Director's actions are not permitted.  Guided by the Supremacy Clause, the Executive Director's attempted enforcement of the MHRL licensing requirement is unconstitutional. *Shaw*, 463 U.S. at 96 n.14 (the Court may grant "injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute").  TwinSpires has demonstrated a likelihood of success on this claim.

### (b) Conflict Preemption

Because TwinSpires's conflict preemption argument relies, essentially, on the premise that the IHA occupies the field of regulating the acceptance of interstate off-track wagers, the Court need not reiterate its analysis as to why the Executive Director's attempted enforcement of the MHRL licensing provisions is unconstitutional due to preemption.

### 2. Dormant Commerce Clause

TwinSpires claims that the MHRL's licensing requirements also violate the dormant Commerce Clause.  Because TwinSpires has demonstrated a likelihood of success on its preemption claim, it need not demonstrate such a likelihood on this second claim.  However, the Court notes that, at this stage, TwinSpires has not demonstrated a likelihood of success on its dormant Commerce Clause claim.

---

[19] TwinSpires may also need consent from nearby racetracks, but this requirement does not include Michigan regulatory entities.  15 U.S.C. § 3004(b).

"[A]ntidiscrimination principle[s] lie[] at the 'very core' of [the Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). The "Commerce Clause" prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* (cleaned up) (citing *Dep't of Revenue of Ky. V. Davis*, 553 U.S. 328, 337-38 (2008)). But the MHRL does not "advantage in-state firms or disadvantage out-of-state rivals." *Id.* at 370. It imposes the same licensing requirements on all third-party facilitators—whether in-state or out-of-state. Mich. Comp. Laws §§ 431.308, 431.317. And TwinSpires has not demonstrated that Michigan's choice to create separate regulatory schemes for third-party facilitators and racetracks violates the dormant Commerce Clause.

Although state regulations may still implicate the dormant Commerce Clause even when they are not facially discriminatory, such is not the case here. TwinSpires likens the MHRL licensing provisions to the "local processing requirements that [courts] long have held invalid." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994). TwinSpires's argument relies on reading the MHRL licensing requirements to impact interstate off-track wagers on races that take place out-of-state and are accepted out-of-state. But this interpretation of the licensing requirements is improper. As indicated above, enforcing the MHRL licensing requirements to such wagers would be unconstitutional due to IHA preemption and subject to equitable relief. Given the Court's duty to avoid unconstitutional interpretations of statutes, the Court interprets these licensing requirements to apply only to wagers that are either placed on races located in Michigan or accepted in Michigan. *See Jennings v. Rodriguez*, 538 U.S. 281, 297 (2018) (encouraging constitutional avoidance).

29

Even if these licensing requirements, when applied to wagers that are accepted in Michigan or placed on races located in Michigan, could be construed as impermissible local process requirements, "Congress may 'redefine the distribution of power over interstate commerce' by 'permitting the states to regulate the commerce in a manner which would otherwise not be permissible.'" *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).  When a federal statute "affirmatively permit[s]" the state regulation, the state regulation does not violate the dormant Commerce Clause.  *Id.* at 91.

As discussed above, the IHA expressly permits states to regulate intrastate wagers.  15 U.S.C. §§ 3001(a)(1), 3002(3).  The IHA also grants states a consenting role when the wager is either placed on races located in Michigan (consent required by the MGCB as the host racing commission) or accepted in Michigan (consent required by the MGCB as the off-track racing commission).  15 U.S.C. § 3004.  For such wagers, TwinSpires must obtain MGCB consent through the Executive Director.  The IHA does not regulate what that consent entails.  In doing so, the IHA affirmatively permits state regulatory bodies to determine how they give that consent.[20] Thus, the licensing requirements, when applied to wagers either placed on Michigan races or accepted in Michigan, do not violate the dormant Commerce Clause.

### 3. Conclusion

The IHA provides the exclusive procedure to accept an interstate off-track wager.  When a wager is placed in Michigan, but the wager is placed on an out-of-state race, and the wager is accepted out-of-state, TwinSpires does not need MGCB's consent.  The Executive Director and Attorney General's attempt to force TwinSpires to obtain an additional licensing is

---

[20] The affirmative permission to issue licenses is not necessarily an endorsement of the process by which such licenses are approved.  The IHA does not displace Michigan laws governing administrative procedures and decisions.

unconstitutional as it violates the preemptive elements of the IHA.  Thus, TwinSpires has demonstrated a likelihood of success on its preemption claim.

### B. Irreparable Harm

To be granted an injunction, TwinSpires "must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002).  The injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019).  Irreparable harm "is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.*

"[L]oss of customer goodwill and fair competition . . . constitutes irreparable harm." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).  "[L]oss of goodwill is not [calculable]." *Id.* (citing *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015)).  Additionally, "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexingon-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

TwinSpires alleges that the Executive Director is seeking to (at least temporarily) prevent TwinSpires from accepting interstate off-track wagers placed in Michigan, even if such wagers are accepted in its Oregon hub and placed on non-Michigan races.  It claims irreparable harm will result due to loss of customer goodwill, monetary damages unrecoverable in a final judgment (due to the state's immunity from monetary damages), and loss of competitive position in the interstate wagering sector.  In support of its position, TwinSpires explains that it will lose access to its 18,000 Michigan users if forced to shut down.  (Murr Decl. 14-15.)  TwinSpires also argues that Defendants' accusations of illegal gambling activity have hurt its reputation and caused a loss of

31

customer goodwill.  (*Id.* at 15 & n.3 (citing articles that claim TwinSpires has had its Michigan license suspended due to illegal activity)).

In response, Defendants argue not that these harms are irreparable, but that they are hypothetical.  However, these harms are far from hypothetical.  TwinSpires demonstrated that it has lost—and will continue to lose—customer goodwill due to the accusations of illegal activity.  (*Id.*)  The Executive Director issued a summary suspension of TwinSpires's third-party facilitator license due to alleged illegal conduct.  Additionally, the day before TwinSpires filed its motion for a preliminary injunction, the Executive Director sought a temporary restraining order to prevent TwinSpires from conducting business in Michigan.  (*Williams v. Churchill Downs Tech. Co.*, No. 2:25-cv-10101 (E.D. Mich. 2025), ECF No. 1-1, PageID.21.)  An order forcing TwinSpires to cease operations in Michigan would cause TwinSpires to continue to lose its competitive place in the Michigan pari-mutuel wagering sector.  (Murr Decl. 14-15.)  This harm is exacerbated now that the MGCB has reinstated Northville Downs's licenses, allowing TwinSpires's competitors to accept wagers while maintaining its summary suspension of TwinSpires's license.  If shut down, TwinSpires would be the only online wagering platform that could not accept bets from Michiganders.

Defendants also claim that TwinSpires unnecessarily delayed its request for a preliminary injunction.  Defendants cite *Huron Mountain Club v. United States Army Corps of Engineers*, 545 F. App'x 390 (6th Cir. 2013), for the proposition that "an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm."  *Id.* at 397.  However, in *Huron Mountain Club*, the plaintiff "did not file [its] federal action until six years after [the defendant's] initial state challenge."  *Id.*  To determine whether the plaintiff unreasonably delayed its preliminary injunction motion, the Court of Appeals looked at the time between the actions that could cause concrete

harm (the state challenge) and the preliminary injunction motion.  Defendants ask this Court to start this clock at the moment TwinSpires could have anticipated some potentially harmful, hypothetical action.  But doing so would defeat the purpose of the imminent and concrete harm requirement.  TwinSpires filed its claim in this Court less than a week after the Executive Director issued the summary suspension and threatened additional sanctions.   TwinSpires did not unnecessarily delay its motion, it waited until harm was imminent and concrete, as is required for the Court to grant this injunctive relief.

If the Court does not issue a preliminary injunction, TwinSpires faces a concrete and imminent threat of state action forcing it to cease operations in Michigan.  Not only is such action an unconstitutional intrusion on TwinSpires's rights to accept certain interstate off-track wagers under the IHA (given the statute's preemptive character), TwinSpires has also demonstrated that it has already lost customer goodwill and its competitive market share.  These are incalculable injuries that constitute irreparable harm.  The Executive Director's continued public allegations and attempts to sanction TwinSpires will only exacerbate these harms.   TwinSpires has demonstrated certain and immediate irreparable harm; a preliminary injunction is warranted to prevent further harm.

### C. Substantial Harms to Others and Public Interest

The two remaining preliminary injunction factors—whether issuing the injunction would harm others and where the public interest lies—merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (citing *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020)).  Here, the balance weighs in TwinSpires's favor.

"[A]t bottom, 'the public interest lies in a correct application' of the law."  *Id.* (quoting *Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006)).  Enjoining a law or policy that violates constitutional rights "is always in the public interest."  *Dahl v. Bd. of Trs.*

*of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (internal quotation and citation omitted). When "the plaintiff[] ha[s] shown a substantial likelihood of success on the merits and imminent irreparable injuries, the . . . government faces a high hurdle in showing that these factors warrant withholding relief." *Kentucky*, 57 F.4th at 556. The Government has not met that bar, basing its argument on the assumption that TwinSpires is not likely to succeed on the merits.

As discussed above, TwinSpires has demonstrated a likelihood to succeed on the merits of its constitutional claim and has established irreparable harm. The preliminary injunction would protect TwinSpires's rights, as well as the rights of Michiganders to place interstate off-track wagers via the IHA. Thus, issuing a preliminary injunction would prevent harm to others and advance the public interest.

## VI. CONCLUSION

The IHA establishes the exclusive procedure by which off-track betting systems (like TwinSpires) accept interstate off-track wagers. When someone in Michigan places a wager on an out-of-state race, and they place this wager through an off-track betting system that accepts the wager out of state, under the IHA, the off-track betting system needs consent from the racetrack, the regulating entity in the racetrack's state, and the regulating entity in the state where the system accepted the wager, not the MGCB. By requiring a third-party facilitator license for such transactions, Michigan has acted contrary to the IHA. The Executive Director's attempt to force TwinSpires to obtain a license before accepting bets of this nature is unconstitutional, akin to adding an additional consent to the IHA's exclusive process. TwinSpires may need a license to accept wagers for races on Michigan racetracks under section 3004 of the IHA, but the Executive Director cannot penalize or prevent TwinSpires for accepting a wager outside of Michigan when the race is not at a Michigan racetrack. TwinSpires has demonstrated a likelihood of success on the merits, that imminent and concrete irreparable harm would occur without a preliminary

injunction, and that a preliminary injunction would prevent harm to others and advance the public interest.

The Court will enter a preliminary injunction to prevent the Executive Director and the Attorney General from enforcing the MHRL licensing requirement—or issuing sanctions under the MHRL—against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan.

An order will enter consistent with this Opinion.

Dated: February 19, 2025                    /s/ Hala Y. Jarbou
                                            HALA Y. JARBOU
                                            CHIEF UNITED STATES DISTRICT JUDGE