UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHURCHILL DOWNS TECHNOLOGY
INITIATIVES COMPANY (d/b/a TwinSpires),

     Plaintiff,

v

MICHIGAN GAMING CONTROL BOARD;
HENRY L. WILLIAMS, JR., in his official
capacity as Executive Director of the Michigan
Gaming Control Board; and DANA NESSEL,
in her official capacity as Attorney General of
the State of Michigan,

     Defendants.

NO. 1:25-CV-00047

HON. HALA Y. JARBOU

MAG. MAARTEN VERMAAT

**DEFENDANTS WILLIAMS'
AND NESSEL'S MOTION FOR
SUMMARY JUDGEMENT**

---

Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
Bush Seyferth, PLLC
Attorneys for Plaintiff
100 West Big Beaver, Ste. 400
Troy, MI 48084
seyferth@bsplaw.com
linkous@bsplaw.com
(248) 822-7800

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorneys for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
KennedyJ7@michigan.gov
HallF2@michigan.gov
(517) 241-0210

Gibson, Dunn & Crutcher, LLP
Attorneys for Plaintiff

Thomas H. Dupree, Jr.*
John W. Tienken*
1700 M St N.W.
Washington, DC 20036
TDupree@gibsondunn.com
JTienken@gibsondunn.com
(202) 955-8500

Christine Demana*
2001 Ross Ave., Ste. 2100
Dallas, TX 75201
CDemana@gibsondunn.com
(214) 698-3246

---

   /

## <u>DEFENDANTS WILLIAMS' AND NESSEL'S</u>
## <u>MOTION FOR SUMMARY JUDGEMENT</u>

Defendants Henry L. Williams, Jr., in his official capacity as Executive

Director of the MGCB (Executive Director); and Dana Nessel, in her Official

Capacity as Attorney General of the State of Michigan (Attorney General), hereby

move this Court for summary judgment in their favor on Plaintiff's Complaint

pursuant to Fed. R. Civ. P. 56(a) for the reasons set forth in the accompanying brief.

Concurrence in the motion was sought from Plaintiff's counsel on October 14, 2025,

but was not obtained.  *See* W.D. Mich. L Civ R 7.1(d).

Respectfully submitted,


<u>/s/ James P. Kennedy</u>

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
KennedyJ7@michigan.gov
HallF2@michigan.gov


Dated:  October 14, 2025

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHURCHILL DOWNS TECHNOLOGY
INITIATIVES COMPANY (d/b/a TwinSpires),

       Plaintiff,

v

MICHIGAN GAMING CONTROL BOARD;
HENRY L. WILLIAMS, JR., in his official
capacity as Executive Director of the Michigan
Gaming Control Board; and DANA NESSEL, in
her official capacity as Attorney General of the
State of Michigan,

       Defendants.

NO. 1:25-CV-00047

HON. HALA Y. JARBOU

MAG. MAARTEN VERMAAT

**BRIEF IN SUPPORT OF
DEFENDANTS WILLIAMS'
AND NESSEL'S MOTION FOR
SUMMARY JUDGMENT**

**ORAL ARGUMENT
REQUESTED**

---

Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
Bush Seyferth, PLLC
Attorneys for Plaintiff
100 West Big Beaver, Ste. 400
Troy, MI 48084
seyferth@bsplaw.com
linkous@bsplaw.com
(248) 822-7800

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorneys for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
KennedyJ7@michigan.gov
HallF2@michigan.gov
(517) 241-0210

Gibson, Dunn & Crutcher, LLP
Attorneys for Plaintiff

Thomas H. Dupree, Jr.*
John W. Tienken*
1700 M St N.W.
Washington, DC 20036
TDupree@gibsondunn.com
JTienken@gibsondunn.com
(202) 955-8500

Christine Demana*
2001 Ross Ave., Ste. 2100
Dallas, TX 75201
CDemana@gibsondunn.com
(214) 698-3246

---/

## <u>BRIEF IN SUPPORT OF DEFENDANTS WILLIAMS'</u>
## <u>AND NESSEL'S MOTION FOR SUMMARY JUDGMENT</u>

ORAL ARGUMENT REQUESTED

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
KennedyJ7@michigan.gov
HallF2@michigan.gov

Dated:  October 14, 2025

# TABLE OF CONTENTS

Page

Index of Authorities ................................................................................ ii

Concise Statement of Issues Presented ................................................. ix

Introduction ............................................................................................. 1

Statement of Facts ................................................................................... 3

Argument ............................................................................................... 14

I.      Summary judgment is appropriate because the IHA does not preempt
        the MHRL's licensing requirements. .......................................... 14

        A.      When Congress legislates in an area of traditional state concern,
                there is a presumption against preemption. .......................... 15

        B.      Congress has long supported each States's gambling policies. ............ 17

        C.      The IHA does not occupy the field of interstate off-track
                wagering. ............................................................................ 20

        D.      The IHA's definition of interstate off-track wagers confirms
                Congress' narrow regulatory approach. ................................ 23

        E.      The Michigan Legislature has only made pari-mutuel wagering
                lawful when it is conducted by a licensed race meeting. ...................... 31

        F.      The IHA Must Be Understood Within the Broader Federal
                Statutory Landscape Governing Wagering ............................ 33

        G.      The MHRL does not conflict with the IHA ............................ 36

II.     Summary judgment is also warranted because TwinSpires has not met
        the other requirements for injunctive relief. ................................ 38

Conclusion and Relief Requested ......................................................... 42

Certificate of Compliance ..................................................................... 43

Certificate of Service ............................................................................ 44

i

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.,*
    511 F. App'x 398 (6th Cir. 2013)................................................................38

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................15

*Arizona v. United States,*
    567 U.S. 387 (2012) .............................................................................17, 22

*Casino Ventures v. Stewart,*
    183 F.3d 307 (4th Cir. 1999) .....................................................................16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...................................................................................14

*Churchill Downs v. Thoroughbred Horsemen's Group, LLC,*
    605 F. Supp. 2d 870 (W.D. Ky. 2009) ...................................................20, 22

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ...................................................................................36

*Dayton Power & Light Co. v. FERC,*
    126 F.4th 1107 (6th Cir. 2025) ..............................................................15, 17

*Fenner v. Gen. Motors, LLC,*
    113 F.4th 585 (6th Cir. 2024) .....................................................................15

*Fla. Lime & Avocado Growers, Inc. v. Park,*
    373 U.S. 132 (1963) ...................................................................................36

*Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.,*
    479 F.3d 1310 (11th Cir. 2007) ..................................................................37

*Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.,*
    399 F.3d 1276 (11th Cir. 2005) ..................................................................16

*Hines v. Davidowitz*, 312 U.S. 52 (1941)................................................................36

*Horseman's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine,*
    666 F.3d 997 (6th Cir. 2012) ..................................................................20, 37

*Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. Zonak,*
    No. 2:07-cv-00057, 2008 WL 11453695 (S.D. Ohio, Sept. 23, 2008) ............... 20, 37

*Hudson v. Tex. Racing Comm'n,*
    455 F.3d 597 (5th Cir. 2006) ..................................................................... 31, 33

*Huron Mountain Club v. U.S. Army Corps of Eng'rs,*
    545 F. App'x 390 (6th Cir. 2013) ..................................................................... 38

*Johnson v. Collins Entm't Co., Inc.,*
    199 F.3d 710 (4th Cir. 1999) ............................................................................ 16

*Ky. Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing
Ass'n, Inc.,*
    20 F.3d 1406 (6th Cir. 1994) .............................................................. 19, 20, 30

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................................ 39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 547 (1986). ........................................................................................ 14

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) .......................................................................................... 15

*Merrick v. Diageo Americas Supply, Inc.,*
    805 F.3d 685 (6th Cir. 2015) ............................................................................ 16

*Michigan v. Lueth,*
    660 N.W.2d 322 (Mich. App. 2002) ................................................................. 31

*Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming,*
    971 F.3d 1021 (9th Cir. 2020) ........................................................ 16, 17, 30, 37

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    584 U.S. 453 (2018) ................................................................................ 1, 18, 19

*Northville Downs v. Granholm,*
    622 F.3d 579 (6th Cir. 2010) ............................................................................ 16

*Overstreet v. Lexington-Fayette Urban Ct'y Govt.,*
    305 F.3d 556 (6th Cir. 2022) ............................................................................ 38

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983) .................................................................................... 17, 18

*Rivera-Corraliza v. Morales,*
    794 F.3d 208 (1st Cir. 2015)...................................................................... 16

*Rohan v. Detroit Racing Ass'n,*
    22 N.W.2d 433 (Mich. 1946)...................................................................... 31

*Torres v. Precision Indus., Inc.,*
    995 F.3d 485 (6th Cir. 2021). .......................................................... 16, 17, 18

*United States v. Atl. Research Corp.,*
    551 U.S. 128 (2007) ................................................................................... 28

*United States, ex rel. Polansky v. Executive Health Resources, Inc.,*
    599 U.S. 419 (2023) ................................................................................... 25

*Va. Uranium, Inc. v. Warren,*
    587 U.S. 761 (2019) ................................................................................... 18

*West Virginia v. Env't Prot. Agency,*
    597 U.S. 697 (2022) ............................................................................ 25, 28

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................................... 1, 15

**Statutes**

15 U.S.C. § 3001(a) ...................................................................................... 23

15 U.S.C. § 3001(a)(1) ....................................................................... 7, 19, 36

15 U.S.C. § 3001(a)(2) ............................................................................. 7, 19

15 U.S.C. § 3001(a)(3) ............................................................................. 7, 30

15 U.S.C. § 3001(b) ......................................................................... 7, 23, 39

15 U.S.C. § 3002(3) ............................................................................. passim

15 U.S.C. § 3002(5) ...................................................................................... 8

15 U.S.C. § 3002(9) .................................................................................. 8, 26

15 U.S.C. § 3002(10) .................................................................................. 26

15 U.S.C. § 3002(11) .................................................................................. 26

15 U.S.C. § 3002(12) .................................................................................... 8

15 U.S.C. § 3002(13) .................................................................. 25

15 U.S.C. § 3002(20) .................................................................... 7

15 U.S.C. § 3003 ................................................................. passim

15 U.S.C. § 3004 ......................................................... 28, 29, 34

15 U.S.C. § 3004(a)(1)–(2) ....................................................... 26

15 U.S.C. § 3004(a)(1)(A) ......................................................... 37

15 U.S.C. § 3004(a)–(b) ....................................................... 7, 21

15 U.S.C. § 3004(a)(3) ............................................................... 26

15 U.S.C. § 3004(c) ............................................................... 8, 21

15 U.S.C. §§ 3005–3006 ...................................................... 8, 21

15 U.S.C. § 3006 ......................................................................... 8

18 U.S.C. § 1081 ...................................................................... 33

18 U.S.C. § 1084 ............................................................. 6, 18, 24

18 U.S.C. § 1084(a) .................................................................. 33

18 U.S.C. § 1084(b) .................................................................. 33

18 U.S.C. § 1952 ...................................................................... 18

18 U.S.C. § 1953 ...................................................................... 18

1933 Mich. Pub. Acts 199 .......................................................... 4

1959 Mich. Pub. Acts 27, §§ 12(1)–12(2) ................................... 4

1980 Mich. Pub. Acts 327, §§ 12(1)–12(2) ................................. 4

1986 Mich. Pub. Acts 108 (repealed 1995) ................................. 4

1995 Mich. Pub. Acts 279 § 17(7) .............................................. 5

1995 Mich. Pub. Acts 279 § 18(1) .............................................. 5

31 U.S.C. §§ 5361–5367 ............................................................. 6

31 U.S.C. § 5362(10)(A) ........................................................ 34

31 U.S.C. § 5362(10)(D)(i) ..................................................... 34

31 U.S.C. § 5362(10)(D)(ii) .................................................... 35

Mich. Comp. Laws § 324.99919 ............................................... 4

Mich. Comp. Laws §§ 431.13, 431.14 ................................... 4, 31

Mich. Comp. Laws §§ 431.42(1)–431.42(2) ............................... 4

Mich. Comp. Laws § 431.302(j) ................................................ 5

Mich. Comp. Laws § 431.302(n) ............................................... 4

Mich. Comp. Laws § 431.303 ................................................... 4

Mich. Comp. Laws § 431.315(3). ............................................ 10

Mich. Comp. Laws § 431.317(1) .......................... 5, 6, 10, 29

Mich. Comp. Laws § 431.317(6) ............................................. 21

Mich. Comp. Laws § 431.317(7) ......................................... 5, 10

Mich. Comp. Laws § 431.317(8) ............................ 6, 10, 29, 32

Mich. Comp. Laws § 431.317(10) ............................................. 6

Mich. Comp. Laws § 431.318(1), (2) ..................... 5, 10, 29, 32

Mich. Comp. Laws § 431.318(1) ........................................ 5, 18

Mich. Comp. Laws § 431.318(2)(j) .......................................... 29

Mich. Comp. Laws § 431.318(3) ............................................. 29

Mich. Comp. Laws § 431.318(8)(c) ..................................... 5, 10

Mich. Comp. Laws § 431.320(5) ............................................. 40

Mich. Comp. Laws § 431.322(2)(b) ......................................... 40

Mich. Comp. Laws § 431.322((3) ............................................ 40

Mich. Comp. Laws §§ 750.314 ............................................... 39

Mich. Comp. Laws § 750.315 ....................................................................... 39

Mich. Comp. Laws § 750.331 ................................................... 3, 16, 31, 39

Mich. Pub. Acts 328 of 1931 ................................................................. 3, 31

Mich. Rev. Stat. of 1846 (Detroit: Bagg & Harmon, 1846).................... 3, 31

Ohio Rev. Code § 3769.089(G) ................................................................ 37

Pub. L. 95-515 (1978) ............................................................................... 24

Pub. L. No. 106-553, tit. VI, 114 Stat. 2762A-108 .................................... 24

## Other Authorities

146 Congressional Record—House of Representatives, Proceedings and
    Debates of the 106th Congress, Second Session, H11230, October 26, 2000) ....... 26

An Act to Prevent Horse Racing, Laws of the Territory of Michigan (Detroit:
    Sheldon & Reed, 1820) ............................................................... 3, 31

*Congressional Authority to Adopt Legislation Establishing a National Lottery*,
    10 Op. O.L.C. 40 (1986) ......................................................................... 19

S. Rep. No. 95-1117 (1978) .................................................................... 19, 24

## Rules

Fed. R. Civ. 56(a) ................................................................................... 1, 14

Mich. Admin. Code R. 431.2050–431.2120 ............................................. 21

Mich. Admin. Code R. 431.5005 .............................................................. 22

Mich. Admin. Code R. 431.5010 .............................................................. 21

Mich. Admin. Code R. 431.5010(10)........................................................ 22

Mich. Admin. Code R. 431.5010(11)........................................................ 22

Mich. Admin. Code R. 431.5015(6)(f) ..................................................... 21

Mich. Admin. Code R. 432.631–639d ...................................................... 22

Mich. Admin. Code R. 432.731–739a ...................................................... 22

Or. Admin. R. 462-210-0030 ............................................................................ 23

Or. Admin. R. 462-220-0020 ...................................................................... 23, 39

Or. Admin. R. 462-220-0030(3)(e) ................................................................. 39

W.D. Mich. L. Civ. R. 7.2(b)(i) ...................................................................... 43

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Congress enacted the Interstate Horseracing Act (IHA) to promote cooperation among States while preserving their authority to decide what forms of gambling may occur within their borders.  Michigan's Horse Racing Law (MHRL) simply requires licensure for those who facilitate pari-mutuel wagers placed from within Michigan and neither conflicts with nor falls within the limited field regulated by the IHA.  Should this Court hold that the IHA does not preempt the MHRL's licensing requirements, and grant summary judgment for Defendants?

2.    To obtain an injunction, a plaintiff must show that absent injunctive relief, it will suffer imminent irreparable harm; and that an injunction will not cause significant harm to others.  TwinSpires voluntarily complied with Michigan's licensing regime for years, delayed seeking relief, and an injunction will harm the State of Michigan, its citizens, its horse-racing industry, and other third-party facilitator licensees.  Should this Court grant summary judgment in Defendants' favor, and dissolve its prior preliminary injunction

# INTRODUCTION

Summary judgment in Defendants' favor is appropriate under Fed. R. Civ. P. 56(a), because there is no genuine dispute of material fact, and because there are numerous reasons for this Court to find that the Interstate Horseracing Act (IHA) does not occupy the regulatory field or conflict with the licensing regime set forth in Michigan's Horse Racing Law (MHRL).

*First*, when Congress legislates in areas of traditional state concern, Courts must begin from a presumption that state law is not preempted, unless the federal law expresses a clear intent to do so.  *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Gambling regulation falls squarely within Michigan's historic police powers, and the IHA does not express any clear or manifest intent to preempt state law.

*Second*, in the specific area of gambling, the Federal government has generally maintained a long-standing policy of deferring to state regulation.  As the Supreme Court recently emphasized, Congress "respect[s] the policy choices of the people of each State on the controversial issue of gambling[,]" allowing each state to determine the scope and terms of gambling within its jurisdiction. See *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018).

*Third*, the IHA does not occupy the field of interstate off-track wagering. It regulates only a few blades of grass on the broad turf of gambling regulation. The IHA primarily concerns the consents that an off-track betting service must obtain before accepting an interstate off-track wager; it leaves to the States the authority to set their own gambling standards for wagering and safeguards for wagerers.

*Fourth*, when properly understood, the IHA governs the process for accepting interstate pari-mutuel wagers that are otherwise legal under state law, including in the state from which the wager is placed. The IHA does not require Michigan to allow gambling that violates both the MHRL and Michigan's Penal Code.

*Fifth*, Michigan has long maintained a general prohibition against placing a bet on a horse race, and the MHRL does not authorize pari-mutuel wagering on simulcast races.  Instead, the MHRL delegates power to the Executive Director to authorize wagering on simulcast races.

*Sixth*, reading the IHA to bless wagers that are unlawful in the bettor's State will create conflict with other federal law including the Interstate Wire Act of 1961 and the Unlawful Internet Gambling Enforcement Act of 2006.

*Seventh*, the MHRL does not conflict with the IHA. From 2020 until 2025, TwinSpires complied with both laws, demonstrating that parallel compliance is entirely possible.  Nor is the MHRL an obstacle to the IHA's purpose.  Accordingly, no conflict preemption arises.

*Finally*, consideration of the other elements required for injunctive relief provides further support for summary judgment in Defendants favor.  An injunction will harm the state of Michigan, its citizens, its horseracing industry, and the other third-party facilitators.  By contrast, TwinSpires' prolonged voluntary compliance with Michigan law (and its decade-long delay before seeking relief) defeats any claim it will suffer imminent, irreparable harm without an injunction.

## STATEMENT OF FACTS

### A. Michigan's laws governing wagering on horse races

Michigan's laws regulating wagering on horse races date back to 1819, when Governor Lewis Cass first enacted a prohibition on wagering on the results of a horse race in the territory of Michigan.  The prohibition applied not only to those who raced horses for stakes or who offered and accepted wagering on such races, but also to those who **placed a bet** on a horse race.  *See* An Act to Prevent Horse Racing, Laws of the Territory of Michigan (Detroit: Sheldon & Reed, 1820), § 1, at p. 77 (October 12, 1819).  Despite amendments, *see* Mich. Rev. Stat. of 1846 (Detroit: Bagg & Harmon, 1846), ch. 40, § 1 at pp. 183–184; Mich. Pub. Acts 328 of 1931, § 331, this general ban on wagering on the results of a horse race has remained in place, with limited exceptions.  *See* Mich. Comp. Laws § 750.331.  Now part of Michigan's Penal Code, this law still subjects those betting on horse races to criminal penalties unless an exception applies:

> All running, trotting, or pacing of horses, or any other animals, for any bet or stakes, in money, goods, or other valuable thing, excepting such as are by special laws for that purpose expressly allowed, constitute racing within the meaning of this section, and are hereby declared to be common and public nuisances and all parties concerned therein, either as authors, betters, stakers, stake-holders, judges to determine the speed of animals, riders, contrivers, or abettors thereof, are guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00.  . . .

Mich Comp. Laws § 750.331.

This case concerns an exception to the Penal Code's general ban, the Michigan Horse Racing Law (MHRL).  What is now the MHRL began to take shape in 1933, when Michigan authorized wagering on horse races, as regulated by the

"Racing Commissioner," a state official granted discretionary authority to regulate pari-mutuel wagering on horseracing.  *See, e.g.,* Mich. Comp. Laws § 431.303.  In 2009, that position was abolished, and all functions and powers of the Racing Commissioner were reassigned to the Executive Director of the Michigan Gaming Control Board (MGCB).  Mich. Comp. Laws § 324.99919.  (Nevertheless, the MHRL continues to refer to the "Racing Commissioner.")  The "Office of the Racing Commissioner" in the MHRL is now "the horse racing section of the horse racing, audit, and gaming technology division of the Michigan [G]aming [C]ontrol [B]oard, which operates under" the Executive Director's supervision.  Mich. Comp. Laws § 431.302(n).  Currently, Williams is the Executive Director of the MGCB and carries out all functions of the Racing Commissioner in the MHRL.

From 1933 until 1986, the wagers regulated by the Racing Commissioner consisted of pari-mutuel wagers on races taking place at a licensed race meeting.  *See* 1933 Mich. Pub. Acts 199, §§ 13–14 (then codified at Mich. Comp. Laws §§ 431.13, 431.14 (repealed 1959)); 1959 Mich. Pub. Acts 27, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.42(1)–431.42(2) (repealed 1980)); and 1980 Mich. Pub. Acts 327, §§ 12(1)–12(2) (then codified at Mich. Comp. Laws §§ 431.72(1)–431.72(2) (repealed 1995)).  No other type or location of wagering on regulated races was permitted.

In 1986, the Legislature delegated authority to the Racing Commissioner to allow race-meeting licensees to offer wagering on one "simulcast" horse race per live-racing day.  *See* 1986 Mich. Pub. Acts 108 (repealed 1995).  The Legislature

broadened that authority in 1995 when enacting the MHRL, which again authorized the Racing Commissioner to allow wagering on horse races that were conducted at racetracks other than the one where the wager was placed (simulcast wagering), but on a wider basis.  *See* Mich. Comp. Laws § 431.318(1), (2).  Rather than authorizing one simulcast race per live-racing day, the MHRL allows the Executive Director to issue a permit for "individual race" and "full card simulcasts." A "simulcast" is "the live transmission of video and audio signals conveying a horse race held either inside or outside of this state to a licensed race meeting in this state."  Mich. Comp. Laws § 431.318(8)(c); *see also* Mich. Comp. Laws § 431.302(j) (defining "full card simulcast").

Through these changes, and subject to the Racing Commissioner's approval, people in Michigan obtained permission to wager on races they were not witnessing in-person.  But that permission was subject to three important limitations: (1) simulcast wagering was authorized only if the Racing Commissioner exercised his delegated authority to allow it; (2) only a race-meeting licensee could accept a simulcast wager; and (3) a simulcast wager could be placed only in-person at a licensed race meeting that was conducted at a licensed racetrack.  *See* 1995 Mich. Pub. Acts 279 §§ 17(7), 18(1); Mich. Comp. Laws §§ 431.317(7), 431.318(1).

Significant to this case, Michigan amended the MHRL again in 2019. Although all forms of pari-mutuel wagering still need to be conducted under a race-meeting license and are subject to the Racing Commissioner's approval, Mich. Comp. Laws § 431.317(1), race-meeting licensees may now accept wagers "in person

at a licensed race meeting *or electronically through a licensed third-party facilitator*[.]"  Mich. Comp. Laws § 431.317(8) (emphasis added).  A race-meeting licensee "may use [a] contracted licensed third-party facilitator," but the race-meeting licensee is still responsible for the third-party facilitator's conduct.  *Id*.

Thus, for the first time, the 2019 amendments allowed people in Michigan who are not physically present at a racetrack to place pari-mutuel wagers and allowed a race-meeting licensee to accept those wagers (an "off-track wager").  But the amended law still imposes the other two limitations mentioned above: off-track wagering is allowed only when the Racing Commissioner exercises his delegated authority to authorize it, Mich. Comp. Laws § 431.317(1), (8), and only a race-meeting licensee may conduct it, Mich. Comp. Laws § 431.317(8).  The MHRL expressly states that "[o]nly a race meeting licensee or its contracted licensed third-party facilitator may process, accept, offer, or solicit wagers on the results of live or simulcast horse races as determined or approved by the racing commissioner."  Mich. Comp. Laws § 431.317(10).

## B. The Federal Interstate Horseracing Act

Federal legislation concerning gambling-related activities exists as well.  *See, e.g.,* 18 U.S.C. § 1084 (prohibiting use of a wire communication facility to transmit bets or wagers on sporting events or contests across state lines); 31 U.S.C. §§ 5361–5367 (restricting payments in connection with unlawful internet gambling).  The remaining claim in this case turns on the IHA, which begins with Congress's findings that:

6

- "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders," 15 U.S.C. § 3001(a)(1);

- "the Federal Government should prevent interference by one State with the gambling policies of another . . . ," 15 U.S.C. § 3001(a)(2); and

- "in the limited area of interstate off-track wagering on horseraces, there is a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers." 15 U.S.C. § 3001(a)(3).

Congress then expresses its policy "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b). After articulating this policy, the IHA states that: "[n]o person may accept an interstate off-track wager except as provided in this chapter." 15 U.S.C. § 3003.

The threshold question, then, is whether a wager is an "interstate off-track wager," such that it is subject to the IHA's governance. The IHA defines its reach by defining "interstate off-track wager" as follows:

> "[I]nterstate off-track wager" means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.

15 U.S.C. § 3002(3).

If a wager satisfies this definition, the IHA requires an "off-track betting system" to obtain certain consents before accepting it, 15 U.S.C. § 3004(a)–(b) and regulates the "takeout," *see* 15 U.S.C. § 3002(20), that the off-track betting system

may employ, 15 U.S.C. § 3004(c).  The IHA also establishes a civil action for damages against a person accepting an interstate off-track wager in violation of the IHA.  *See* 15 U.S.C. §§ 3005–3006.  This action may be brought only by the "host State" (the state where the race at issue occurs, 15 U.S.C. § 3002(5)), the "host racing association" (a person who conducts the race at issue in the host state, with the host state's permission or licensure, 15 U.S.C. § 3002(9)), or "the horsemen's group" (a group representing the majority of owners and trainers racing at the host racing association under specified circumstances, 15 U.S.C. § 3002(12)).  *See* 15 U.S.C. § 3006.

### C. Facts and Procedural History

TwinSpires began accepting online pari-mutuel wagers from people in Michigan around 2010.  (Mot. for P.I., ECF 11, Page.ID # 67.)  On May 23, 2013, the Executive Director formally instructed TwinSpires to cease accepting online pari-mutuel wagers from Michigan residents.  (Decl. of Murr, ECF 11-1, Page.ID # 103, ¶ 25; and Churchill Downs' 6/13/13 response letter, ECF 16-1, Page.ID # 411–414.)  In his letter, the Executive Director made clear that, under the MHRL, pari-mutuel wagering was only permitted at a licensed race meeting; thus, the Executive Director concluded that the IHA prohibited TwinSpires from accepting pari-mutuel wagers from people in Michigan and requested that they immediately cease and desist from doing so.  (*Id.*)  Further, the Executive Director stated that TwinSpires was in violation of the IHA, because the IHA required TwinSpires to obtain Michigan's consent, and Michigan did not consent to TwinSpires' unlicensed off-

track wagering activities.   TwinSpires, through its parent company Churchill Downs, disputed this interpretation, claiming in its response that the Executive Director's position violated the dormant Commerce Clause.  (Decl. of Murr, ECF 11-1, Page.ID # 103, ¶ 26; and Churchill Downs' 6/13/13 response, ECF 16-1, Page.ID # 411–414.)

Although law-enforcement officials did not take action against TwinSpires, the Executive Director consistently maintained that TwinSpires' acceptance of online pari-mutuel wagers from people in Michigan between 2010 and 2020 was unlawful under both state and federal law—as can be seen from a condition the Executive Director imposed on TwinSpires in 2020.  Specifically, in the summer of 2020, TwinSpires applied for a third-party facilitator license, as the 2019 amendments to the MHRL allowed.  (Decl. of Murr, ECF 11-1, Page.ID # 105, ¶ 31; Compl., ECF 1, Page.ID # 13, ¶ 34.)

While its application was under review, the Executive Director granted TwinSpires a conditional, temporary third-party facilitator license and, in his order, expressly required TwinSpires to agree that it would "not . . .  accept wagers in the State of Michigan without a license."  (9/3/20 Cond'l. Temp. Lic., ECF 11-5, Page.ID # 253; *see also* MOAHR Hr'g. Tr., ECF 22-1, Page.ID # 738–740 (explaining licensing order).)  Thus, on September 20, 2020, TwinSpires acknowledged "that it w[ould] not accept pari-mutuel wagers on the results of live or simulcast horse racing from a person within the State of Michigan without a Third-Party Facilitator

License."  (TwinSpires' 9/3/20 letter, ECF 15-3, Page.ID # 363; and Decl. of Murr, ECF 11-1, Page.ID # 105, ¶ 31.)

Following its agreement to comply with the MHRL's licensing requirements, TwinSpires held a third-party facilitator license from 2020 to 2024. (Compl., ECF 1, Page.ID # 13, ¶¶ 35–36.)  With that license, TwinSpires has offered "advance deposit wagering" (ADW), a means for people to place wagers remotely through an account funded in advance.  (*Id*. at 6, ¶ 15.)  From TwinSpires' licensure in 2020 until January 2025, TwinSpires complied with Michigan's licensing requirement so it could legally facilitate wagers accepted electronically by race-meeting licensees in Michigan.  (Decl. of Murr, ECF 11-1, Page.ID # 105, ¶ 32.)

TwinSpires reignited its earlier disagreement with Michigan's licensing requirement in 2024 after Northville Downs, LLC, (the only race-meeting licensee in Michigan) requested an unlicensed racetrack in Hastings, Michigan, as the location for its 2025 race-meeting license and simulcast permit.  (Ex. Dir.'s 12/23/24 letter, ECF 11-7, Page.ID # 261.)  This was a problem for TwinSpires because, as explained above, the MHRL does not permit third-party facilitators to independently conduct or operate pari-mutuel wagering.  *See* Mich. Comp. Laws §§ 431.317(1), (7), (8).  Rather, TwinSpires' authorization to accept off-track wagers in 2025 depended on Northville Downs' ability to obtain a race-meeting license and simulcast permit.  *See* Mich. Comp. Laws §§ 431.317(1), (7), (8); 431.318(1), (8)(c). And Northville Downs could not obtain that license and permit without a licensed racetrack.  Mich. Comp. Laws § 431.315(3).

10

Executive Director Williams issued Northville Downs an Order Granting a
2025 Race Meeting License and 2025 Simulcast Permit on October 30, 2024, but—
consistent with the MHRL—he expressly conditioned that order on Northville
Downs having a track license for the new location in Hastings, Michigan.  (Ord.
Granting 2024 Race Meeting License and Simulcast Permit, ECF 15-1.)  The order
stated that "[i]f a track license is not granted at 1350 N. M-37 Hwy., Hastings MI
49058 on or before December 31, 2024, the 2025 Race Meeting License and 2025
Simulcast Permit will not go into effect and no live racing or simulcasting (including
pari-mutuel wagering contracted for through third-party facilitators) is
permitted[.]"  (*Id*. at Page.ID # 348–349.)  Further, the Executive Director's order
stated that "[t]he 2025 Simulcast Permit is granted contingent on the granting of a
track license at [the Hastings location] . . . .  Otherwise, this 2025 Simulcast Permit
is not effective until the beginning of live racing."  (*Id*. at Page.ID # 351–352.)

Northville Downs did not timely fulfill this condition.  On December 23,
2024—soon after it became clear that Northville Downs would not be able to timely
obtain a track license and trigger the effectiveness of its 2025 race-meeting license
and 2025 simulcast permit—the Executive Director notified all licensed third-party
facilitators that they would need to cease facilitating pari-mutuel wagering with
Michigan account holders on January 1, 2025.  (Ex. Dir.'s 12/23/24 letter, ECF 11-7,
Page.ID # 261.)

But TwinSpires did not comply with the Executive Director's instructions.
On December 31, 2024, TwinSpires informed the Executive Director that it would

11

not cease accepting wagers from Michigan accounts.  (TwinSpires' 12/31/24 letter, ECF 11-8, Page.ID # 263–267.)  On January 3, 2025, the Executive Director responded to TwinSpires, advising that continuing to conduct unauthorized internet wagering violated Michigan law and subjected TwinSpires to various penalties.  (Ex. Dir.'s 1/3/25 letter, ECF 11-9, Page.ID # 269–270.)  On January 6, 2025, TwinSpires advised the Executive Director's staff that TwinSpires would continue to accept pari-mutuel wagers from people in Michigan.  (Compl., ECF 1, Page.ID # 17, ¶ 47.)

Because TwinSpires refused to follow Michigan law and the Executive Director's instructions, the Executive Director summarily suspended TwinSpires' third-party facilitator license on January 7, 2025.  (Ord. of Summary Suspension, ECF 15-4, Page.ID # 366.)  That same day, the Executive Director submitted a request for an administrative hearing with the Michigan Office of Administrative Hearings and Rules ("MOAHR.") (MOAHR Prop. for Decis., ECF 22-4, Page.ID 784.) The following day, MOAHR scheduled an administrative hearing for January 21, 2025 regarding the summary suspension of TwinSpires' license.  (*Id.*)  Following this hearing, the ALJ found that TwinSpires continued to accept wagers placed from within Michigan, and did not comply with the suspension.  (*Id.*, Page.ID 793, ¶ 24; see also, MOAHR Hr'g Tr., ECF 22-1, Page.ID 761-767; and Compl., ECF 1, Page.ID # 17, ¶ 47.)  MOAHR's proposal for decision also recommended the permanent revocation of TwinSpires license.  (ECF 22-4, Page.ID # 798.)

On January 12, 2025, TwinSpires filed this lawsuit seeking (1) a declaration that the MHRL's third-party facilitator licensing requirement is preempted by the IHA; (2) a declaration that the MHRL's third-party facilitator licensing requirement violates the dormant Commerce Clause; and (3) a preliminary and permanent injunction to prevent the MGCB, the Executive Director, and the Attorney General from enforcing the MHRL's third-party facilitator licensing requirements.  (Compl., ECF 1, Page.ID # 22–23.)  A few days later, TwinSpires requested a preliminary injunction (Mot. for P.I., ECF 11), which Defendants opposed (Defs' Resp. to Mot. for P.I., ECF 16).  This Court granted TwinSpires' motion for a preliminary injunction. (Op. on Mot. for P.I., ECF 19, Page.ID # 474.)

Upon its preliminary review, this Court opined that TwinSpires had demonstrated that "[t]he IHA occupies the field of interstate off-track wagers[.]" (*Id.* at Page.ID # 466.)  This Court did not conclude, however, that TwinSpires was likely to succeed on the merits of its dormant Commerce Clause claim.  (*Id.* at Page.ID # 467–469.)  Further, this Court determined that the MGCB is immune from this suit but that the Executive Director and Attorney General are not.  (*Id.* at Page.ID # 450.)  Thus, the Court preliminarily enjoined the Executive Director and Attorney General "from enforcing the MHRL licensing requirement—or issuing sanctions under the MHRL—against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan."  (*Id.* at Page.ID # 474.)

Shortly thereafter, Defendants filed an interlocutory appeal of the preliminary injunction, (Not. of App., ECF 23).  The parties have finished briefing this interlocutory appeal, and oral argument before the 6th Circuit is scheduled for October 23, 2025.  On May 9, this Court issued an order granting in part and denying in part Defendants' motion to dismiss the complaint, in which this Court dismissed the MGCB as a defendant, dismissed TwinSpires' dormant Commerce Clause claim, and declined to dismiss TwinSpires' field-preemption claim.  (Ord. on Defs.' Mot. to Dismiss, ECF 44.)

## ARGUMENT

### I.    Summary judgment is appropriate because the IHA does not preempt the MHRL's licensing requirements.

Summary judgment is proper if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proofs to determine whether there is a genuine need for a trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 587 (1986).

If the moving party carries the burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The mere existence of a scintilla of evidence in support of the

14

nonmoving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.  Applying these principles, the dispute between the parties in this case is a legal one: does the IHA, read against the strong presumption against preemption and Congress's longstanding deference to state gambling regulation, displace Michigan's licensing regime.  As explained below, the IHA does not preempt Michigan law.  Accordingly, this Court should find Plaintiff is not entitled to relief, and grant summary judgment in Defendants' favor.

### A.    When Congress legislates in an area of traditional state concern, there is a presumption against preemption.

In all preemption cases, especially where Congress has legislated in a field the States have traditionally occupied, courts must presume that the States' police powers were not preempted by the federal act unless "that was the clear and manifest purpose of Congress."  *Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see also Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1128 n.12 (6th Cir. 2025).

The foundational presumption against preemption exists "[b]ecause the States are independent sovereigns in our federal system[,]" *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (quotation omitted), and " '[w]hen Congress acts to preempt state law—especially in areas of longstanding state concern—it

treads on the states' customary prerogatives in ways that risk upsetting the traditional federal-state balance of authority,' " *id.* (quoting *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)).  "This presumption is at its zenith when federal law impinges upon core state police powers." *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999); *see also Merrick*, 805 F.3d at 694 (stating that the presumption is "strong" and "operates with special force" in fields the States have traditionally occupied).  "[P]reemption can trammel upon state sovereignty." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021).

Michigan has historically prohibited or strictly regulated wagering on horse races.  *See, e.g.,* Mich. Comp. Laws § 750.331.  Courts have long recognized that wagering is a field of regulation traditionally occupied by the States pursuant to their police powers.  In fact, "[t]he regulation of gambling lies at the 'heart of the state's police power' " because gambling regulations protect the public's health, welfare, and safety.  *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 399 F.3d 1276, 1278 (11th Cir. 2005) (quoting *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 720 (4th Cir. 1999); *see also Rivera-Corraliza v. Morales*, 794 F.3d 208, 220 (1st Cir. 2015); *Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020); *see also Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir. 2010).  "Congress has explicitly recognized the preeminent state interests in controlling gambling and has sought to extend, not curb, state police power in this field." *Casino Ventures*, 183 F.3d at 311 (recognizing the State's

interest in controlling gambling and concluding that a federal law did not preempt the state gambling prohibition at issue).

Because the IHA concerns an area within the traditional scope of Michigan's police powers and does not clearly state an intent to preempt state gambling laws, this Court should start from a perspective that sustains valid state regulations. The "IHA pointedly le[aves] intact the states' primary responsibility for determining what forms of gambling may legally take place within their borders, thus preserving their traditional police powers." *Monarch Content Mgmt.,* 971 F.3d at 1028 (cleaned up).

## B.    Congress has long supported each States's gambling policies.

When analyzing an implied field-preemption challenge, "[t]he core question is whether the 'scheme of federal regulation' is 'so pervasive as to make reasonable the inference that Congress left no room to supplement it.' " *Dayton Power & Light,* 126 F.4th at 1129 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983).  If Congress properly determines that conduct in a specific field must be governed exclusively by federal law, the States cannot regulate conduct in that field.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).

But "defining the scope of the relevant 'field' matters."  *Torres*, 995 F.3d at 491.  Thus, courts carefully examine the field of regulation to determine pervasiveness.  For example, in *Arizona*, the Court surveyed the historical federal regulation of immigration matters and the important federal interests at stake

17

before concluding that the field of alien registration had been occupied by the federal government.  567 U.S. at 394–401.  And in *Pacific Gas & Electric*, the Court recognized a distinction between what subjects the federal government had traditionally regulated in the area of nuclear power (radiological safety) and what subjects the States had traditionally governed (the need for power facilities, economic and land use considerations, among other non-safety issues) before rejecting the preemption challenge at issue.  461 U.S. at 205; *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 771 (2019) (plurality opinion); *Torres,* 995 F.3d at 491–92, 494 (holding that a federal law concerning "hiring and continued employment of unauthorized aliens" did not occupy the field of employment regulation of foreign nationals).

Such a review of gambling regulation reveals "a coherent federal policy" of "respect[ing] the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484.  Several federal statutes recognized in *Murphy* evidence this deference; Congress limited each enactment's applicability to situations where gambling activity violates state or local law.  As *Murphy* observed, 18 U.S.C. § 1955 prohibits operating a gambling business only if that activity violates a State's or political subdivision's laws; 18 U.S.C. § 1953 prohibits transmitting wagering paraphernalia only if the underlying gambling contravenes state law; 18 U.S.C. § 1084 prohibits interstate transmission of certain wagering information only if the wagering is prohibited by the State; and 18 U.S.C. § 1952

bars traveling in interstate commerce to further a gambling business that state law prohibits.  *Murphy*, 584 U.S. at 484.

Moreover, Congress's authority over gambling is limited.  *Murphy* recognized that Congress could not prohibit the States from authorizing sports wagering, 584 U.S. at 480, and the Office of Legal Counsel once concluded that "Congress lacks the power to establish a national lottery and, thus, to override the anti-gambling laws of the states," *Congressional Authority to Adopt Legislation Establishing a National Lottery*, 10 Op. O.L.C. 40 (1986).  Congress can regulate interstate gambling through its Commerce Clause powers, *Ky. Div., Horsemen's Benev. & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994), but the States determine whether gambling is legal within their borders, including whether to "prohibit interstate off-track wagering within [their] borders," *id.*

The IHA echoes this viewpoint, expressing that the States are primarily responsible for deciding what forms of gambling to allow, 15 U.S.C § 3001(a)(1), and that "the Federal Government should prevent interference by one State with the gambling policies of another," 15 U.S.C. § 3001(a)(2).  *See also* S. Rep. No. 95-1117, at 1 (1978) (stating in the Senate Judiciary Committee's report on the IHA the "prevailing view" that gambling matters "are generally of State concern and that the States' prerogatives in the regulation of gambling are in no way preempted by this or other federal law").

## C.    The IHA does not occupy the field of interstate off-track wagering.

In its opinion regarding TwinSpires' motion for a preliminary injunction, this Court opined that the IHA expresses "a full, exclusive set of standards governing the process by which an entity can accept interstate off-track wagers." (Op. on Mot. for P.I., ECF 19, Page.ID # 465.)  In reaching this opinion, this Court relied in part on *Horsemen's Benevolent & Protective Ass'n-Ohio Div., Inc. v. Zonak*, No. 2:07-cv-00057, 2008 WL 11453695, at *5 (S.D. Ohio, Sept. 23, 2008).  (Op. on P.I., ECF 19, Page.ID # 465–466).  But, on appeal in that case, the Sixth Circuit did not adopt *Zonak*'s field preemption analysis of the IHA.  Instead, the Sixth Circuit examined the challenged law only under conflict preemption.  *See Horseman's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine*, 666 F.3d 997, 1000–01 (6th Cir. 2012).

Contrary to *Zonak* and this Court's earlier opinion, the IHA does not create a pervasive or extensive regulatory scheme.  Rather, the IHA "constitutes economic legislation regulating a very narrow subject matter." *Turfway Park*, 20 F.3d at 1413.  Through the IHA, Congress aimed to keep the burgeoning off-track wagering industry from hurting the horseracing industry by lowering track attendance, industry employment, and small-track viability.  *Id.* at 1414.  In the IHA, Congress "balanc[ed] the interests of the horseracing industry against those of the interstate off-track wagering industry," *id.* (cleaned up), and "created the rules under which racetracks could legally market and facilitate inter-state horse race wagering," *Churchill Downs v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870, 882 (W.D. Ky. 2009).

The IHA fosters interstate industry relationships through its minimal regulatory framework consisting of three main restrictions and a civil remedy. First, the IHA prohibits an off-track betting system from accepting interstate off-track wagers without consent from the host racing association (which must have an agreement with the horsemen's group that races at that site), the host racing commission, and the off-track racing commission.  15 U.S.C. §§ 3003, 3004(a). Second, the IHA requires an off-track betting *office* to also obtain approval from nearby racetracks before accepting such wagers, with certain exceptions for states with higher-volume racing.  15 U.S.C. § 3004(b).  Third, the IHA limits the amount of money off-track betting systems may take out of interstate off-track wagers. 15 U.S.C. § 3004(c).  Finally, the IHA establishes a civil action that a host state, host racing association, or horsemen's group can bring against someone accepting an interstate off-track wager in violation of the IHA.  15 U.S.C. §§ 3005–3007.

In contrast to these bare-bones federal regulations, States, including Michigan, strictly regulate gambling.  Noticeably absent from the IHA are laws governing the actual wagering, such as:

- The legal age for placing a wager; *see* Mich. Comp. Laws § 431.317(6).

- The permitted types of wagers and how they are conducted; *see* Mich. Admin. Code R. 431.2050–431.2120.

- Disclosures on responsible wagering and how to obtain assistance for problem gambling; *see* Mich. Admin. Code R. 431.5015(6)(f).

- An application and regulatory review to ensure suitability of those conducting gambling; *see* Mich. Admin. Code R. 431.5010.

21

- Auditing and compliance checks to ensure proper management of player funds; *see* Mich. Admin. Code R. 431.5005; *see also* Mich. Admin. Code R. 432.631–639d; and Mich. Admin. Code R. 432.731–739a.

- Technical standards for computers and software used in conducting wagering to ensure security against cheating; Mich. Admin. Code R. 431.5005, 5010(10), (11); *see also* Mich. Admin. Code R. 432.631–639d; and Mich. Admin. Code R. 432.731–739a.

- Cybersecurity standards to protect players' personal and financial data; *id.*

Further, no federal agency administers the IHA, in sharp contrast with areas where Congress has adopted detailed, comprehensive regulatory frameworks that are administered by federal agencies. *See*, *e.g.*, *Arizona*, 567 U.S. at 397 (recognizing the significant role federal agencies play in immigration enforcement). Congress chose instead to leave "regulation of the horse wagering industry . . . to the respective state racing commissions[,]" instead of creating an all-inclusive federal regulatory scheme to oversee interstate horseracing. *Churchill Downs*, 605 F. Supp. 2d at 882. The IHA does not even provide a mechanism for the federal government to enforce its requirements.

This Court's prior opinion illustrates the lack of federal governance in that it does not require Michigan to give way to *federal* gambling regulation. Instead, the Court's prior opinion has the odd effect of eliminating respect for Michigan's gambling regulations while imposing *Oregon's* laws onto wagers placed from Michigan. This runs against two of the IHA's stated purposes: States should have primary responsibility over pari-mutuel wagering within their borders, and the

22

federal government should prevent out-of-state interference with in-state gambling policies.  15 U.S.C. § 3001(a), (b).

Examining Oregon's regulatory framework demonstrates the problem which this causes.  Oregon restricts "account wagering centers" to establishing accounts only for persons whose principal residence address is in Oregon.  Or. Admin. R. 462-210-0030.  But Oregon allows a "multi-jurisdictional simulcasting and interactive wagering totalizator hub," (hereafter, "multi-jurisdictional simulcast-wagering licensee") such as TwinSpires, to establish accounts with people whose principal address is outside Oregon if "(a) Wagering on that same type of live racing is lawful in the jurisdiction which is the natural person's principal residence or the hub utilizes geo-location [sic] technology or methodology that has been approved by the commission, that confirms wagers are placed from jurisdictions where wagering is legal;" and "(b) the hub complies with the [IHA]."  Or. Admin. R. 462-220-0020.  If Michigan law is excluded from consideration under the IHA, the question whether the wager may be legally placed from Michigan is left up to Oregon, not the federal government.

### D.    The IHA's definition of interstate off-track wagers confirms Congress' narrow regulatory approach.

The IHA's narrow focus is also reflected in the definition of  "interstate off-track wager" in 15 U.S.C. § 3002(3), establishing the only wagers to which the IHA applies.  *See* 15 U.S.C. § 3003.  Because the wagers TwinSpires wants to accept

violate Michigan law if TwinSpires does not hold a third-party facilitator license from Michigan, these wagers are not regulated by the IHA.

The definition of "interstate off-track wager" consists of two parts, the first of which was in the original enactment: " 'interstate off-track wager' means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State . . . ." *See* Pub. L. 95-515 (1978).  The report of the Senate Judiciary Committee recommending passage of the IHA stated that, under the original definition of "interstate off-track wager," "the regulations and exceptions in the bill would not apply to illegal handbook or parimutuel operations which are already covered by existing criminal statutes."  S. Rep. No. 95-1117, at 1 (1978); *see*, *e.g.*, 18 U.S.C. § 1084.

 Through an amendment in 2000, Congress added the second part of the definition: ". . . and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools."  15 U.S.C. § 3002(3), as amended by Pub. L. No. 106-553, tit. VI, 114 Stat. 2762A-108.

This Court's prior opinion erroneously construed "legal" in the first part of the definition (the original language) as referring to wagers that are legal because they satisfy the IHA's procedures.  (Op. on Mot. for P.I., ECF 19, Page.ID # 453.) But that interpretation disregards that the subsequent section of the IHA, 15 U.S.C. § 3003, prohibits a person from "accept[ing] an interstate off-track wager

except as provided in this chapter."  For that provision to make sense and have effect, the definition of "interstate off-track wager" cannot mean wagers that satisfy the IHA's procedures.  If "legal" has that meaning, section 3003 becomes circular, meaning that no one can accept a wager that complies with the IHA unless it complies with the IHA.  *See United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 432 (2023) (stating that statutory words should have meaning); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (stating that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

The second part of the definition concerns a subset of "legal wagers"—"pari-mutuel wagers"—but it references only certain "pari-mutuel wagers"—those "lawful in each State involved" that are "placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State . . . ."  15 U.S.C. § 3002(3).  The IHA defines "parimutuel" (so spelled throughout the IHA other than in the language added to the definition of "interstate off-track wager") as "any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator."  15 U.S.C. § 3002(13).  Thus, to be considered "pari-mutuel wagers, where lawful in each State involved," the wager must be placed with or in a pool conducted

by someone authorized by state law.  The wager must meet the IHA's definition of "pari-mutuel" *in each State*.

This Court's prior opinion discerned a surplusage problem from reading both the original language and added language as referencing the legality of the wagers under state law.  (Op. on Mot. for P.I., ECF 19, Page.ID # 453.)  But no such problem arises.  The original language involves two States—the State where the wager was "placed or accepted" and the State where the race occurred.  The wager must be legal under the law of both of those states to be subject to the IHA—and for the required consents to be obtained (the consents from the off-track racing commission, *see* 15 U.S.C. § 3004(a)(3), and the host racing association and host racing commission, *see* 15 U.S.C. § 3004(a)(1)–(2)).  The definition of each of those consenting parties incorporates approval under state law.  *See* 15 U.S.C. § 3002(11) (defining "off-track racing commission"); 15 U.S.C. § 3002(9) (defining "host racing association"); 15 U.S.C. § 3002(10) (defining "host racing commission").  If the wagers were not legal under state law, there would be no one to give consent in those two States.

But the amended language, which contemplates legality of pari-mutuel wagers in "*each* State involved" (as opposed to *both* States involved) reflects that the amendment clarifies the wagers subject to the IHA by encompassing wagers placed on the internet or telephone.  *See* 146 Congressional Record—House of Representatives, Proceedings and Debates of the 106th Congress, Second Session, H11230, October 26, 2000) (Representative Wolf stating that under the pre-

amendment version, pari-mutuel gambling on the internet was considered illegal and that the amendment would "legalize interstate pari-mutuel gambling over the Internet").  The amended language recognizes that, because wagers could be placed through those methods across state lines, the wagerer might not be in either the host state or the off-track state.  Thus, the two locations expressly referenced in the amended language are the State where the wager is "placed or transmitted" and the State where the off-track betting system accepts the wager, whether that is "the same or another State."  *See* 15 U.S.C. § 3002(3).  (The wager remains an *interstate* off-track wager because the race occurs in a state other than where the off-track betting system is located.)  Through the reference to "each" State involved, rather than *both* States, the definition acknowledges that three States could be involved: the State where the race is occurring, the State where the wagerer is located, and the State where the wager is received via the telephone or the internet.  But just as the wagers in the original language must be "legal" in the two States involved, those encompassed in the amended language likewise have to be "lawful in each State involved," including in the State from which they are transmitted.

In short, two references to state legality do not create a surplusage problem. The two references were enacted at different times, and each clarifies where the wagers discussed in each part of the definition must be legal.  Regardless, surplusage does not have to be avoided "at all costs.  It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that

threatens to render [an] entire provision a nullity." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

This Court's prior opinion also improperly construed "where lawful in each State involved" as applying to pari-mutuel wagers in general, as opposed to the specific wager being accepted.  (Op. on Mot. for P.I., ECF 19, Page.ID # 454–455.) This reading is inconsistent with the initial part of the definition, which examines each wager's legality (" 'interstate off-track wager' means *a* legal wager . . . ." (emphasis added)) and the prohibition on accepting "an" interstate off-track wager without complying with the IHA, 15 U.S.C. § 3003, which requires each wager accepted to comply with the IHA.  This construction also conflicts with the definition of "parimutuel" because someone authorized to conduct a wagering pool under state law would not be authorized to accept illegal wagers.

The limiting phrase "lawful in each State involved" is not obscure or elliptical.  Just as Congress limited the original part of the definition to "a legal wager," Congress limited the second part of the definition to wagers that are "lawful in each State involved."  TwinSpires' interpretation, that "each State involved" means only the states whose consent is required in 15 U.S.C. § 3004, ignores the phrase's context. *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Nothing in the definition suggests that Congress intended to limit the "States involved" to the states that consent under § 3004.  The phrase "where lawful in each

State involved" modifies "pari-mutuel wagers" ("and includes pari-mutuel wagers, where lawful in each State involved") and is followed by further description of the wagers.  The logical conclusion is that "where lawful in each State involved" is referring to each State involved in the wager, not just the two states involved in the consents.  TwinSpires is accepting wagers from people in Michigan.  Michigan is clearly a state involved in the wager.  Thus, for those wagers to be affected by the IHA, the wagers must be legal in Michigan.  If the wager is not legal in Michigan because, for example, the party accepting it is not properly licensed, the wager is not encompassed by the IHA, and the IHA cannot be viewed as preempting the state law that prohibits the wager.

Moreover, contrary to this Court's prior opinion, requiring state licensure to qualify for state legality does not add a "consent" requirement to the consents listed in 15 U.S.C. § 3004.  Satisfying Michigan's licensure requirement, which limits wagerers to placing bets with licensed parties, merely brings a wager within the scope of the IHA's definition of "interstate off-track wager."  Under Michigan law, only a licensed race meeting may offer pari-mutuel wagering on horse races in Michigan.  Mich. Comp. Laws § 431.317(1), (8).  Michigan law also prohibits licensed race meetings from accepting off-track wagers on races outside of Michigan without permission from the Executive Director.   Mich. Comp. Laws § 431.318(1), (3).  Not only is Michigan's regulatory structure consistent with the IHA, but Michigan also explicitly requires its licensees to comply with the IHA.  Mich. Comp. Laws § 431.318(2)(j).

29

A wager does not qualify as an "interstate off-track wager" under the IHA if it violates the gambling laws of the state where it is placed because it is not "lawful in each State involved" in the wager.  See 15 U.S.C. § 3002(3).  Applying this statutory definition does not create a "fourth consent" requirement, as TwinSpires insists.  Rather, the statutory definition constitutes a limit that Congress placed on the IHA's scope.  Congress directly stated that it wanted to regulate only "the limited area of interstate off-track wagering" 15 U.S.C. § 3001(a)(3), which Congress defined as "pari-mutuel wagers . . . [that are] lawful in each State involved." 15 U.S.C. § 3002(3).  If Congress had wanted to regulate every wager on a horse race where the wager is accepted in a state other than where the race is run, it could have simply said so.  The fundamental definition of "interstate off-track wager" does not bury a detail in an ancillary statutory provision.  Rather, recognizing the scope of "interstate off-track wager" provides the proper lens for interpreting the IHA.

Properly understood, it is clear that the "IHA pointedly le[aves] intact the States' primary responsibility for determining what forms of gambling may legally take place within their borders, thus preserving their traditional police powers." *Monarch Content Mgmt., LLC.*, 971 F.3d at 1028 (cleaned up).  Thus, "[u]nder the [IHA], each state may prohibit interstate off-track wagering within its borders[] and may prohibit a resident racetrack from contracting with an off-track wagering facility in another state." *Turfway Park Racing Ass'n, Inc.*, 20 F.3d at 1414.  And because a State can altogether prohibit wagering on horse races, it also has the

power to allow it in a limited manner by "condition[ing] a license to engage in legalized racing upon compliance with any regulation that is reasonably appropriate . . . to protect the integrity of the sport, and to protect the betting public[.]" *Hudson v. Tex. Racing Comm'n*, 455 F.3d 597, 601–02 (5th Cir. 2006); *see also Rohan v. Detroit Racing Ass'n*, 22 N.W.2d 433, 441 (Mich. 1946); *Michigan v. Lueth*, 660 N.W.2d 322, 330 (Mich. App. 2002).

### E.     The Michigan Legislature has only made pari-mutuel wagering lawful when it is conducted by a licensed race meeting.

This Court's preliminary opinion also misconstrued Michigan's gambling laws.  Although this Court recognized that Michigan generally prohibits winning and losing at gambling, Mich. Comp. Laws §§ 750.314–750.315, it incorrectly noted that Michigan does not have "consumer-side prohibitions" on the act of placing a wager.  (Op. on Mot. for P.I., ECF 19, Page.ID # 456–457.)  As discussed above, Michigan has long prohibited the act of placing a wager on the results of a horse race in its Penal Code.  *See* Mich. Comp. Laws § 750.331; Mich. Pub. Acts 328 of 1931, § 331; Mich. Rev. Stat. of 1846, ch. 40, § 1; Mich. Terr. Laws, "An Act to Prevent Horse Racing," § 1 (1819).

In light of Michigan's long-standing Penal Code prohibition, a person in Michigan may wager on the results of a horse race only as allowed by an exception to that prohibition, such as the MHRL.  The MHRL makes pari-mutuel wagering legal only to the extent that the wager is received by a licensee; if a wager is not

31

placed at a licensed race meeting, then the wager is legal only if it is placed through a licensed third-party facilitator.  Mich. Comp. Laws § 431.317(8).

Thus, this Court preliminary determination incorrectly opined that the MHRL made pari-mutuel wagering lawful in Michigan "even when no entities have the license to accept these wagers."  (Op. on Mot. for P.I., ECF 19, Page.ID # 456.) Specifically, this Court improperly suggested that, if no one holds a license to conduct pari-mutuel wagering in Michigan, the Executive Director has improperly exercised legislative power, contrary to the separation of powers.  (*Id*. at 455.) There are multiple significant flaws with that portion of this Court's preliminary opinion.

First, the MHRL does not authorize pari-mutuel wagering or simulcast wagering.  It authorizes the Executive Director to issue licenses to people to conduct pari-mutuel wagering and simulcast wagering, through a race-meeting license and simulcast permit, respectively.  *See* Mich. Comp. Laws § 431.318(1) (giving the racing commissioner discretion to issue licenses).  Northville Downs needed to request that the Executive Director issue a race-meeting license *and* a simulcast permit for 2025 because Michigan law does not authorize either type of wagering without those approvals.

Second, because a State can altogether prohibit wagering on horse races, it also has the power to allow it in a limited manner by  "condition[ing] a license to engage in legalized racing upon compliance with any regulation that is reasonably

appropriate . . . to protect the integrity of the sport, and to protect the betting public[.]"  *Hudson*, 455 F.3d at 601–02.

### F.    The IHA Must Be Understood Within the Broader Federal Statutory Landscape Governing Wagering

Two other federal statutes are relevant to this case—the Wire Act and UIGEA—because this Court's preliminary opinion has created the risk of conflict by disregarding their terms.  The Wire Act prohibits businesses engaged in betting or wagering from using "a wire communication facility" which includes the internet, *see* 18 U.S.C. § 1081, to transmit bets or information assisting in placing bets on sporting events or contests across state lines.  18 U.S.C. § 1084(a).  The Wire Act contains a safe harbor allowing the interstate transmission of information assisting in placing wagers on sporting events that applies if the wager would be legal both in the state where the information originates and the state where it is received.  18 U.S.C. § 1084(b).  But the Wire Act does not contain a safe harbor for transmitting wagers themselves across state lines, even if they comply with the gambling laws of both the sending and receiving States.

The ability to legally send horseracing wagers across state lines via the internet came in 2000, with the amendment to the definition of "interstate off-track wager."  If the interpretation of this Court in its preliminary opinion remains, then TwinSpires would be allowed to accept an interstate wager that is illegal under Michigan law, but TwinSpires would be prohibited by the Wire Act from

transmitting information assisting in placing that wager, because the wager is not legal in both the sending and receiving States.

Additionally, the Unlawful Internet Gambling Enforcement Act (UIGEA) enacted in 2006, also must be considered.  UIGEA was enacted nearly three decades after the IHA and directly addresses online wagering and the role of state law.  Its careful exceptions and anti-preemption clause confirm that the IHA does not displace state regulation.  UIGEA defines "unlawful Internet gambling" to include:

> [P]lac[ing], receiv[ing], or otherwise knowingly transmit[ing] a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

31 U.S.C. § 5362(10)(A).  In other words, under UIGEA, internet gambling is generally unlawful if it violates *any applicable Federal or State law* in the state where the bet is *initiated, received, or otherwise made.*

Following this broad general definition of unlawful internet gambling, UIGEA sets forth a number of specific exceptions including an exception for "any activity that is allowed under the Interstate Horseracing Act of 1978."  31 U.S.C. § 5362(10)(D)(i).

This carveout reflects Congress's recognition that, even if an internet-based wager is conducted with the consent of those identified in § 3004 of the IHA, the wager could still be considered "unlawful Internet gambling" under UIGEA if it violates state law.  That alone undermines TwinSpires' claim that IHA-compliant wagers are inherently lawful and insulated from state regulation.  But even more

importantly, immediately following the IHA exception, Congress included a rule of construction that states: "Nothing in this subchapter may be construed to preempt any State law prohibiting gambling." 31 U.S.C. § 5362(10)(D)(ii).

The placement of this anti-preemption clause is critical. Congress could have written a broad field-preemption clause affirming that IHA-authorized wagering overrides state law. Instead, it did the opposite, expressly affirming that even "activities allowed under the IHA" may still be prohibited or regulated by states. If Congress had believed the IHA already preempted state regulation of interstate horse wagering, this language would have been redundant and contradictory. But it is not. UIGEA reflects the long-standing federal policy of letting States decide how to regulate gambling in their territory.

TwinSpires' argument fails when one considers both the purpose of this exception (to avoid criminalizing IHA-compliant activity under UIGEA), and the explicit anti-preemption clause that follows. UIGEA expressly affirms that States retain their authority to regulate, condition, or prohibit interstate pari-mutuel wagers, even when it passes federal muster under the IHA.

In short, this Court's prior opinion improperly concluded that the IHA preempts the field of interstate off-track wagering. Far from creating a comprehensive regulatory scheme, the IHA preserves substantial room for state regulation to ensure that each State retains primary authority over gambling within its jurisdiction. This Court's decision on the preliminary injunction not only misreads the scope of the IHA, and of Michigan law, but improperly elevates

35

Oregon's regulatory preferences above Michigan's sovereign interests, in direct contradiction to the IHA's stated purposes.  Consequently, TwinSpires' field preemption claim against the Executive Director and Attorney General fails as a matter of law, and this Court should grant summary judgment on this count in Defendants' favor.

### G.    The MHRL does not conflict with the IHA

Under the doctrine of conflict preemption, "state law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Conflict preemption arises only in two limited situations: (1) where compliance with both federal and state regulators is a physical impossibility for one to engage in interstate commerce.  *Fla. Lime & Avocado Growers, Inc. v. Park*, 373 U.S. 132, 142–43 (1963); or (2) when, in "a particular case, [state] law stands as an obstacle to the accomplishment and execution of the full purpose and objective of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (cleaned up).  Three points confirm that neither form of conflict exists here.

First, TwinSpires complied with both the IHA and MHRL from 2020 through 2024.  (Decl. of Murr, ECF 11-1, Page.ID # 105, ¶¶ 31–32.)  Thus, compliance with both laws is not "impossible."  *Fla. Lime & Avocado Growers*, 373 U.S. at 142–43.  Second, the IHA expressly states, as its first priority, that "States should have primary responsibility for determining what forms of gambling may legally take place within their borders[.]"  15 U.S.C. § 3001(a)(1).  Accordingly, the MHRL advances the objectives of, rather than "stand[ing] as an obstacle to the

36

accomplishment or execution" of the IHA.  *Hines*, 312 U.S. at 67.  Third, both the Ninth and Eleventh Circuits have already recognized that there is no conflict between the IHA and traditional state licensing and regulatory authority over gambling.  *See Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 479 F.3d 1310 (11th Cir. 2007); *Monarch Content Mgmt.*, 971 F.3d at 1027.

It is worth noting that this case is distinguishable from cases concerning conflict preemption and the consents required under the IHA.  For example, the statute at issue in *Zonak*, 2008 WL 11453695, at *2, and *DeWine*, 666 F.3d at 1000, allowed Ohio to determine whether a horsemen's organization had "unreasonably" withheld consent and, if so, to authorize interstate simulcasting over the horsemen's objection.  That created an irreconcilable conflict with the IHA, which requires that a host racing association's consent be given pursuant to a written agreement with the horsemen's group that sets forth the "terms and conditions" of that consent.  15 U.S.C. § 3004(a)(1)(A).  By contrast, the MHRL does not interfere with the consents required by the IHA.  The MHRL's licensing requirement instead concerns whether the wagers at issue are "interstate off-track wagers" that are subject to the IHA's requirements.  Accordingly, the MHRL avoids the conflict that mandated preemption of Ohio Rev. Code § 3769.089(G) in *DeWine*.

Because it is possible to comply with both laws, and because Michigan's licensing requirement reinforces rather than frustrates the IHA's objectives, there is no basis for conflict preemption.  Accordingly, summary judgment in Defendants' favor is appropriate on this issue.

II.    **Summary judgment is also warranted because TwinSpires has not met the other requirements for injunctive relief.**

Even if TwinSpires were correct about its preemption theory, TwinSpires has still failed to satisfy the other requirements for injunctive relief.  In particular, TwinSpires fails to show that it faced an imminent threat of irreparable injury.  The harm that results from the wrong TwinSpires asserts is the harm of being subjected to a licensing scheme that it believes is unconstitutional.  See *Overstreet v. Lexington-Fayette Urban Ct'y Govt.*, 305 F.3d 556, 578 (6th Cir. 2022) (holding that "a plaintiff can demonstrate . . . irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").

Yet TwinSpires voluntarily complied with Michigan's licensing regime for over four years before seeking judicial relief.  (Compl., ECF 1, Page.ID # 13, ¶¶ 35–36.)  In fact, it affirmatively sought and obtained a Michigan license in 2020, after having long claimed that such licensure was unconstitutional.  (Mot. for P.I., ECF 11, Page.ID # 71; Decl. of Murr, ECF 11-1, Page.ID # 104, ¶ 29.)  This prolonged and voluntary submission to Michigan's framework undermines any claim of imminent, irreparable injury from the wrong it asserts.  See *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013); see also *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013).  TwinSpires' belated challenge confirms the weakness of its claims and provides yet another reason for this Court to grant summary judgment in Defendants' favor.

Further, summary judgment is also warranted because an injunction against the Executive Director inflicts serious and ongoing harm to the State, its residents,

38

its horseracing industry, and other third-party facilitators.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quotation omitted).  The Executive Director's regulatory authority exists to protect the public health, safety, and welfare and to preserve confidence in the integrity of wagering.  An injunction undermines that authority and creates a false impression that Michigan cannot regulate wagers placed within its borders.

If the injunction remains, Michigan residents wagering through TwinSpires will effectively be governed by gaming regulators 2,000 miles away in Oregon, whose rules for out-of-state wagerers provide far weaker consumer-protections than those afforded to Oregon residents. *See* Or. Admin. R. 462-220-0020, & 462-220-0030(3)(e).  An injunction will thus deprive Michiganders of important consumer safeguards.  An injunction will also strip Michigan residents of protections against underage and compulsive gambling; remove lawful barriers intended to protect the public; and expose participants to criminal liability for illegal gambling activities under the Penal Code.  Mich. Comp. Laws §§ 750.314, 750.315, & 750.331.

Finally, an injunction would also frustrate the IHA's stated goal of promoting the horseracing industry.  See 15 U.S.C. § 3001(b) (stating the IHA's goal to "further the horseracing and legal off-track betting industries in the United States"). As TwinSpires acknowledges, Michigan's horseracing industry has long been in decline: racetrack attendance peaked at 3.8 million in 1975 but fell to 1.1 million by 2007.  (Mot. for P.I., ECF 11, Page.ID # 68–70.)  In 2020, "there was only one

racetrack operating in Michigan—Northville Downs in Northville, Michigan."
(Decl. of Murr, ECF 11-1, Page.ID # 104, ¶ 30.)  In February 2024, Northville
Downs ceased operations after 80 years when its property was sold to developers.
(Mot. for P.I., ECF 11, Page.ID # 73; Decl. of Murr ECF 11-1, Page.ID #106, ¶ 34.)

Before the preliminary injunction, Northville Downs derived a portion of total
revenues from wagers placed via TwinSpires' third-party facilitator platform.  This
money helped to "support horsemen and horseracing in Michigan." (Decl. of Murr,
ECF 11-1, Page.ID # 104, ¶ 29.)  The loss of this revenue is significant, as
"TwinSpires is one of the largest . . . wagering platforms for horseracing in the
United States."  (Mot. for P.I., ECF 11, Page.ID # 64.)  The preliminary injunction
cut off these revenues from Northville Downs.  See Mich. Comp. Laws
§§ 431.322(2)(b), (3); 431.320a(a); 431.320(5)).

The injunction also harmed the other licensed third-party facilitators who
acted in good faith by temporarily halting online pari-mutuel wagering, as
instructed.  While these operators bore the burdens of compliance, TwinSpires kept
running.  Id.  The preliminary injunction rewarded TwinSpires' noncompliance,
which undermines fair competition and public confidence.  If this Court retains its
preliminary interpretation, other third-party facilitators will likely refuse to comply
with the licensing, regulatory, and tax requirements of the MHRL, which will
deprive the Michigan horseracing industry of the significant revenues derived from
Michigan customers making interstate off-track wagers.

In short, an injunction will harm Michigan, its lawful operators, and the general public.  Accordingly, summary judgment for Defendants is warranted.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment, declare that the IHA does not preempt the MHRL's licensing provisions, dissolve the preliminary injunction, and enter final judgment for Defendants Williams and Nessel.

Respectfully submitted,


/s/ James P. Kennedy

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorney for Defendants
Alcohol & Gambling Enf. Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
KennedyJ7@michigan.gov
HallF2@michigan.gov

Dated:  October 14, 2025

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the word count limitation of W.D. Mich. L. Civ. R. 7.2(b)(i) because, excluding the part of the document exempted by W.D. Mich. L. Civ. R. 7.2(b)(i), this brief contains no more than 10,800 words. This document contains 10,381 words.

2.     This word count was generated using Microsoft Word for Microsoft 365 MSO, version 2410.

Respectfully submitted,

/s/ James P. Kennedy

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorney for Defendants
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
KennedyJ7@michigan.gov
HallF2@michigan.gov

Dated:  October 14, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2025, I electronically filed the above

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic copies to counsel of record.

/s/ James P. Kennedy

James P. Kennedy (P80244)
Felepe H. Hall (P59533)
Assistant Attorneys General
Attorney for Defendants
Alcohol & Gambling Enforcement Div.
2860 Eyde Parkway
East Lansing, MI 48823
(517) 241-0210
KennedyJ7@michigan.gov
HallF2@michigan.gov

Dated:  October 14, 2025