IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| CHURCHILL DOWNS TECHNOLOGY INITIATIVES COMPANY (d/b/a TwinSpires), <br><br> Plaintiff, <br><br> v. <br><br> MICHIGAN GAMING CONTROL BOARD; HENRY L. WILLIAMS, JR., in his official capacity as Executive Director of the Michigan Gaming Control Board; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, <br><br> Defendants. | Case No. 1:25-cv-00047 <br><br> Hon. Hala Y. Jarbou <br><br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Churchill Downs Technology Initiatives Company (d/b/a TwinSpires) ("TwinSpires") moves for entry of summary judgment on Count I of the Complaint.

This Motion is based on the accompanying Brief, the exhibits thereto, and such other written and oral argument as may be presented to the Court.

As required by Local Rule 7.1(d)(i), undersigned counsel hereby certifies that on October 14, 2025, there was a conference between undersigned counsel and counsel for Defendants in which undersigned counsel explained the nature of the motion and requested, but did not obtain, concurrence in the relief sought.

WHEREFORE, TwinSpires respectfully requests that this Court enter an order granting TwinSpires's Motion for Summary Judgment, and awarding such other relief that the Court deems appropriate.

Date: October 14, 2025                        Respectfully submitted,

                                             /s/ *Derek J. Linkous*
                                             Patrick G. Seyferth (P47575)
                                             Derek J. Linkous (P82268)
                                             **BUSH SEYFERTH PLLC**
                                             100 West Big Beaver, Suite 400
                                             Troy, MI 48084
                                             (248) 822-7800
                                             seyferth@bsplaw.com
                                             linkous@bsplaw.com

                                             Thomas H. Dupree, Jr.
                                             John W. Tienken
                                             **GIBSON, DUNN & CRUTCHER LLP**
                                             1700 M St N.W.
                                             Washington, DC 20036
                                             202-955-8500
                                             TDupree@gibsondunn.com
                                             JTienken@gibsondunn.com

                                             Christine Demana
                                             **GIBSON, DUNN & CRUTCHER LLP**
                                             2001 Ross Ave., Ste. 2100
                                             Dallas, TX  75201
                                             214-698-3246
                                             CDemana@gibsondunn.com

                                             *Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHURCHILL DOWNS TECHNOLOGY
INITIATIVES COMPANY (d/b/a
TwinSpires),

                Plaintiff,

      v.

MICHIGAN GAMING CONTROL BOARD;
HENRY L. WILLIAMS, JR., in his official
capacity as Executive Director of the Michigan
Gaming Control Board; DANA NESSEL, in
her official capacity as Attorney General of the
State of Michigan,

                Defendants.

Case No. 1:25-cv-00047

Hon. Hala Y. Jarbou

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF MATERIAL FACTS ............................................................................ 3

    I.    TwinSpires Accepts Interstate Pari-Mutuel Wagers From Michigan Residents As Authorized By Federal Law. ................................................................. 3

    II.   The State Threatens To Shut Down TwinSpires' Lawful Interstate Wagering. ............... 6

    III.  The Court Grants TwinSpires' Motion For A Preliminary Injunction. ........................... 8

    IV.  The Preliminary Injunction Remains In Effect. ............................................................ 10

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ...................................................................................................................... 12

    I.    The IHA Preempts Michigan's Licensing Requirements. ............................................. 12

        A.   The IHA Preempts The Field Of Interstate Off-Track Wagering On Horseraces. ... 13

        B.   Michigan's Licensing Requirements Are Also Preempted Because They Conflict With The IHA. ..................................................................................... 16

        C.   Defendants' Arguments Are Meritless. ................................................................... 19

            1.   The IHA Does Not Contain A Hidden Fourth Consent Requirement. ............... 19

            2.   The IHA Respects And Preserves State Authority. ........................................... 21

            3.   The IHA Does Not Conflict With The Wire Act And UIGEA. .......................... 23

    II.   TwinSpires Faces Irreparable Harm Without Injunctive Relief. ................................... 24

    III.  The Remaining Factors Support A Permanent Injunction. ............................................ 27

CONCLUSION ................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Ky. v. McCreary Cnty., Ky.*,
   607 F.3d 439 (6th Cir. 2010) ......................................................................2, 24, 25

*ACLU v. McCreary Cnty., Ky.*,
   354 F.3d 438 (6th Cir. 2003) .............................................................................3, 24

*Allstates Refractory Contractors, LLC v. Walsh*,
   625 F. Supp. 3d 676 (N.D. Ohio 2022)...................................................................27

*Amoco Prod. Co. v. Village of Gambell*,
   480 U.S. 531 (1987)...................................................................................................2

*Arizona v. United States*,
   567 U.S. 387 (2012)......................................................................1, 13, 14, 16, 17

*Att'y Gen. v. PowerPick Club*,
   783 N.W.2d 515 (Mich. Ct. App. 2010) ...................................................................4

*Chamber of Com. of U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ................................................................................25

*Coventry Health Care of Mo., Inc. v. Nevils*,
   581 U.S. 87 (2017)...................................................................................................14

*CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*,
   727 F. Supp. 3d 641 (E.D. Ky. 2024) .....................................................................16

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)..................................................................................................12

*Egelhoff v. Egelhoff ex rel. Breiner*,
   532 U.S. 141 (2001)..................................................................................................22

*Foresight Coal Sales LLC v. Chandler*,
   750 F. Supp. 3d 795 (E.D. Ky. 2024) ...............................................................24, 25

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
   878 F.3d 524 (6th Cir. 2017) ...................................................................................26

*Harden v. Hillman*,
   993 F.3d 465 (6th Cir. 2021) ...................................................................................12

*Horseman's Benevolent & Protective Ass'n v. DeWine*,
   666 F.3d 997 (6th Cir. 2012) ......................................................................15, 16, 17

*Horsemen's Benevolent & Protective Ass'n, Inc. v. Zonak*,
     2008 WL 11453695 (S.D. Ohio Sept. 23, 2008) ...................................................15

*Jobete Music Co., Inc v. Johnson Commc'ns, Inc.*,
     285 F. Supp. 2d 1077 (S.D. Ohio 2003) ...........................................................12

*Kansas v. Garcia*,
     589 U.S. 191 (2020).....................................................................................15, 16

*Kentucky v. United States ex rel. Hagel*,
     759 F.3d 588 (6th Cir. 2014) ...........................................................................25

*Kurns v. R.R. Friction Prods. Corp.*,
     565 U.S. 625 (2012)..........................................................................................13

*Maryland v. Louisiana*,
     451 U.S. 725 (1981)..........................................................................................13

*Matthews v. Centrus Energy Corp.*,
     15 F.4th 714 (6th Cir. 2021) .............................................................................13

*McKerchie v. Wrigglesworth*,
     2025 WL 2673389 (W.D. Mich. Sept. 18, 2025) ...............................................12

*Mik v. Fed. Home Mortg. Corp.*,
     743 F.3d 149 (6th Cir. 2014) ............................................................................18

*Mumford v. Basinski*,
     105 F.3d 264 (6th Cir. 1997) ............................................................................25

*Murphy v. NCAA*,
     584 U.S. 453 (2018).....................................................................................14, 16

*Mut. Pharm. Co. v. Bartlett*,
     570 U.S. 472 (2013)..........................................................................................13

*NetChoice, LLC v. Yost*,
     778 F. Supp. 3d 923 (S.D. Ohio 2025) .............................................................27

*Ohio v. Becerra*,
     87 F.4th 759 (6th Cir. 2023) .............................................................................25

*Patio Enclosures, Inc. v. Herbst*,
     39 F. App'x 964 (6th Cir. 2002) .......................................................................28

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
     52 F.3d 1373 (6th Cir. 1995) ............................................................................26

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
  822 F.2d 1390 (6th Cir. 1987) ...................................................................27

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011)...................................................................................13

*Pulsifer v. United States*,
  601 U.S. 124 (2024)...................................................................................20

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)...................................................................................24

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976)...................................................................................24

*State ex rel. Reading v. W. Union Tel. Co.*,
  57 N.W.2d 537 (Mich. 1953)................................................................4, 20

*Sackett v. EPA*,
  598 U.S. 651 (2023)...................................................................................19

*Samantar v. Yousuf*,
  560 U.S. 305 (2010)...................................................................................20

*Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*,
  989 F.2d 1266 (1st Cir. 1993) ...................................................................14

*United States v. Hunter*,
  12 F.4th 555 (6th Cir. 2021) ......................................................................24

*United States v. Locke*,
  529 U.S. 89 (2000).....................................................................................23

*United States v. Miami Univ.*,
  294 F.3d 797 (6th Cir. 2002) .....................................................................12

*United States v. Production Plated Plastics, Inc.*,
  762 F. Supp. 722 (W.D. Mich. 1991) ........................................................25

*United States v. Truesdale*,
  152 F.3d 443 (5th Cir. 1998) .....................................................................20

*Verizon N. Inc. v. Strand*,
  309 F.3d 935 (6th Cir. 2002) ...............................................................16, 18

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)...................................................................................13

*Wedgewood Ltd. P'ship I v. Township of Liberty*,
    610 F.3d 340 (6th Cir. 2010) ................................................................12

*Wilson v. Williams*,
    961 F.3d 829 (6th Cir. 2020) ................................................................27

## Constitutional Provisions

U.S. Const. art. VI.........................................................................................13

## Statutes

15 U.S.C. § 3001 ...............................................................................15, 21, 22

15 U.S.C. § 3002 ...........................................................................4, 19, 20, 23

15 U.S.C. § 3003 ....................................................................................3, 14

15 U.S.C. § 3004 .........................................................4, 14, 16, 19, 20, 22

15 U.S.C. § 3005 .....................................................................................18

15 U.S.C. § 3006 .................................................................................18, 20

15 U.S.C. § 3007 .....................................................................................20

18 U.S.C. § 1084 .....................................................................................23

31 U.S.C. § 5362 .....................................................................................24

Mich. Comp. Laws § 431.308............................................................................5

Mich. Comp. Laws § 431.317............................................................................5

Pub. L. 106-553.......................................................................................23

## Rules

Fed. R. Civ. P. 56.................................................................................11, 12

## Other Authorities

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) .........................................17

Steve Cady, Betting on Derby Opens Here Today, N.Y. Times  (Apr. 28, 1971)........................22

Steve Cady, OTB Payoff is $59, N.Y. Times (May 2, 1971) .......................................22

## INTRODUCTION

There are no genuine disputes of material fact in this case, with which "[t]he Court is, at this point, intimately familiar."  ECF No. 43, PageID.973.  Facing the imminent shutdown of its Michigan business and the threat of "administrative, civil, and criminal penalties," Plaintiff Churchill Downs Technology Initiatives Company ("TwinSpires") filed a complaint and motion for preliminary injunction against Defendants, the Executive Director of the Michigan Gaming Control Board and the Attorney General.  ECF No. 1; ECF No. 11.  TwinSpires alleged that the Interstate Horseracing Act of 1978 (IHA) barred Defendants' efforts to use Michigan state law to prohibit TwinSpires from accepting interstate pari-mutuel wagers on horse races from Michigan residents.  This Court agreed.  A unanimous panel of the Sixth Circuit agreed, too, finding Defendants "are unlikely to show" this Court "got it wrong."  *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd., et al.*, No. 25-1235, slip op. at 6 (Aug. 1, 2025) ("Sixth Circuit Stay Op.").

With the IHA, "Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers."  ECF No. 19, PageID.460.  The IHA's framework is straightforward:  So long as TwinSpires obtains the consents of a host racetrack, a host state, and the off-track racing commission in the state where interstate wagers are accepted, TwinSpires may offer interstate wagering.  *Id.*  The IHA's "statutory directive[]" means states like Michigan may not impose "supplemental requirements" on TwinSpires.  *Id.* at PageID.460, 465 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)).  But that is exactly what Michigan purported to do with the licensing requirements in Michigan's Horse Racing Law (MHRL).  This Court rightly granted TwinSpires' motion for a preliminary injunction in February, enjoining Defendants "from enforcing [Michigan's] licensing requirement[s]—or issuing sanctions … —

1

against TwinSpires for accepting wagers from individuals in Michigan on races that take place outside Michigan." ECF No. 19, PageID.474; *see also* ECF No. 20.

Since then, the case for equitable relief has only gotten stronger. This Court has twice more reviewed the merits of this case, both times vindicating TwinSpires' IHA arguments. It denied Defendants' motion for a stay of the preliminary injunction, finding once again that "Congress made clear its intention to supersede state powers in the limited area of interstate off-track wagers." ECF No. 36, PageID.949. It denied Defendants' motion to dismiss, reiterating that Defendants' "attempted enforcement" of Michigan's licensing requirements runs contrary to the IHA's exclusive requirements. ECF No. 43, PageID.981. The Sixth Circuit, too, has evaluated the merits and unanimously denied Defendants' request for a stay pending appeal. In doing so, the Sixth Circuit held that Defendants' interpretation of the IHA "is inconsistent with the act's text," and "flatly contradicts the IHA's express intent." Sixth Circuit Stay Op. at 5.

This Court should now grant TwinSpires' motion for summary judgment and permanently enjoin Defendants from enforcing Michigan's challenged licensing requirements against it. "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show … actual success" on the merits. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *accord ACLU of Ky. v. McCreary Cnty., Ky.* (*McCreary II*), 607 F.3d 439, 445 (6th Cir. 2010). As a matter of law, the IHA preempts Michigan's licensing requirements for the reasons this Court and the Sixth Circuit have already identified. ECF No. 19, PageID.467; *accord* Sixth Circuit Stay Op. at 5. And the undisputed facts fully support a permanent injunction. TwinSpires will suffer irreparable harm in the absence of an injunction for which there is no adequate remedy at law. Defendants' enforcement of the licensing requirements is an "unconstitutional intrusion on TwinSpires['] rights to accept certain interstate off-track

wagers under the IHA," which is by definition an irreparable injury.  *See* ECF No. 19, PageID.472;

*see ACLU of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003).

This Court should grant summary judgment in favor of TwinSpires and permanently enjoin

Defendants from enforcing Michigan's unconstitutional licensing requirements.

## STATEMENT OF MATERIAL FACTS

**I.      TwinSpires Accepts Interstate Pari-Mutuel Wagers From Michigan Residents As Authorized By Federal Law.**

Named for the iconic twin spires on the grandstand at Churchill Downs racetrack,

TwinSpires is one of the largest and most successful wagering platforms in the United States.

Ex. A (2024 10-K, TS000773).  TwinSpires has been licensed by the Oregon Racing Commission

since 2007 as a multi-jurisdictional simulcasting and interactive wagering hub.  Through its

Oregon hub, TwinSpires accepts advance deposit wagering from states around the country.  *See id.*

(TS000773, TS000777).  In addition, TwinSpires' platform offers live streaming of horseraces,

replays, and an assortment of horseracing-related information.  *Id.*

Throughout the time it has accepted wagers, TwinSpires has operated pursuant to federal

law, specifically the Interstate Horseracing Act of 1978 (IHA).  With the IHA, Congress created

"one, exclusive procedure by which entities can accept *interstate* off-track wagers," ECF No. 19,

PageID.459 (emphasis added).  It states:  "No person may accept an interstate off-track wager

except as provided in this chapter." 15 U.S.C. § 3003.  The IHA thus provides a "uniform"

procedure for interstate wagering.  ECF No. 19, PageID.452–53.  And operating within the

regulatory framework set out by the IHA, TwinSpires has accepted wagers from Michiganders

since 2010.

The IHA authorizes "off-track betting systems"—those platforms like TwinSpires that

accept wagers at places other than the track where the race is run—to accept interstate pari-mutuel

wagers, so long as the off-track betting system acquires consent from three entities.  15 U.S.C. §§ 3002(7), 3004(a).  Those entities are: (1) the host racing association, the entity that "conducts the horserace subject to the interstate wager," *id.* § 3002(9); (2) the host racing commission, the state entity "with jurisdiction to regulate the conduct of racing within the host State," *id.* § 3002(10); and (3) the off-track racing commission in the "off-track State," the entity "with jurisdiction to regulate off-track betting in" the state in which the "interstate off-track wager is accepted," *id.* § 3002(6), (11).  That is, consent is required from (1) the track where the race is run, (2) the state entity that regulates racing for that track, and (3) the state entity that regulates the off-track betting system that accepts the wagers.  Once those three consents are received, "[a]n interstate off-track wager may be accepted by an off-track betting system."  *Id.* § 3004(a).

The IHA tracks the common law rule that a wager is deemed to occur in the state where the wager is accepted—not the state from which the wager is placed.  *See State ex rel. Reading v. W. Union Tel. Co.*, 57 N.W.2d 537, 539 (Mich. 1953); *see also Att'y Gen. v. PowerPick Club*, 783 N.W.2d 515, 533 (Mich. Ct. App. 2010) (applying traditional rule).  The common-law rule is reflected in the IHA's third consent requirement—"the off-track racing commission" must give consent.  15 U.S.C. § 3004(a)(3).  The "'off-track racing commission' means that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State."  *Id.* § 3002(11).  The reference to "that State" means the "off-track State," which is defined as "the State in which an interstate off-track wager is accepted."  *Id.* § 3002(6); Sixth Circuit Stay Op. at 4.  Thus, consistent with the common law rule, the IHA requires consent from the state in which the wager is accepted, not the state where the wagerer resides or the state from which the wager is placed.

In 2019, Michigan amended its Horse Racing Law to provide that: "Only a race meeting licensee or its contracted licensed third-party facilitator may process, accept, offer, or solicit wagers on the results of live or simulcast horse races as determined and approved by the racing commissioner." Mich. Comp. Laws § 431.317(10). For the first time, Michigan required that out-of-state off-track betting systems—"third-party facilitators" in the words of the statute—obtain a license from Michigan to accept wagers from Michigan residents. To obtain that license, the third-party facilitator "must have a joint contract with all race meeting licensees and certified horsemen's organizations in this state." *Id.* § 431.308(1)(d)(i). In short, Michigan required the third-party facilitator to partner with all the in-state brick-and-mortar racetracks and horsemen's organizations before it could accept wagers from Michigan residents.

TwinSpires has consistently maintained to Michigan regulators that it did not need a state license to accept interstate wagers. *See, e.g.*, Ex. B (2013 Letter, TS001244); Ex. C (2020 Correspondence, Responses to RFP #1 001046); Ex. D (Dec. 31, 2024 Letter, TS001289). Still, to ensure wagering would be offered to Michigan residents without disruption and to support the Michigan horseracing industry, TwinSpires promptly sought an in-state partner when Michigan amended its law. Ex. D (Dec. 31, 2024 Letter, TS001289–90). TwinSpires partnered with the only racetrack remaining in Michigan—Northville Downs—and the certified horsemen's associations. Ex. E (Northville Downs Agreement, TS004040). In exchange for Northville Downs agreeing to serve as TwinSpires' in-state partner, TwinSpires contractually agreed to give Northville Downs a share of all money wagered by Michiganders on the TwinSpires platform. *Id.*

TwinSpires obtained its license from Michigan in 2020 and successfully renewed it through 2024. *See* Ex. F (2020 license); Ex. D (Dec. 31, 2024 Letter, TS001290). Throughout this time, TwinSpires has been the most popular platform for online horseracing wagering in

Michigan.   In  2024,  tens of thousands of Michigan residents were active users of the platform, wagering more than $48.5 million.  *See* Ex. G (2024 MGCB Horse Racing Report, 7).   Michigan residents  have  trusted  their  wagers  with  TwinSpires,  as  the  company  has  consistently outperformed competing betting platforms and earned significant customer goodwill.  *Id.*

## II.       The State Threatens To Shut Down TwinSpires' Lawful Interstate Wagering.

This dispute arose in late 2024 as TwinSpires was anticipating the renewal of its third-party facilitator license.  The Michigan Gaming Control Board advised TwinSpires that so long as TwinSpires submitted its renewal application by the end of November, its "license w[ould] remain active until a decision is made on the 2024 renewal application" and TwinSpires would remain in "good standing" in Michigan.  Ex. H (September 2024 email, TS004166).  TwinSpires accordingly submitted its application on November 26.

Despite the Board's assurances, the Board informed TwinSpires on December 23 that— even though TwinSpires' renewal application was timely filed and pending—TwinSpires must shut down its Michigan operations and stop accepting wagers from Michiganders.  Ex. I (Dec. 23, 2024 Letter, TS004162).  The Board stated that Northville Downs, which was in the process of relocating its racetrack, no longer had a valid race meeting license under Michigan law.  *Id.*  Thus, the Board concluded, because TwinSpires no longer had the necessary licensed in-state partner, "on January 1, 2025 at 12:00am, all account wagering with Michigan account holders must cease."  *Id.*  The Board sent similar shutdown notices to other licensed "third-party facilitators" partnering with Northville Downs.

TwinSpires responded on December 31.  Ex. D (Dec. 31, 2024 Letter, TS001286).  It noted that TwinSpires had submitted the required renewal application on November 26, and therefore, per the Board's prior representations, TwinSpires was "in good standing with" the Board.  *Id.*

(TS001289–90).  In addition, TwinSpires reiterated its long-held position that its continued operations in Michigan remained lawful because it indisputably complies with the IHA in offering interstate, "off-track" wagering to Michiganders.  *Id*.  TwinSpires explained that because the IHA preempted Michigan's licensing requirements, the Board had no authority to order TwinSpires to shut down.  *Id*.

On January 3, 2025, the Board replied.  Ex. J (Jan. 3, 2025 letter, TS001291).  It did not dispute that TwinSpires satisfied the IHA's requirements for offering interstate pari-mutuel wagers on horseraces.  *See id*.  Instead, the Board said that if TwinSpires continued to accept wagers from Michigan residents—as it had at that point done for well over a decade pursuant to the IHA— TwinSpires would be "subjecting [it]self to administrative, civil, and criminal penalties" under Michigan's regulations.  *Id*. (TS001292).

On January 6, the Board again demanded that TwinSpires shut down its pari-mutuel wagering platform in Michigan.  TwinSpires declined to do so.  On January 7, the Board announced that TwinSpires had been "summarily suspended."  Ex. K (Jan. 7, 2025 letter, TS002640).  In the suspension order, the Board made no mention of TwinSpires' uninterrupted compliance with the IHA.

TwinSpires' summary suspension generated significant public attention.  Members of the harness racing community pleaded with the Board to permit wagering to resume.  Ex. L (Responses to RFP 2, Pg. 00000193) ("So many hard-working families rely on racing and the supporting business and industries for their livelihood."); Ex. M (*id.* at Pg. 00000197) (similar); Ex. N (*id.* at Pg. 000000200) (similar); Ex. O (*id.* at Pg. 00000202) (similar); Ex. P (*id.* at Pg. 00000208) (similar).  Likewise, wagering customers, looking for a platform to wager on, complained that "[o]nline horse racing wagering is currently unavailable in Michigan. Please resolve this issue as

it directly impacts me." Ex. Q (Response to RFP 2, Pg. 00000177).  Customers noted that the timing of the shutdown was costly.  Midwinter is the "time of the year" when "horses that will run in the Kentucky [D]erby start" the preliminary races leading up to the big event.  *See* Ex. R (Responses to RFP 2, Pg. 00000134).  But wagerers were missing out.  *Id.*

While TwinSpires' shutdown order was in effect, the Board actively funneled customers away from TwinSpires.  The Board "reinstated Northville Downs's licenses, allowing TwinSpires['] competitors to accept wagers."  ECF No. 19, Page ID.471.  But the Board maintained "its summary suspension of TwinSpires['] license."  *Id.*  So when the Board received inquiries, the Board assured wagerers that they could use other wagering platforms in the state—just not TwinSpires.  *See* Ex. S (Responses to RFP 2, Pg. 00000076) ("As a result, NYRA Bets, FanDuel Racing/TVG, and Xpressbet can resume accepting Advance Deposit Wagering (ADW) in the state of Michigan effective immediately.  However, TwinSpires will not be able to resume ADW operations due to ongoing litigation."); Ex. T (*id.* at Pg. 0000080) (same); Ex. U (*id.* at Pg. 00000096) (same).

## III.    The Court Grants TwinSpires' Motion For A Preliminary Injunction.

On January 12, TwinSpires filed this lawsuit to seek injunctive and declaratory relief because Michigan's licensing requirements are preempted by the IHA and the State's suspension posed a significant threat to TwinSpires' business.[1]

But before this Court had the opportunity to rule on the merits, Defendants proceeded with attempts to shut down TwinSpires' wagering.  First, the Executive Director filed a secret *ex parte* state-law complaint for a TRO in Wayne County Circuit Court as an end-run around the ongoing litigation before this Court.  *See* Compl., *Williams v. Churchill Downs Tech. Initiatives Co.*, Case

---

[1] TwinSpires also brought a claim under the dormant Commerce Clause but that claim has since been dismissed.

No. 25-000787-CZ (Wayne Cnty. Cir. Ct. Jan. 17, 2025); *see also Williams v. Churchill Downs Tech. Initiatives Co.*, Case No. 1:25-cv-173, ECF No. 1-1.  The Attorney General's Office never mentioned this filing to counsel or this Court during the week the parties spent conferring on TwinSpires' lawsuit.  The prosecutors, however, did tell the Wayne County Circuit Court that it was important for that state court to grant the TRO quickly, before this Court could issue an order. *See Williams*, Case No. 1:25-cv-173, ECF No. 1-1, PageID.17–18, ¶¶ 24–25.  TwinSpires immediately removed the case to federal court, but this Court later remanded it back to state court where the litigation is now stayed, by joint stipulation, until resolution of the Executive Director's Sixth Circuit appeal.  *See* Order, *Williams*, Case No. 25-000787-CZ (Wayne Cnty. Cir. Ct. Apr. 13, 2025) (granting stipulated stay).

Second, the Executive Director proceeded with an administrative hearing regarding TwinSpires' alleged violations of the licensing requirements.  *See Mich. Gaming Control Bd. v. Churchill Downs Tech. Initiatives Co.*, No. 25-000627, SDA 2025-1 (Jan. 21, 2025 Hearing).  After that hearing, the hearing officer issued an advisory opinion to the Executive Director (a "proposal for decision"), which recommended to the Executive Director that he revoke TwinSpires' license and deny renewal.  As a matter of state law, the Executive Director has plenary authority to adopt the hearing officer's recommendations and impose these sanctions.  *See Mich. Gaming Control Bd. v. Churchill Downs Tech. Initiatives Co.*, No. 25-000627, SDA-2025-1.

Before the Executive Director issued a final suspension decision, this Court granted TwinSpires' motion for a preliminary injunction.  ECF No. 20.  It preliminarily enjoined "the Executive Director and the Attorney General from enforcing" Michigan's licensing requirements "or issuing sanctions under [Michigan's Horse Racing Law] against TwinSpires for accepting

9

wagers from individuals in Michigan on races that take place outside Michigan." ECF No. 19, PageID.474.

This Court explained that "[t]he IHA provides the exclusive procedure to accept an interstate off-track wager." ECF No. 19, PageID.469. "When a wager is placed in Michigan, but the wager is placed on an out-of-state race, and the wager is accepted out-of-state, TwinSpires does not need [Michigan's] consent." *Id*. This Court found that "Congress established an exclusive, uniform process through which off-track betting systems could accept interstate off-track wagers" and "[t]he IHA prohibits states from adding supplemental requirements." *Id*. at PageID.460. "By establishing this complete, exclusive regulatory structure, Congress occupied the field of regulating interstate off-track wagering" and Michigan's licensing requirements were therefore preempted. *Id*. at PageID.465.

The Court also found that TwinSpires "face[d] a concrete and imminent threat of state action forcing it to cease operations in Michigan," posing "an unconstitutional intrusion on TwinSpires['] rights." ECF No. 19, PageID.472. And TwinSpires demonstrated it would lose "customer goodwill and its competitive market share" if Defendants were able to shut down TwinSpires in Michigan. *Id.* By "forcing TwinSpires to cease operations in Michigan," TwinSpires would "continue to lose its competitive place in the Michigan pari-mutuel wagering sector"—a harm "exacerbated" by the fact Defendants permitted TwinSpires' competitors to accept wagers. *Id.* at PageID.471. And as to the remaining public interest factor, here too the Court concluded that "the balance weighs in TwinSpires['] favor." *Id.* at PageID.472.

## IV.    The Preliminary Injunction Remains In Effect.

Defendants appealed this Court's preliminary injunction decision, ECF No. 23, and belatedly sought a stay, ECF No. 31, which this Court denied, ECF No. 36. In its denial, the Court

noted that it "ha[d] already determined that Defendants are unlikely to succeed on the merits" of their preemption argument because "the IHA establishes the exclusive regulatory framework for the limited area of interstate off-track wagers on horse races."  ECF No. 36, PageID.941–42.  For that reason, "the MHRL cannot supplement or supplant" federal law.  *Id.* at PageID.942.  The Court later denied Defendants' motion to dismiss in an opinion that, once again, rejected Defendants' MHRL arguments.  *See* ECF No. 43, PageID.981.  Here, too, the Court made clear that Defendants' "attempted enforcement of the [licensing requirement] is akin to adding an additional consent requirement, one that runs contrary to the IHA's exclusive requirements."  *Id.* (citation omitted).

Defendants then sought a stay in the Sixth Circuit.  *See* App. ECF No. 24.  A unanimous Sixth Circuit panel likewise denied that request.  *See* Sixth Circuit Stay Op.  It held that Defendants' interpretation of the IHA—which would leave room for state regulation of interstate wagers—is "inconsistent with the act's text" and "with the act's stated goals."  *Id.* at 5–6.  The Court of Appeals then held that Defendants were "unlikely to show" that this Court's preemption holding was "wrong."  *Id.* at 6.  And it agreed that precluding TwinSpires from offering interstate wagers to Michiganders "threaten[ed] TwinSpires' goodwill and competitive position," so a stay of this Court's grant of TwinSpires' motion for preliminary injunction was inappropriate.  *Id.* at 7.

Briefing for Defendants' appeal of this Court's preliminary injunction decision on the merits is complete, and the Sixth Circuit is set to hear argument on October 23, 2025.  *See* App. ECF No. 41.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "ultimate question is whether the evidence presents a sufficient factual disagreement to require

submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *McKerchie v. Wrigglesworth*, 2025 WL 2673389, at *2 (W.D. Mich. Sept. 18, 2025) (quoting *Harden v. Hillman*, 993 F.3d 465, 474 (6th Cir. 2021)).

In addition to demonstrating success on the merits of its legal claim, a party seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

And when a district court "properly grant[s] summary judgment," it may likewise grant a "permanent injunction" without an evidentiary hearing. *Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010) (citation omitted); *United States v. Miami Univ.*, 294 F.3d 797, 815 (6th Cir. 2002) (same); *see also Jobete Music Co., Inc v. Johnson Commc'ns, Inc.*, 285 F. Supp. 2d 1077, 1092 (S.D. Ohio 2003) (same).

## ARGUMENT

As this Court recognized before, "there are no material facts in dispute, and the primary issues are questions of law." ECF No. 19, PageID.463–64. TwinSpires is "entitled to judgment as a matter of law" because Michigan's licensing requirements are federally preempted as both this Court and a panel of the Sixth Circuit have recognized. Fed. R. Civ. P. 56(a). The resulting irreparable injury to TwinSpires can only be fully remedied by a permanent injunction.

## I.    The IHA Preempts Michigan's Licensing Requirements.

The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the

supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  "Accordingly, it has long been settled that state laws that conflict with" or otherwise interfere with federal law, *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013), are "without effect," *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  Even when a federal statute lacks an express preemption clause, it displaces a conflicting state statute.   *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011) ("The Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress.").

Federal law impliedly preempts state law in two circumstances—when federal law occupies the relevant field, and when federal law and state law conflict.  Field and conflict preemption are not "rigidly distinct." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (citation omitted).  Here, the IHA—whether considered as a matter of field or conflict preemption—supersedes Michigan's conflicting licensing requirements.

**A.    The IHA Preempts The Field Of Interstate Off-Track Wagering On Horseraces.**

By enacting the IHA, Congress occupied the field of interstate off-track wagering on horseraces.  If "Congress, acting within its proper authority, has determined" that an area "must be regulated by its exclusive governance," federal law preempts any state law in that area.  *Arizona*, 567 U.S. at 399.  In such cases, the "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," or Congress otherwise established that it considered the federal interest "so dominant" as to "preclude enforcement of state laws on the same subject."  *Id.* (cleaned up); *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 641 (2012).

The beginning of any field preemption analysis is the text of the federal statute.  *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).  As this Court has correctly found, the IHA's plain language establishes that "Congress occupied the field of regulating interstate off-

track wagering." ECF No. 19, PageID.465.  The IHA provides a "comprehensive" "statutory framework" for such wagering.  *Arizona*, 567 U.S. at 401.  It expressly prohibits any person from "accept[ing] . . . interstate off-track wager[s] except as provided in this chapter."  15 U.S.C. § 3003. And it then provides that interstate off-track wagers "may be accepted by an off-track betting system *only if* consent is obtained" from three entities: (1) the racetrack hosting the race, (2) the state racing authority governing the race, and (3) the offtrack betting regulator in the state where the wager is accepted. 15 U.S.C. § 3004(a) (emphasis added).

"Th[at] plain language of [the IHA] makes clear that the IHA exclusively regulates interstate wagering."  ECF No. 19, PageID.466 (quotation marks omitted).  As the Supreme Court explained in *Arizona*, when a federal statute "provide[s] a full set of standards" sufficient to "govern[]" a field, that "reflect[s] a congressional decision" to preempt state law—even without including an express preemption provision.  *Arizona*, 567 U.S. at 401; *see also Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2017) ("[W]e do not require Congress to employ a particular linguistic formulation when preempting state law.").  In other words, the IHA alone establishes the "absolute condition precedent to off-track wagering across state lines."  *Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n, Inc.*, 989 F.2d 1266, 1270 –71 (1st Cir. 1993).  By setting out the "only" means for accepting interstate wagers (as Congress otherwise banned them, 15 U.S.C. § 3003), Congress "foreclose[d] any state regulation in th[is] area, even if it is parallel to federal standards."  *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (quoting *Arizona*, 567 U.S. at 401).  After all, "[i]f states could add additional consent requirements, it would defeat Congress's pronounced purpose to 'prevent interference by one State with the gambling policies of another'" because it would allow states to "regulate wagers on races" that Congress "already

14

committed to the regulation of other states."  ECF No. 19, PageID.460 (quoting 15 U.S.C. § 3001(a)); Sixth Circuit Stay Op. at 5.

There can be no doubt as to the preemptive "field" Congress "ousted the States from regulating." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).  Congress defined that field in the IHA itself:  "[I]n the limited area of interstate off-track wagering on horseraces, there is a need for Federal action."  15 U.S.C. § 3001(a)(3).  In this "limited" field, Congress made the considered judgment that the consent of the three specified entities—two state authorities and one private association—would be both necessary and sufficient for wagering to occur.  This is the approval process Congress designed "to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers."  *Id.*  Allowing the states a free hand to regulate in this field would destroy the carefully designed federal scheme.  *See* Sixth Circuit Stay Op. at 5.

The Court's prior conclusion that the IHA's plain language preempts that limited field of interstate horserace wagering mirrors the court's decision in *Horsemen's Benevolent & Protective Ass'n, Inc. v. Zonak*, 2008 WL 11453695 (S.D. Ohio Sept. 23, 2008).  There, the court concluded that "the IHA provisions that govern the procurement of consent from necessary parties [for interstate wagering] leave no room for supplementation by the state," and it is "clear that Congress intended to occupy the entire field of interstate horserace wagering."  *Id*. at *5.  (The Sixth Circuit later affirmed on the alternative (and related) ground of conflict preemption.  *See Horseman's Benevolent & Protective Ass'n v. DeWine*, 666 F.3d 997 (6th Cir. 2012).)

Because the IHA occupies the field of interstate off-track wagering on horseraces such that it preempts state regulations in that field, Michigan's licensing requirements—which provide that a wagering platform cannot accept interstate off-track wagers on horseraces unless the platform

partners with Michigan racetracks and horsemen's associations and obtains a license from the Michigan Gaming Control Board—are preempted.

## B.     Michigan's Licensing Requirements Are Also Preempted Because They Conflict With The IHA.

As the Sixth Circuit explained in denying Defendants' motion for a stay pending appeal, the IHA preempts Michigan's licensing requirements for an additional reason:  Michigan's requirements conflict with federal law.  *See* Sixth Circuit Stay Op. at 5–7.

"When a state law runs up against federal law, federal law comes first."  Sixth Circuit Stay Op. at 5.  A state law that "imposes restrictions that conflict with the federal law" is therefore preempted.  *Murphy*, 584 U.S. at 477.  Likewise, "federal law pre-empts state-law" when the "two are in logical contradiction."  *Garcia*, 589 U.S. at 214 (Thomas, J., concurring) (citation omitted); *see also CTIA - The Wireless Ass'n v. Kentucky 911 Servs. Bd.*, 727 F. Supp. 3d 641, 654 (E.D. Ky. 2024) (applying logical contradiction test).  And federal law preempts state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, or "interferes with the methods by which the federal statute was designed to reach [its] goal," *Verizon N. Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) (quotation marks omitted).

In *Horseman's Benevolent*, 666 F.3d at 1001, the Sixth Circuit held that federal law preempted an Ohio statute because it conflicted with the IHA.  The statute "allow[ed] a host racing association to consent to interstate off-track betting in the absence of a written agreement with the horsemen's group."  *Id.* at 1000.  Although the IHA provides that the host racing association's consent may only be given if it has "a written agreement with the horsemen's group," 15 U.S.C. § 3004(a), Ohio sought to superimpose its own law modifying the IHA's consent requirements.

16

The Sixth Circuit noted that the Ohio statute provided for "consent to off-track wagering through a different process," holding that "Federal law preempts this alternative path."  666 F.3d at 1001.

The same is true here.  As in *Horseman's Benevolent*, Michigan's statute conflicts with the IHA because it purports to establish an "alternative path" for obtaining the requisite consents to accept interstate wagers.

*First*, Michigan's licensing requirements are in logical contradiction to the IHA because they would impose a fourth consent requirement on platforms seeking to offer interstate pari-mutuel wagering on horseracing.  The IHA says, "Once you have obtained the three consents, you may accept interstate wagers."  Michigan says, "Once you have obtained the three consents, you may not accept interstate wagers.  You need to obtain our consent too."  These two schemes are logically contradictory; a fourth consent is "not the system Congress created."  *Arizona*, 567 U.S. at 408; *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 n.107 (2000) ("additional [state] condition[s]" must give way when "federally recognized conditions" are exclusive).

*Second*, Michigan's licensing requirements stand as an obstacle to the IHA's purpose and objective.  *See* Sixth Circuit Stay Op. at 5.  Congress intended to set the rules under which off-track betting systems could accept interstate wagers, and it designed a process in which two states (the state where the wager is accepted and the state that hosts the horserace) have a say.  The congressional purpose of confining regulatory authority to these two states is frustrated if a third state (the state from which the wager is placed or the state where the wagerer resides)—*i.e.*, a state that Congress *declined* to give a say in the process—is permitted to interfere and prohibit the wager.  Consistent with the common law, the IHA focuses on the place a wager is accepted—in this case, in Oregon, where TwinSpires' multijurisdictional hub is located and licensed—not the state from

which the wager was placed.  *See* Sixth Circuit Stay Op. at 4 ("The IHA consistently defines 'off-track' conduct in relation to the location of the wager's acceptance.").

*Third*, Michigan's licensing requirements "interfere[] with the methods by which the [IHA] was designed to reach [its] goal."  *Verizon N. Inc.*, 309 F.3d at 940 (quotation marks omitted).  There can be no serious dispute that Michigan's licensing requirements interfere with the IHA's method of authorizing interstate wagering.  The requirements purport to render the IHA's method *insufficient* for a platform to accept interstate wagers.  A platform that has obtained the three IHA consents would not be able to offer or accept interstate wagers in Michigan until it has contracted with in-state partners and obtained a Michigan license.  That is clear and indisputable "interfere[nce]."  *Id*.  And to permit it would "skew[] the careful balance struck by Congress when it passed the federal statute."  Sixth Circuit Stay Op. at 5.

The IHA provisions giving a cause of action to sue for IHA violations further illustrate the conflict between the IHA and Michigan's licensing requirements.  Congress provided that the "host State"—i.e., the state where the horserace is run—could "commence a civil action against any person" who "accept[s] any interstate off-track wager in violation of" the IHA.  15 U.S.C. §§ 3005, 3006(a).  Congress also gave the host racing association and the relevant horsemen's group a cause of action.  *Id*.  But Congress did *not* give the state where the wagerer resides, or the state from which the wager was placed, a cause of action.  This was deliberate, as "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."  *Mik v. Fed. Home Mortg. Corp.*, 743 F.3d 149, 160 (6th Cir. 2014) (quotation marks omitted).  If Congress contemplated that the wagerer's home state had a say in approving the wager, it would have given *that* state a cause of action under the IHA.  But it did not.

18

In short, because Michigan's licensing requirements conflict with the IHA's statutory scheme, they are preempted.

## C.    Defendants' Arguments Are Meritless.

To defend Michigan's licensing requirements, Defendants have relied on a misreading of the IHA over the course of this litigation.  It is not persuasive.

### 1.    The IHA Does Not Contain A Hidden Fourth Consent Requirement.

Defendants' main argument is that Congress secretly embedded a *fourth* consent requirement—consent from the state where the wager is placed—within a subclause of the definition of "interstate off-track wager" in the IHA.

The IHA defines an "interstate off-track wager" as:

> a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes parimutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools.

15 U.S.C. § 3002(3).  Defendants have claimed that the phrase "lawful in each state involved" refers to the host track state, the off-track state—*and* the state from which the wager is placed.

But Defendants' "interpretation is inconsistent with the act's text."  Sixth Circuit Stay Op. at 5.  To begin, Defendants' reading is not plausible because Congress would not have enacted a fourth consent requirement in such a vague way.  It is a canon of statutory construction that Congress does not "alter[] fundamental details of a regulatory scheme in vague terms or ancillary provisions."  *Sackett v. EPA*, 598 U.S. 651, 677 (2023).  If Congress wanted to add a fourth consent requirement, it would simply have included the requirement alongside the existing three consent requirements in section 3004.  It would not have done so in such an obscure and elliptical manner,

especially in a statute specifying the precise steps a wagering platform must take to ensure compliance with federal law.

The correct, common-sense reading of "lawful in each state involved" is that it refers to the states listed as "involved" in providing the requisite consents under section 3004—that is, the state where the wager is accepted and the state where the horserace is conducted.  The IHA does not require the consent of the state from which the wager was placed, so that state is not "involved" within the meaning of section 3002(3).  *See Pulsifer v. United States*, 601 U.S. 124, 132 (2024) (courts must "review[] text in context").  The state from which the wager is placed is not in the definitional provisions of "host state" or "off-track state," § 3002; it is not in the enforcement provision, § 3006(a); and it is not in the venue provision, § 3007(b).  All these provisions specify the rights and roles of the states "involved" in the consent process, but Congress nowhere "involved" the state from which the wager is placed.  Instead, "[t]he IHA consistently defines 'off-track' conduct in relation to the location of the wager's *acceptance*."  Sixth Circuit Stay Op. at 4 (emphasis added).

Congress "is understood to legislate against a background of common-law . . . principles," *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) (quotation marks omitted), and its approach in the IHA is consistent with the common-law rule that wagers are deemed made in the state in which they are accepted—not the state from which they were placed.  *See United States v. Truesdale*, 152 F.3d 443, 447 (5th Cir. 1998).  As the Michigan Supreme Court has explained, "an offer to bet" in Michigan that is "accepted" in New York "takes effect" in New York, not Michigan.  *Reading*, 57 N.W.2d at 539.  The IHA retains the substance of that common law rule by giving the state in which the wager is accepted—but not the state from which the wager is placed—the prerogative to consent.

A contrary interpretation, the Sixth Circuit has already explained, would be "inconsistent with the [IHA's] stated goals."  Sixth Circuit Stay Op. at 6.  Defendants' interpretation—permitting wagers "only when the wagers placed are already entirely lawful under the laws of the state in which they are placed"—would unduly limit the IHA's reach.  *Id.*  It would "allow Michigan to regulate wagers on races already committed to the regulation of other states," namely the off-track state and the host state.  *Id.* at 5.  And instead of "prevent[ing] interference by one State with the gambling policies of another," the IHA would seemingly approve it by enabling otherwise uninvolved states to impose barriers to interstate parimutuel wagering.  *Id*.  This Court, like the Sixth Circuit, should again reject such a "flatly contradict[ory]" result.  *Id.*

This Court has previously construed the "lawful in each state involved" language as meaning that the type of wager—i.e., a pari-mutuel wager placed on a horse race—must be lawful in the state from which the wager is placed.  ECF No. 19, PageID.454–56.  Under this reading, too, the outcome in this case is the same because pari-mutuel wagers on horseraces are lawful in Michigan.  *Id.*  As the Sixth Circuit has recognized, this Court's "interpretation protects the act's interstate/intrastate balance by letting states determine whether to allow their residents to place parimutuel wagers but prohibiting states that so allow from interfering when those wagers are accepted out of state."  Sixth Circuit Stay Op. at 6.

## 2.    The IHA Respects And Preserves State Authority.

Defendants have repeatedly argued, as well, that interpreting the IHA to preempt Michigan's licensing requirements gives insufficient weight to its interest in regulating gambling. But the IHA respects the right of states to regulate *intra*state gambling—that is, gambling that occurs entirely within the state's borders.  *See* 15 U.S.C. § 3001(a)(1) ("the States should have the primary responsibility … within their borders").  And for that reason, TwinSpires does not seek

21

and this Court did not grant injunctive relief for wagering on races occurring within Michigan's borders. *See* ECF No. 11; ECF No. 20. As to *inter*state gambling, Congress likewise respected state authority, but it made a different decision. Congress granted a consent to the state in which the wager was accepted, as well as to the state in which the horserace was conducted. *See* 15 U.S.C. § 3004. Although Michigan believes a *third* state—the state from which the interstate wager was placed—should also be given a consent right, that is again not the scheme Congress designed.

It makes no difference that courts have recognized a presumption against preemption in areas traditionally governed by state law. A presumption cannot override the IHA's statutory text. *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) ("that presumption can be overcome where, as here, Congress has made clear its desire for pre-emption."). As this Court put it, Congress "explicitly establish[ed], in a clear and manifest manner, that the IHA's regulatory scheme supersedes state powers in the limited area of interstate off-track wagers." ECF. No. 36, PageID.942. Moreover, the "limited area of interstate off-track wagering on horseraces" that the IHA governs is not a field traditionally occupied by the states. 15 U.S.C. § 3001(a)(3). To the contrary, when Congress enacted the IHA in 1978, interstate off- track wagering on horseraces was *new*—it began in 1971 with a New York track offering wagers on the Kentucky Derby. *See* Steve Cady, Betting on Derby Opens Here Today, N.Y. Times (Apr. 28, 1971), at 53; Steve Cady, OTB Payoff is $59, N.Y. Times (May 2, 1971), at S1.

Congress has been active in the field of interstate wagering on horseraces from the very start, precisely because of all the questions that arose in the absence of federal intervention. Regulating gambling that occurred entirely within a single state at a brick-and-mortar racetrack was one thing. But regulating interstate gambling where wagers flow electronically across state

lines was quite different.  Which state or states should have a say in the process?  The state from which the wagerer places his bet?  The state where the wager is accepted?  The state where the horserace is held?  Should the group that hosts the horserace have a say?  What if the wager was allowed in one state but prohibited in another?  The IHA answered all of these questions; from the beginning it has been Congress that set the terms by which states can and cannot regulate interstate parimutuel wagering.  *See United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n assumption of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." (cleaned up)).

### 3.    The IHA Does Not Conflict With The Wire Act And UIGEA.

Finally, Defendants have claimed that interpreting the IHA to preempt Michigan's licensing requirements would conflict with two other federal laws, the Wire Act and the Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA).  Neither poses a conflict.

As to the Wire Act, Congress amended the IHA in 2000 and, in doing so, put beyond doubt that interstate pari-mutuel wagering on horseracing is lawful, so long as the necessary consents are obtained.  *See* Pub. L. 106-553.  The Wire Act prohibits those "engaged in the business of betting or wagering" from "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers . . . on any sporting event or contest."  18 U.S.C. § 1084(a).  Prior to the 2000 amendments, there was some question over the scope of the Wire Act with respect to interstate parimutuel wagers.  The amendment to the IHA adopted by Congress in 2000 resolved any such questions:  Transmitting such wagers, and information enabling the wagers to be placed, is not prohibited by the Wire Act.  *See* 15 U.S.C. § 3002(3).  Moreover, if there were a conflict between the two statutes, the IHA's more specific provisions governing interstate pari-mutuel wagers on horse races would control over the Wire Act's more general proscription.  *See*

23

*United States v. Hunter*, 12 F.4th 555, 567 (6th Cir. 2021) ("the specific provision is construed as an exception to the general one" (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)); *accord Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

As to UIGEA, that statute provides that its prohibition on "'unlawful internet gambling' shall not include any activity that is allowed under" the IHA. 31 U.S.C. § 5362(10)(D)(i). By its own terms then, UIGEA does not present any conflict. If anything, it confirms this Court's interpretation of the IHA. In UIGEA, Congress defined "unlawful Internet gambling" to include wagers made unlawful "under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). But Congress did not include such a provision in the IHA. UIGEA thus demonstrates that if Congress wanted to prohibit interstate pari-mutuel wagers that are unlawful in the state from which the wager is placed or initiated, it knew how to do so. The Court rightly vindicated that choice in granting TwinSpires' motion for a preliminary injunction and it should do so again.

## II.    TwinSpires Faces Irreparable Harm Without Injunctive Relief.

A permanent injunction is appropriate when a party demonstrates "continuing irreparable injury for which there is no adequate remedy at law." *See McCreary II*, 607 F.3d at 445 (quotation marks omitted). It is well-established that "a constitutional violation establishes irreparable injury." *Foresight Coal Sales LLC v. Chandler*, 750 F. Supp. 3d 795, 804 (E.D. Ky. 2024) (citing *ACLU*, 354 F.3d at 445). That is the case here, and the end of the inquiry. Michigan's licensing requirements are unconstitutional because they violate the Supremacy Clause's clear instruction that "federal law comes first." Sixth Circuit Stay Op. at 5. Defendants' continued enforcement of

these requirements would be "an unconstitutional intrusion" upon TwinSpires, imposing the kind of irreparable injury that only a permanent injunction can fully remedy.  ECF No. 19 at PageID.472; *accord McCreary II*, 607 F.3d at 445.

In granting TwinSpires' motion for a preliminary injunction, this Court also recognized the significant real-world injuries that continued enforcement of the unconstitutional licensing requirements would inflict on TwinSpires.  TwinSpires faced "lost customer goodwill" and "competitive market share" from Defendants' "concrete and imminent threat" of enforcement. ECF No. 19, PageID.472.

"[T]here is no adequate remedy at law," such as "[m]oney damages," for these harms TwinSpires will suffer absent a permanent injunction.  *United States v. Production Plated Plastics, Inc.*, 762 F. Supp. 722, 730 (W.D. Mich. 1991); *accord Foresight Coal Sales LLC*, 750 F. Supp. 3d at 804.  A shutdown order based on unconstitutional licensing requirements would lead to millions of dollars in lost revenue.  But TwinSpires would never be able to recover damages for that lost revenue because the State of Michigan is immune from money damages.  *See Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *cf. Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023) ("[E]conomic injuries caused by federal agency action are generally unrecoverable because the APA does not waive sovereign immunity for damages claims."); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014).

The record demonstrates, too, the very real threat to customer goodwill and competitive position that TwinSpires would face if Defendants enforce Michigan's licensing requirements.  In the wake of the Board's online wagering shutdown in January 2025, wagering customers flooded

the Board with requests to restart wagering within the state.  Ex. Q (Responses to RFP 2, Pg. 00000177); Ex. R (*id.* at Pg. 00000134).  Concerned customers noted the timing of the January shutdown—the "time of the year" to make deposits for races leading up to the "Kentucky [D]erby." Ex. R (Responses to RFP 2, Page 00000134).  Yet once the Board allowed "NYRA Bets, FanDuel Racing/TVG, and Xpressbet" to resume wagering, the Board encouraged wagerers to place bets on *those* platforms while actively steering customers away from "TwinSpires."  *E.g.*, Ex. S (Responses to RFP 2, Pg. 00000076); Ex. T (*id.* at Pg. 00000080); Ex. U (*id.* at Pg. 00000096). Specifically, before this Court's preliminary injunction, MGCB told concerned customers that "TwinSpires will not be able to resume ADW operations due to ongoing litigation."  Ex. S (Responses to RFP 2, Pg. 00000076); Ex. T (*id.* at Pg. 00000080); Ex. U (*id.* at Pg. 00000096). Defendants' own communications to the public thus ensured the shutdown would injure TwinSpires' competitive standing and customer goodwill.  These are irreparable injuries, which TwinSpires "stands to face" again without permanent injunctive relief.  ECF No. 36, PageID.954; *accord Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).

Far from disclaiming their intention to shut down TwinSpires, Defendants' actions in this litigation reaffirm they impose these very same irreparable injuries again without an injunction. Defendants will pursue, as well, "administrative, civil, and criminal penalties" if TwinSpires continues to offer wagering to Michigan consumers under the IHA.  Ex. J (Jan. 3, 2025 Letter, TS001292).  As Defendants explained in their stay briefing in the Sixth Circuit, Defendants view "the district court's ruling" as "allow[ing] otherwise illegal wagers to be placed from within Michigan."  App. ECF No. 24 at 12.  Defendants have only repeated on appeal that this Court's preliminary injunction "preclude[s]" them "from furthering the[ir] interests" and "infringes on"

state authority "to regulate . . . within its borders." *Id.* at 15. And they have maintained that they need to "regulate and maintain jurisdiction over parimutuel wagering on horseracing in Michigan to protect the public health, safety, and welfare of its residents and to ensure that wagering on the results of horseraces is properly regulated in strict adherence to Michigan law." *Id.* at 17. Indeed, before this Court issued a preliminary injunction, Defendants sought an *ex parte* temporary restraining order in state court to compel TwinSpires to shut down.

This Court's preliminary injunction has been holding these extraordinary threats to TwinSpires temporarily at bay. *See* Sixth Circuit Stay Op. at 7 (noting that absent an injunction TwinSpires faces a threat to its "goodwill and competitive position"). Without permanent relief, Defendants will pursue enforcement of the licensing requirements once more, inevitably imposing these irreparable injuries again.

## III.   The Remaining Factors Support A Permanent Injunction.

The two remaining permanent injunction factors—whether issuing the injunction would harm others and where the public interest lies—"merge when the government is the opposing party." *Allstates Refractory Contractors, LLC v. Walsh*, 625 F. Supp. 3d 676, 681 (N.D. Ohio 2022) (quoting *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020)); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 958 (S.D. Ohio 2025) (same).

These factors likewise decisively weigh in favor of issuing a permanent injunction. *See* ECF No. 19, PageID.472–73; Sixth Circuit Stay Op. at 7. As the Sixth Circuit recognized, Defendants have shown no "serious questions going to the merits," so they cannot claim to be harmed by an injunction prohibiting their unconstitutional licensing requirements. Sixth Circuit Stay Op. at 7; *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822

F.2d 1390, 1400 (6th Cir. 1987) (government has no "valid" interest in enforcing unconstitutional laws).

Along the same lines, an injunction would serve the public interest.  "At bottom, the public interest lies in a correct application of the law."  ECF No. 19, PageID.472 (cleaned up).  This is an "essential interest" that may be vindicated by equitable relief.  ECF No. 36, PageID.954.  Moreover, it is "entirely appropriate" for a court to find it in the public interest to permit a "successful" business operation "to continue performing [its] trade."  *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002).  A permanent injunction here would halt Michigan's disregard of the Supremacy Clause, further Congress's goals of ensuring consistency in the rules that govern interstate parimutuel wagering, and ensure TwinSpires' lawful business may continue consistent with federal law.  *See id.*; *see also* Sixth Circuit Stay Op. at 7 ("the public is served by enforcing Congress's efforts to exercise its exclusive authority where permitted").

## CONCLUSION

For these reasons, this Court should grant Plaintiff's motion for summary judgment.


October 14, 2025                                        Respectfully submitted,



                                                    /s/ *Derek J. Linkous*
                                                    Patrick G. Seyferth (P47575)
                                                    Derek J. Linkous (P82268)
                                                    **BUSH SEYFERTH PLLC**
                                                    100 West Big Beaver, Suite 400
                                                    Troy, MI 48084
                                                    (248) 822-7800
                                                    seyferth@bsplaw.com
                                                    linkous@bsplaw.com

Thomas H. Dupree, Jr.
John W. Tienken
**GIBSON, DUNN & CRUTCHER LLP**
1700 M St N.W.
Washington, DC 20036
202-955-8500
TDupree@gibsondunn.com
JTienken@gibsondunn.com

Christine Demana
**GIBSON, DUNN & CRUTCHER LLP**
2001 Ross Ave., Ste. 2100
Dallas, TX  75201
214-698-3246
CDemana@gibsondunn.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Civil Rule 7.3(b), because it contains 8,647 words, excluding the portions of the brief exempted from the word count under Local Civil Rule 7.3(B)(i).  The word count was generated using Microsoft Word 2016.

*/s/ Derek J. Linkous*
Patrick G. Seyferth (P47575)
Derek J. Linkous (P82268)
**BUSH SEYFERTH PLLC**
100 West Big Beaver, Suite 400
Troy, MI 48084
(248) 822-7800
seyferth@bsplaw.com